ACCEPTED
15-24-00132-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
5/21/2025 4:41 PM
CHRISTOPHER A. PRINE
CLERK

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
5/21/2025 4:41 PM
CHRISTOPHER A. PRINE
Clerk

**No. 15-24-00132-CV**

## IN THE COURT OF APPEALS FOR THE
## FIFTEENTH JUDICIAL DISTRICT OF TEXAS

AIRW 2017-7, L.P.; 600 WESTINGHOUSE INVESTMENTS, LLC; 800 WESTINGHOUSE INVESTMENTS, LLC; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; AND JONAH WATER SPECIAL UTILITY DISTRICT,

*Appellants,*

*v.*

CITY OF GEORGETOWN,

*Appellee.*

## BRIEF OF APPELLANT
## TEXAS COMMISSION ON ENVIRONMENTAL QUALITY

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

AUSTIN KINGHORN
Deputy Attorney General for Civil Litigation

AARON L. NIELSON
Solicitor General

WILLIAM F. COLE
Principal Deputy Solicitor General

KELLIE E. BILLINGS-RAY
Chief, Environmental Protection Division

SARA J. FERRIS
Assistant Attorney General
State Bar No. 50511915
Sara.Ferris@oag.texas.gov

Office of the Attorney General
Environmental Protection Division
P.O. Box 12548, MC-066
Austin, Texas 78711-2548
(512) 463-2012 | Fax: (512) 320-0911

COUNSEL FOR THE TEXAS COMMISSION ON ENVIRONMENTAL QUALITY

**Oral Argument Requested**

## IDENTITY OF PARTIES AND COUNSEL

**Party**

Texas Commission on
Environmental Quality

**Counsel**

Aaron L. Nielson
Solicitor General

William F. Cole
Principal Deputy Solicitor General

Kellie E. Billings-Ray
Chief, Environmental Protection Division

Sara J. Ferris
Assistant Attorney General
Sara.Ferris@oag.texas.gov

OFFICE OF THE ATTORNEY
GENERAL OF TEXAS
Environmental Protection Division
P.O. Box 12548, MC-066
Austin, Texas 78711-2548
(512) 463-2012 | Fax: (512) 320-0911

## IDENTITY OF PARTIES AND COUNSEL
### (*continued*)

| Party | Counsel |
|---|---|
| City of Georgetown, TX | William A. Faulk, III<br>cfaulk@spencerfane.com<br><br>Carlota Hopkins-Baul<br>chbaul@spencerfane.com<br><br>Maris M. Chambers<br>mchambers@spencerfane.com<br><br>SPENCER FANE, LLP<br>816 Congress Ave., Suite 1200<br>Austin, TX 78701<br><br>Patricia Erlinger Carls<br>tcarls@tcarlslaw.com<br><br>LAW OFFICE OF PATRICIA<br>ERLINGER CARLS<br>3100 Glenview Ave.<br>Austin, TX 78703 |

| Jonah Water | John J. Carlton |
| Special District | john@carltonlawaustin.com |

Kelli A. N. Carlton
kelli@carltonlawaustin.com

Erin R. Selvera
erin@carltonlawaustin.com

Michael Parsons
michael@carltonlawaustin.com

THE CARLTON LAW FIRM, PLLC
4301 Westbank Dr., Suite B130
Austin, TX 78746-6568

| AIRW 2017-7, L.P., | William T. Thompson |
| 600 Westinghouse | will@lkcfirm.com |
| Investments, LLC, | |
| and 800 Westinghouse | Todd Disher |
| Investments, LLC | todd@lkcfirm.com |

LEHOTSKY KELLER COHN, LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701

Helen S. Gilbert
hgilbert@bartonbensonjones.com

BARTON BENSON JONES, PLLC
7000 N. MoPac Expwy, Suite 200
Austin, TX 78731

Edmond McCarthy
Ed@ermlawfirm.com

MCCARTHY & MCCARTHY, LLP
1122 Colorado St., Suite 2399
Austin, TX 78701

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL.................................................ii

TABLE OF CONTENTS .......................................................................v

INDEX OF AUTHORITIES................................................................viii

RECORD REFERENCES ...................................................................xii

STATEMENT OF THE CASE ..........................................................xiii

STATEMENT REGARDING ORAL ARGUMENT .............................xiv

ISSUES PRESENTED ......................................................................xv

STATEMENT OF FACTS...................................................................2

I.  Regulatory Background: TPDES Permitting and
    Water Quality in Texas.......................................................... 4

    A.  TCEQ Administers the EPA-approved TPDES
        Program in Texas. ..........................................................5

    B.  Texas regionalization policy is incorporated in
        the TPDES permitting process. ......................................7

    C.  The Commission's TPDES permitting includes
        an application review process designed to
        ensure compliance with the Water Code, Water
        Quality Standards, and State policy. ..............................10

II. Factual Background: AIRW applied for a new
    TPDES permit which was granted by the
    Commission after a contested-case hearing. ............................13

STANDARD OF REVIEW....................................................................17

    Statutory Construction .........................................................19

SUMMARY OF THE ARGUMENT .......................................................21

ARGUMENT AND AUTHORITIES ....................................................23

I.  The district court erred in reversing the Commission's Order, which properly applied Texas regionalization policy and controlling law. ...................................23

    A.  The Commission properly considered and applied its regionalization policy. .......................................23

    B.  Substantial evidence demonstrates the City declined to provide service. ................................................27

    C.  No formal denial from the city council is required for the Commission to determine that the permit is needed and complies with regionalization policy. .......................................31

    D.  The Commission's findings on costs, including consideration of economic costs, are consistent with regionalization policy and supported by record evidence. ................................................33

    E.  The district court improperly imposed a novel legal standard not provided by statute or Commission rule. ................................................35

    F.  The district court overlooked other Commission findings related to availability and regionalization, and substantial evidence indicates the City could not provide service even if it had agreed to do so. ..............................................38

II. The remainder of the order is supported by substantial evidence and was issued in accordance with applicable law and policy. ..................................................40

    A.  The statutory prima facie demonstration supports the Commission's Order granting the permit. ..............................................41

    B.  Testimony in the record demonstrating that the permit complies with the Commission's antidegradation policy and Water Quality

Standards also supports the Commission's Order. .................................................43

C. The Commission's additional findings on the protectiveness of the permit similarly are supported by substantial evidence. ......................................48

    1. Witness testimony and AIRW's Application materials demonstrate satisfaction of all applicable nuisance-odor requirements. .....................................48

    2. Record evidence demonstrates that human health is protected and that the operational requirements in the permit are sufficient. ................................51

PRAYER .............................................................54

CERTIFICATE OF COMPLIANCE...........................................55

CERTIFICATE OF SERVICE................................................55

APPENDIX ...........................................................57

# INDEX OF AUTHORITIES

**Cases**

*Citizens Against Landfill Location v. Tex. Comm'n on Envtl. Quality,*
169 S.W.3d 258 (Tex. App.—Austin 2005, pet. denied) ...................................................................... 19

*Dyer v. Tex. Comm'n on Envtl. Quality,*
646 S.W.3d 498 (Tex. 2022) ........................................................ 18

*Heritage on San Gabriel Homeowners Ass'n v. Tex. Comm'n on Envtl. Quality,*
393 S.W.3d 417 (Tex. App.—Austin 2012, pet. denied) ................................................................ 19, 48

*In re Dallas County,*
697 S.W.3d 142 (Tex. 2024) ........................................................ 20

*Mayhew v. Town of Sunnyvale,* 964 S.W.2d 922 (Tex. 1998) ................. 32

*Morath v. Lampasas Indep. Sch. Dist.,*
686 S.W.3d 725 (Tex. 2024), *reh'g denied* (Apr. 19, 2024) ...................................................................... 31

*R.R. Comm'n of Tex. v. City of Austin,*
524 S.W.2d 262 (Tex. 1975) ........................................................ 19

*R.R. Comm'n of Texas v. Texas Citizens for a Safe Future & Clean Water,*
336 S.W.3d 619 (Tex. 2011) .................................................... 20, 21

*Sirius XM Radio, Inc. v. Hegar,*
643 S.W.3d 402 (Tex. 2022) ........................................................ 21

*State v. Hollins,*
620 S.W.3d 400 (Tex. 2020) ........................................................ 20

*State v. Pub. Util. Comm'n of Texas,*
344 S.W.3d 349 (Tex. 2011) ........................................................ 20

*Steering Comms. for the Cities Served by TXU Elec. v. Pub.
Util. Comm'n,*
42 S.W.3d 296 (Tex. App.—Austin 2001, no pet.) .........................21

*Tex. Comm'n on Envtl. Quality v. Maverick Cnty.,*
642 S.W.3d 537 (Tex. 2022)........................................................1, 18

*Tex. Health Facilities Comm'n v. Charter Med.-Dall., Inc.,*
665 S.W.2d 446 (Tex. 1984).............................................................1

*Texas Comm'n on Env't Quality v. San Antonio Bay
Estuarine Waterkeeper,*
No. 15-24-00036-CV (Tex. App. [15th] May 20, 2025)
(Slip Op.)......................................................................................18

*The Commons of Lake Houston, Ltd. v. City of Houston,*
No. 23-0474, 2025 WL 876710 (Tex. Mar. 21, 2025) ......... 31, 32, 33

*TJFA, L.P. v. Tex. Comm'n on Envtl. Quality,*
632 S.W.3d 660 (Tex. App.—Austin 2021, pet.
denied) ........................................................................................20

**Statutes**

33 U.S.C.

§ 1251(a)(2) ...........................................................................5
§ 1311(a) ...............................................................................4
§ l342(a)(l)(b) .......................................................................5

Tex. Gov't Code

§§ 2001.001-.903...............................................................18
§ 2001.174............................................................. 1, 17, 18, 21
§ 2001.174(2) ................................................................ 17, 18
§ 2001.175(e).......................................................................18
§ 2003.047(i-1) ......................................................... 41, 43, 51
§ 2003.047(i-2) ............................................................. 42, 51
§ 2003.047(i-3) .................................................................42
§ 2003.047(m) ...................................................................25

Tex. Water Code

§ 5.122................................................................................................33
§ 5.351................................................................................................17
§ 26.003.................................................................. 7, 24, 35, 36, 38
§ 26.027................................................................................................33
§ 26.027(a) ...........................................................................................10
§ 26.027(b) ...........................................................................................10
§ 26.0282.............................................................. 7, 8, 24, 35, 36, 38
§ 26.030(a) ...........................................................................................49
§ 26.081 ...................................................................... 7, 8, 36, 38

## Rules & Regulations

16 Tex. Admin. Code

§ 24.225(c) ...........................................................................................39

30 Tex. Admin. Code

§ 39.418................................................................................................11
§ 39.419(a) ...........................................................................................11
§ 39.420................................................................................................13
§ 39.551................................................................................................10
§ 39.551(b) ...........................................................................................11
§ 39.551(c) ...........................................................................................12
§ 39.551(f) ...........................................................................................12
§ 50.117(f) ...........................................................................................13
§ 50.133................................................................................................10
§ 55.154........................................................................................10, 12
§ 55.156........................................................................................10, 12
§ 55.211(b)(3)(A)(i)...........................................................................12
§ 80.17................................................................................................51
ch. 307.............................................................................................5, 41
§ 307.3(a)(27) ........................................................................................6
§ 307.4(d) ......................................................................................48, 52
§ 307.5................................................................................6, 12, 44
§ 307.5(b) ......................................................................................11, 43
§ 307.5(b)(1) ..........................................................................................6
§ 307.5(b)(2) ..............................................................................6, 45, 46
§ 307.5(c)(2)(A) .....................................................................................6

§ 307.5(c)(2)(B) ...................................................................... 6

§ 309.11(9) ......................................................................... 49

§ 309.13(e)........................................................................ 49

§ 309.13(e)(1) ..................................................................... 49

§ 319.9 ............................................................................ 53

§ 319.9(a) ......................................................................... 47

ch. 351 ......................................................................... 8, 32

## Other Authorities

63 Fed. Reg. 51164 (Sept. 24, 1998) ....................................... 5

Georgetown, Tex., Unified Dev. Code § 1.01 ........................... 27

Georgetown, Tex., Unified Dev. Code § 13.05........................... 27

# RECORD REFERENCES

**Reporter's Record**

The Reporter's Record is cited in this brief as "RR [page number]."

**Clerk's Record**

The Clerk's Record is cited in this brief as "CR [page number]."

**Supplemental Clerk's Record and the Administrative Record**

The Administrative Record (AR) consists of three components—administrative documents, evidentiary exhibits, and transcripts. The AR was entered into evidence in the district court proceedings as Joint Exhibit 1. RR at 5. The Supplemental Clerk's Record (SCR) contains the AR (Joint Exhibit 1), the contents of which have item numbers assigned. Citations to the AR will be to SCR-AR [item number] (example: SCR-AR 11 (ED's Response to Public Comment) at 1).

# STATEMENT OF THE CASE

Nature of the Case: This is a suit for judicial review of a final order of a state agency. The Texas Commission on Environmental Quality issued an order under Texas Water Code Chapter 26, granting a Texas Pollutant Discharge Elimination System permit to construct and operate a new wastewater treatment plant in Williamson County, Texas.

Course of Proceedings: The City of Georgetown sought judicial review of the Commission's final order in Travis County District Court. CR at 3-26.

The Travis County District Court held a hearing on the merits on October 31, 2024 RR at 1.

Trial Court: 261st Judicial District Court, Travis County

Presiding Judge: The Honorable Laurie Eiserloh

Trial Court Disposition: The district court reversed the Commission's Order for two stated reasons and remanded to the Commission for further proceedings consistent with the order. CR at 730-31.

## STATEMENT REGARDING ORAL ARGUMENT

The Commission respectfully requests oral argument. This case involves a complex regulatory-permitting process. Oral argument will help explain the regulatory scheme supporting the Commission's final order and provide additional insight into the administrative record.

# ISSUES PRESENTED

1. Did the district court err in reversing the final order of the Commission based upon the court's disagreement with the Commission's regionalization determination and related findings?

2. Was the final order of the Commission, granting the TPDES permit, supported by substantial evidence and based upon applicable law and reasoned decision-making?

The State's regionalization policy generally promotes the consolidation of multiple wastewater-service areas into larger areas to allow the State to manage wastewater needs more efficiently. Regionalization goals must, of course, be balanced along with a multitude of other factors affecting the permitting process. Consequently, the Commission is afforded broad discretion to determine whether granting any particular permit is reasonable in light of all these potentially competing interests—including the costs, practicality, and feasibility of consolidating waste-water service areas.

Here, the Commission determined that AIRW's application to operate a new wastewater-treatment plant satisfied all applicable legal requirements, including regionalization goals. So, it issued an order granting the permit.

The district court's review of that order should have been limited to whether the order was reasonable and supported by substantial evidence. Tex. Gov't Code § 2001.174; *see Tex. Comm'n on Envtl. Quality v. Maverick Cnty.*, 642 S.W.3d 537, 544 (Tex. 2022); *Tex. Health Facilities Comm'n v. Charter Med.-Dall., Inc.*, 665 S.W.2d 446, 454 (Tex. 1984). But the court went far beyond those parameters and improperly reweighed

1

the evidence that was before the Commission—reversing the agency's decision because the court hypothesized that AIRW's wastewater needs could have been met by obtaining services from or connecting with the City of Georgetown's existing system. This was both legally and factually erroneous. It was plainly improper to require AIRW to obtain services from the City, as all the evidence indicated that the City's conditional offer of service would have been prohibitively costly to AIRW's project and otherwise prohibited by other legal requirements. AIRW's application otherwise (and undisputedly) met all other legal requirements for a permit. As such, the Commission's order granting the permit—which necessarily incorporated regionalization goals—was supported by the evidence and entirely reasonable. The judgment of the district court therefore should be reversed.

## STATEMENT OF FACTS

This case involves a challenge to the Commission's approval of a permit for a wastewater-treatment facility that will serve two new subdivisions being built within the extraterritorial jurisdiction (ETJ) of the City of Georgetown (the City).

This is a water-quality case involving laws and policies written and enacted to protect Texas water quality while also weighing wastewater needs and the use and enjoyment of water by people, and terrestrial and aquatic life. The Texas Commission on Environmental Quality is delegated authority through the federal Clean Water Act and the Texas Water Code to administer the Texas Pollutant Discharge Elimination System (TPDES) permitting program. It is through this administration that the Commission issued the final order being challenged here.[1]

After a contested case hearing, the Commission issued a permit to AIR-W 2017-7, L.P. (AIRW). The permit allows AIRW to discharge treated wastewater from AIRW's proposed wastewater treatment plant into State waters in Williamson County, Texas. The City of Georgetown (the City) sought judicial review of the Commission's Order granting the permit.

The district court reversed the Commission's Order, providing two bases for its judgment, both relating to the State's regionalization policy under the Texas Water Code. First, the court found that the Commission erred in determining that AIRW's permit complies with the

_____

[1] SCR-AR 66.

regionalization policy. Second, the court found that the Commission erred in finding that AIRW was denied service from the City and in finding that interconnection to the City would cost $20 million. CR at 730-31 (*City of Georgetown, Texas v. Tex. Comm'n on Envt'l Qual.,* No. D-1-GN-23-001004 (261st Dist., Travis County, Dec. 2, 2024) (Final Judgment Reversing Order of the Texas Commission on Environmental Quality)). The Commission now appeals the district court's judgment.

## I. Regulatory Background: TPDES Permitting and Water Quality in Texas

Under section 301(a) of the federal Clean Water Act (the Act),[2] a person cannot discharge a pollutant into a water of the United States except as allowed under the Act, 33 U.S.C. § 1311(a), including section 402, which establishes the framework for the National Pollutant Discharge Elimination System (NPDES). Under this system, the United States Environmental Protection Agency (EPA), and any state to which EPA has delegated its authority, can issue a permit allowing a discharge that complies with requirements designed to minimize the discharged

---

[2] 33 U.S.C. §§ 1251-1389.

effluent's impact on the receiving water's uses. 33 U.S.C. § l342(a)(l)(b), 33 U.S.C. § 1251(a)(2).

## A. TCEQ Administers the EPA-approved TPDES Program in Texas.

EPA has delegated NPDES authority to the State of Texas. 63 Fed. Reg. 51164 (Sept. 24, 1998). And the Texas Legislature authorized the Commission to administer the State's wastewater-discharge permitting program. Statutes addressing TPDES are predominantly found under chapter 26 of the Texas Water Code. Section 26.121 provides that no person may discharge wastewater into water in the State[3] except as authorized by the Commission. Additionally, the Commission's rules governing TPDES permitting include the Texas Surface Water Quality Standards (Water Quality Standards), which set out the criteria for maintaining the quality of the State's surface waters. 30 Tex. Admin. Code ch. 307.[4]

The Water Quality Standards establish the Commission's antidegradation policy, which is a tiered system for ensuring that

---

[3] Water in the State is defined in Texas Water Code section 26.001(5).

[4] Commission rules governing TPDES permitting also include 30 Texas Administrative Code chapters 217, 305, 309, 312, and 319.

existing uses will not be impaired and water quality will not be degraded by a proposed discharge.[5] *Id.* § 307.5. Under Tier 1, existing uses, and water quality sufficient to protect those existing uses, must be maintained. *Id.* § 307.5(b)(1). Tier 1 review applies to any pollution that could cause an impairment of water quality. *Id.* § 307.5(c)(2)(A). If the water quality of the receiving water is higher than the quality needed to support propagation of indigenous fish, shellfish, terrestrial life, and recreation in and on the water (i.e. exceeds fishable/swimmable quality), Tier 2 review also applies. *Id.* § 307.5(c)(2)(B).

Under Tier 2, no regulated activities that would cause degradation of waters that exceed fishable/swimmable quality are allowed unless it can be shown that the lowering of water quality is necessary for important economic or social development. *Id.* § 307.5(b)(2). Degradation is defined as a lowering of water quality by more than a de minimis extent, but not to the extent that an existing use is impaired. *Id.* The Commission has developed guidance—the Implementation Procedures

---

[5] "Existing use" is defined as a "use that is currently being supported by a specific water body or that was attained on or after November 28, 1975." 30 Tex. Admin. Code § 307.3(a)(27).

for the Texas Surface Water Quality Standards—to help the Commission in conducting antidegradation reviews in TPDES permitting. AR 129.

### B. Texas regionalization policy is incorporated in the TPDES permitting process.

In addition to water-quality assessments, the Commission reviews permit applications for consistency with the State's regionalization policy. Wastewater regionalization involves the consolidation of multiple service areas (such as subdivisions) into a larger facility or collection system within the same geographic area so that State wastewater needs can be managed more efficiently.

The Legislature has codified the encouragement of regionalization and provided the Commission with significant discretion to implement this policy—particularly in determining the "reasonable methods" to use to further regionalization. Tex. Water Code § 26.003; *see also* Tex. Water Code §§ 26.0282, and 26.081[6] (further setting out the State's regionalization policy).

Regionalization is addressed in wastewater permitting as part of the Commission's consideration of need for the permitted operation:

---

[6] Section 26.081 authorizes the Commission to establish regional areas served exclusively by designated regional entities to "implement the state policy . . . ."

In considering the issuance, amendment, or renewal of a permit to discharge waste, the [C]ommission may deny or alter the terms and conditions of the proposed permit, amendment, or renewal **based on consideration of need**, including the expected volume and quality of the influent and the **availability of existing or proposed areawide or regional waste collection, treatment, and disposal systems** not designated as such by commission order pursuant to provisions of this subchapter. . . .

Tex. Water Code § 26.0282 (emphasis added).

The Commission implements Texas regionalization policy in two ways:

1) Adopting rules establishing Regional Areas—clearly defined geographic areas with designated Regional Entities who are the sole persons authorized to serve in the area. 30 Tex. Admin. Code ch. 351; *see* Tex. Water Code § 26.081.

2) Outside of these Regional Areas, requiring wastewater permit applicants to demonstrate that they have contacted service providers located within 3 miles of a proposed facility and inquired about the possibility of connecting for service. *See* Tex. Water Code § 26.0282.

The second prong, or non-Regional Area implementation, involves case-by-case consideration of need and nearby service availability. It is incorporated in the Commission's permit application instructions, and at the time the Commission considered AIRW's permit application, the Commission's regionalization policy was also the subject of a Commission

8

guidance webpage entitled "TCEQ Regionalization Policy for Wastewater Treatment" (Regionalization Guidance).[7] SCR-AR 98.

The Regionalization Guidance explains that the presence of a wastewater-treatment facility or collection system within three miles of the proposed facility does *not* compel an applicant to connect with an existing facility. SCR-AR 98 at 1. The Commission's guidance also provides four scenarios under which "TCEQ may approve . . . applications for discharges of wastewater":

- There is no wastewater treatment facility or collection system within three miles of the proposed facility.
- The applicant requested service from wastewater treatment facilities within the 3 miles, and the request was denied.
- The applicant can successfully demonstrate that an exception to regionalization should be granted based on costs, affordable rates, and/or other relevant factors.
- The applicant has obtained a Certificate of Convenience and Necessity (CCN) for the service area of the proposed new facility or the proposed expansion of the existing facility.

SCR-AR 98 at 1-2.

---

[7] Nine months after the Commission issued its order in the proceeding at issue, the Commission adopted a policy document in August 2023 entitled "TCEQ Guidance Document RG-632: Evaluating Regionalization for Proposed Wastewater Systems" which is now available on the Commission's Regionalization Policy webpage.

**C.** **The Commission's TPDES permitting includes an application review process designed to ensure compliance with the Water Code, Water Quality Standards, and State policy.**

Under the Texas Water Code, a person may be authorized to discharge into water in the State by applying to the Commission for a wastewater-discharge permit. Tex. Water Code § 26.027(a)–(b). The Commission rules governing the permit-application process contemplate a permit-review process with Executive Director Staff, substantive assessments, and several opportunities for public participation. *See e.g.* 30 Tex. Admin. Code §§ 39.551 (Notices); 50.133 (Executive Director Action on Application); 55.154 (Public Meeting); and 55.156 (Public Comment Processing).

Applicants must provide information to allow Executive Director Staff to conduct a regionalization analysis and effectuate the Commission's policy of encouraging regionalization of wastewater services where possible, in light of other factors affecting permitting. The Commission's application form includes a specific section relating to "Regionalization of Facilities" and requires additional information to be attached for certain responses. *See* SCR-AR 74 at 44-45.

Upon receipt of the application, Executive Director Staff must first ensure the application is administratively complete (*i.e.,* contains all the required information). *See* 30 Tex. Admin. Code § 39.418. Once the Executive Director finds the application to be administratively complete, the applicant provides its first public notice of the application, called the Notice of Receipt of Application and Intent to Obtain a Permit. *Id.* § 39.551(b).

Executive Director Staff then begins a technical review of the application to determine whether it meets all applicable statutory and regulatory requirements. *See id.* § 39.419(a). During this process, the Executive Director may ask the applicant to provide additional information regarding the technical aspects of the project.

As a key part of its review, Executive Director Staff conducts an antidegradation review. AR 127 (ED Ex. JL-1) at 7 ("An antidegradation review is performed for all new permits and major amendment permits"); AR 84 (AIRW Ex. 14) at 10-11; *see* 30 Tex. Admin. Code § 307.5(b). The purpose of an antidegradation review is to ensure that the existing water quality (Tier 2) and existing uses (Tiers 1 and 2) are maintained in accordance with the Commission's antidegradation policy (30 Tex.

11

Admin. Code § 307.5) and the 2010 TCEQ Procedures to Implement the Texas Surface Water Quality Standards (Implementation Procedures). *See* AR 129 (ED Ex. JL-3) (Implementation Procedures).

During its substantive review, the Commission also assesses "for the need and availability of regionalization for wastewater during the permitting process." SCR-AR 98 at 1. But "[t]he presence of a wastewater treatment facility or wastewater collection system within three miles of a proposed new wastewater treatment facility or the expansion of an existing facility is not an automatic basis to deny an application or to compel an applicant to connect to an existing facility." *Id.*

When the technical review has been completed, Executive Director Staff prepares a draft permit and technical summary of the application. SCR-AR 9, 10. Once the Executive Director has made a preliminary decision on the application, further notice is published and opportunity for public comment, public meeting, and requests for a contested-case hearing are provided. 30 Tex. Admin. Code §§ 39.551(c) and (f), 55.154, 55.156. If a contested-case hearing is granted, the Commission will specify the number and scope of the specific factual issues referred to the State Office of Administrative Hearings (SOAH). *Id.* § 55.211(b)(3)(A)(i).

After the public-comment period has closed, Executive Director Staff responds to public comments. *Id.* § 39.420. If the permit is ultimately granted, the response to public comment becomes part of the final Commission order: the Commission "shall consider all timely public comment in making its decision and shall either adopt the executive director's response to public comment in whole or in part or prepare a commission response." *Id.* § 50.117(f).

## II. Factual Background: AIRW applied for a new TPDES permit which was granted by the Commission after a contested-case hearing.

In April 2020, AIRW applied to the Commission for a new TPDES permit to construct and operate a new wastewater-treatment plant near the City in Williamson County, Texas. SCR-AR 1 (Application). The proposed plant, known as the Rockride Lane Water Resource Reclamation Facility (Facility), plans to serve two adjacent housing communities—the Mansions of Georgetown III and the Luxe Development (Mansions-Luxe Developments) consisting of a total of 880 residential units. SCR-AR 74 at 26; SCR-AR 78 at 8:14-17.

The TPDES application sought authorization to discharge treated domestic wastewater[8] from the proposed Facility ultimately into the San Gabriel River. *Id.* at 9.

Executive Director Staff deemed the application to be administratively complete on June 19, 2020, and instructed AIRW to publish the Notice of Receipt of Application and Intent to Obtain a Permit. SCR-AR 2. Next, Executive Director Staff conducted its technical review of the Application to determine whether it met all applicable statutory and regulatory requirements. *See* SCR-AR 6, 8.

During this technical review, the Commission identified the existing and designated uses for each of the receiving waters of the proposed discharge. RR-AR 10 at 2. Executive Director Staff then conducted an antidegradation review, consistent with the Water Quality Standards and the Implementation Procedures, and determined that the proposed, treated discharge would not impair existing uses under Tier I or cause degradation of water quality under Tier II. *Id.*

---

[8] *See* SCR-AR 59 (PFD) at 73 (AIRW proposed a relatively low flow volume of 0.2 million gallons per day (MGD)). In comparison, the City has three wastewater treatment plants with much larger authorized discharges of 2.5 MGD, 2.5 MGD, and 3.0 MGD, respectively. *See* SCR-AR 134 (GT Ex. 3) at 17 (Woelke Direct); SCR-AR 152 (GT Ex. 21) at 2 (Dove Springs Permit).

14

After determining that the Application met the requirements for issuance of the permit, the Executive Director issued a preliminary decision and draft permit. *Id.* at 1; *see also* SCR-AR 9. Notice was published informing the public of the opportunity to submit comments and request a contested-case hearing on the Application. SCR-AR 72 at 19-20. At the close of the public comment period, the Executive Director issued its Response to Comments. SCR-AR 11.

Appellee, the City, requested a contested-case hearing on the Application. SCR-AR 19. After considering the request at an open meeting on November 21, 2021, the Commission determined that the City was an affected person and referred the matter to the State Office of Administrative Hearings for a contested-case hearing on eight issues. *Id*. The Executive Director participated as a party. SCR-AR 59 at 3.

Jonah Water Special Utility District (Jonah) appeared and initially participated in the administrative proceeding as a protestant to the Application. SCR-AR 22; SCR-AR 25 at 1.[9] In April 2022, during the contested-case hearing process, Jonah and the developers of the housing

---

[9] The Commission's Office of Public Interest Counsel also participated in the contested case proceeding. *See* SCR-AR 66 (Order) at FOF 21, COL 17.

communities to be served by the facility (the Westinghouse Entities[10])
entered into two Non-Standard Service Agreements (NSSAs) under
which Jonah agreed to provide wastewater service to the Mansions-Luxe
Developments after the permit is issued and a transfer from AIRW to
Jonah is requested and approved by the Commission.[11] SCR-AR 113. An
evidentiary hearing on the Application was held on May 23-25, 2022.
SCR-AR 66 (Order) at 1. Nine of the eleven witnesses presenting
testimony addressed regionalization. *See* SCR-AR 78, 87, 94, 124, 131,
133, 134, 176, 177; *see also* SCR-AR 180-181.

A Proposal for Decision (PFD) and proposed order was ultimately
issued that recommended the Commission issue the draft permit to
AIRW. SCR-AR 59 at 75-76.

The Commission considered the PFD at an open meeting on
November 16, 2022. SCR-AR 66 (Order) at 1. Shortly thereafter, the
Commission issued its final order granting TPDES Permit No.
WQ0015878001 to AIRW. *Id.* (Order) at 13. After exhausting

---

[10] 600 Westinghouse Investments, LLC and 800 Westinghouse Investments, LLC
(Collectively, "the Westinghouse Entities").

[11] Jonah continued participating in the contested case, but in support of the
application. *See* SCR-AR 66 (Order) at FOF 77; SCR-AR 47 (closing argument).

administrative remedies before the Commission, the City filed this suit for judicial review of the Commission's final order granting the permit. AIRW, the Westinghouse Entities, and Jonah all intervened in support of the permit.

## STANDARD OF REVIEW

This is a suit for judicial review of a final order of the Commission following a contested-case hearing. The substantial-evidence standard of review applies. Tex. Gov't Code § 2001.174; Tex. Water Code § 5.351. In addition, this case involves the construction of statutes within the Commission's jurisdiction.

Under the substantial-evidence standard, the Court may reverse and remand for further proceedings an agency decision that is in violation of a constitutional or statutory provision; in excess of the agency's statutory authority; made through unlawful procedure; affected by other error of law; not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or is otherwise arbitrary, capricious, or characterized by abuse of discretion. *Id.* § 2001.174(2). However, even if the Court finds error on any of these bases, the Court may only reverse the agency's decision if

17

the substantial rights of the appellant have been prejudiced by the error. *Id.*; *Dyer v. Tex. Comm'n on Envtl. Quality*, 646 S.W.3d 498, 514 (Tex. 2022); *Tex. Comm'n on Envtl. Quality v. Maverick Cnty.*, 642 S.W.3d 537, 545 n.3 (Tex. 2022) ("Permit Contestants would only be entitled to relief under the APA 'if substantial rights of the appellant have been prejudiced because' of the error" (quoting Tex. Gov't Code § 2001.174(2)).[12] Review of an agency decision under the substantial-evidence standard is confined to the record developed before the agency and the court may not substitute its judgment for that of the agency on the weight of the evidence on questions committed to agency discretion. Tex. Gov't Code §§ 2001.174, 2001.175(e); *Maverick Cnty.*, 642 S.W.3d at 544. "The trial court erred by substituting its judgment in place of the Commission's decision, which was supported by substantial evidence." *Texas Comm'n on Env't Quality v. San Antonio Bay Estuarine Waterkeeper*, No. 15-24-00036-CV, at 32 (Tex. App. [15th] May 20, 2025) (Slip Op.).

In reviewing an agency's factual findings and conclusions for substantial evidence, the issue before the court is not whether the agency reached the correct conclusions but whether there is some basis in the

---

[12] Administrative Procedure Act (APA), Tex. Gov't Code §§ 2001.001-.903.

18

record for its action. *Citizens Against Landfill Location v. Tex. Comm'n on Envtl. Quality*, 169 S.W.3d 258, 264 (Tex. App.—Austin 2005, pet. denied).

Although substantial evidence is more than a mere scintilla, the evidence in the record may preponderate against the agency's decision and nonetheless amount to substantial evidence. *Id.* The Court may even disagree with the reasons given by the agency in its order and still affirm the order as long as the Court finds that a valid basis exists in the record for the action taken by the agency. *R.R. Comm'n of Tex. v. City of Austin*, 524 S.W.2d 262, 279 (Tex. 1975). The court presumes that the agency's findings, inferences, conclusions, and decisions are supported by substantial evidence. *Heritage on San Gabriel Homeowners Ass'n v. Tex. Comm'n on Envtl. Quality*, 393 S.W.3d 417, 424 (Tex. App.—Austin 2012, pet. denied). The burden to prove otherwise is on the party challenging the agency decision. *Id.*

**Statutory Construction**

This case also involves the construction of statutes within the Commission's jurisdiction. In construing statutes, courts first look to the plain meaning of the statute's words, considering the context and

19

framework of the statute as a whole. *TJFA, L.P. v. Tex. Comm'n on Envtl. Quality*, 632 S.W.3d 660, 667 (Tex. App.—Austin 2021, pet. denied). "We interpret statutes according to their plain language, but in context—not isolation." *State v. Hollins*, 620 S.W.3d 400, 407 (Tex. 2020); *see In re Dallas County,* 697 S.W.3d 142, 158 (Tex. 2024).

"Where statutory text is clear, that text is determinative of legislative intent unless the plain meaning of the statute's words would produce an absurd result." *TJFA, L.P. Id.* 632 S.W.3d at 667. If the statute is ambiguous, however, courts will look to the agency's interpretation. *See R.R. Comm'n of Texas v. Texas Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 629 (Tex. 2011) (holding that when a statute is subject to multiple interpretations, courts uphold the enforcing agency's construction if it is reasonable and in harmony with the statute).

An agency's interpretation is entitled to "serious consideration" when it does not conflict with the statute. *State v. Pub. Util. Comm'n of Texas*, 344 S.W.3d 349, 356 (Tex. 2011). "'[W]e will generally uphold an agency's interpretation of a statute it is charged by the Legislature with enforcing, so long as the construction is reasonable and does not

contradict the plain language of the statute.'" *Sirius XM Radio, Inc. v. Hegar*, 643 S.W.3d 402, 407 (Tex. 2022) (quoting *R.R. Comm'n v. Tex. Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 625 (Tex. 2011)). Moreover, the Court should accept an agency's interpretation even if another reasonable interpretation exists. *Steering Comms. for the Cities Served by TXU Elec. v. Pub. Util. Comm'n*, 42 S.W.3d 296, 300 (Tex. App.—Austin 2001, no pet.).

## SUMMARY OF THE ARGUMENT

The Commission's order should have been upheld under the substantial evidence rule, Tex. Gov't Code § 2001.174. In reversing, the district court improperly re-weighed evidence that was before the Commission and imposed a legal standard not found in the governing law.

In granting the AIRW's wastewater permit, the Commission reasonably and properly applied Texas regionalization policy. The record demonstrates there were significant barriers—both financial and logistical—to obtaining service from or connecting with the City's existing system. Further, months of communications took place, but the City never wavered in its position that annexation, along with attendant

21

changes in land use, would be required for service from the City. Nothing in the Record indicates that the City was willing to waive these requirements.

Moreover, record evidence indicates that the cost of annexation and connection to the City's facilities would have been high, and conversely, availability of service from the City was not confirmed in the record. The planned development and the proposed treatment facility are partially within Jonah Special Utility District's district boundaries, and the City has not obtained or sought Jonah's consent to serve there.

Given all this, the Commission reasonably concluded that there is a need for the permit, and that its issuance is consistent with the State's regionalization policy. The Commission ultimately determined the permit application was reasonable and supported by record evidence, and while the City may disagree with the Commission's decision, it has not shown reversible error.

In addition to regionalization-policy considerations, the Commission's Order is supported by substantial evidence and is consistent with applicable law in all other respects. The Commission properly concluded that the permit complies with all legal and technical

standards, protects water quality, and protects the existing uses of the receiving waters and the health of nearby residents and wildlife. In reaching these conclusions, the Commission considered the record before it, weighing the evidence and assessing the credibility of the witnesses—matters which are the exclusive province of the Commission under Texas law—and determined that, based upon the record, and applying its Water Quality Standards, AIRW's permit should be granted.

At bottom, the Commission engaged in reasoned decision-making when granting the permit and accordingly, this Court should reverse the district court's judgment and affirm the underlying Order granting the permit.

## ARGUMENT AND AUTHORITIES

**I. The district court erred in reversing the Commission's Order, which properly applied Texas regionalization policy and controlling law.**

**A. The Commission properly considered and applied its regionalization policy.**

Exercising its discretion to consider need and availability in wastewater permitting, the Commission considered the record before it and determined there is a demonstrable need for AIRW's permit, and the

permit's issuance is consistent with Texas regionalization policy. *See* SCR-AR 66 at COL 10-11; Tex. Water Code § 26.0282.

Under the Water Code, the Commission has broad discretion to determine the reasonable methods for encouraging regionalization. Tex. Water Code § 26.003. In areas of the State outside of designated regional areas, the Commission determines regionalization considerations on a case-specific basis. SCR-AR 98 at 1-2. While Texas policy promotes regionalization in general, it does not require that service must be provided from existing facilities when denial, costs, or other factors impact the availability of service through an existing facility. Tex. Water Code § 26.003; SCR-AR 98 at 1-2.

The Commission's approval of AIRW's TPDES permit is consistent with Texas regionalization policy. AIRW's application and the evidence developed during the contested-case process indicated that connection with the City's wastewater treatment system was not available and not feasible. Consistent with the Commission's Regionalization Guidance, the record indicates: (1) AIRW requested service from wastewater treatment facilities within three miles, and its requests were denied; and (2) AIRW demonstrated that an exception to regionalization should be

24

granted based on costs and other considerations. SCR-AR 59 (PFD) at 21-22, 47; SCR-AR 98 at 2; *see* SCR-AR 66 at FOF 40-46, 51-52. Nothing more was required.

AIRW's application—which is part of the evidentiary record—complied with permitting requirements, providing required information including a map of nearby wastewater-treatment facilities and email communications between AIRW and the cities of Georgetown and Round Rock discussing the respective cities' abilities to provide wastewater services to the development. SCR-AR 74 at 75-79. In response to a request from Executive Director Staff, AIRW provided additional information in the form of two letters explaining the justification for the Facility and cost estimates related to annexation and connection to the City's facilities. *Id.* at 103-08.

Beyond that, the Commission's Order issuing the permit is not based on the application alone—it is based on the full administrative record developed through the contested-case hearing. Tex. Gov't Code § 2003.047(m). Nine witnesses presented testimony on the issue of

regionalization.[13] After considering the witnesses' testimony and the entire evidentiary record, as well as arguments of the parties, the Proposal for Decision recommended that the Commission issue the draft permit to AIRW. The Commission followed this proposal and granted the permit. SCR-AR 59 at 75-76; SCR-AR 66.

While the Commission did not accept every argument made by AIRW, it was not required to. The Commission determined the applicant had met its burden of proving that issuing the permit is consistent with the State's regionalization policy. *See* SCR-AR 66 at FOF 33-52. Specifically, the Commission found that, due to approximately $20 million in costs related to annexation-related diminution in property value, "[c]osts weigh in favor of granting AIRW's application." *Id.* at FOFs 45-46. The Commission determined the City had effectively denied AIRW's request for service. *Id.* at FOF 42.

The Commission's Order, finding that there is a need for the proposed facility and that issuance of AIRW's permit is consistent with

---

[13] SCR-AR 78 (AIRW- Sims Direct), 87 (AIRW-Perkins Direct), 94 (AIRW-Tuckfield Direct), 124 (ED-Cooper Direct), 131 (Georgetown-Reed Direct), 133 (Georgetown-Rubenstein Direct), 134 (Georgetown-Woelke Direct), 176 (Jonah-Brown Revised Direct), 177 (Jonah-Whitney Revised Direct); *see also* SCR-AR 180-181 (Hearing Transcripts).

the State's regionalization policy, is supported by substantial evidence in the record, is consistent with applicable law, and is the product of reasoned decision-making.

## B. Substantial evidence demonstrates the City declined to provide service.

The City effectively denied service to AIRW by conditioning it on annexation and significant land-use restrictions. While the City argues that it did not refuse to serve AIRW because it could possibly later waive its annexation prerequisite, this assertion is belied by the City's written correspondence providing precisely the opposite. *See e.g.,* SCR-AR 74 (AIRW Ex. 4) at 77.[14]

The record demonstrates that, in communications in July 2019 with the developer of the project that will be served by AIRW's permit, the City stated that using City wastewater services would require voluntary annexation and involve zoning considerations.[15] SCR-AR 100 at 1. Likewise, communications with the Assistant City

---

[14] *See also* SCR-AR 59 (PFD) at 39-40.

[15] Georgetown's development code requires annexation. "Properties in the ETJ that desire or require wastewater service from the City of Georgetown **shall first submit a petition for voluntary annexation**, in accordance with Section 3.25 of this Code." Georgetown, Tex., Unified Dev. Code § 13.05 (emphasis added); *see id.* at § 1.01 ("The word 'shall' is mandatory.").

27

Manager, Wayne Reed, reiterate that position. In a February 2020 email, Mr. Reed cited generally to the City's code requiring voluntary annexation for connecting to the City's wastewater system and referenced the City Planner's confirmation "that we do not support a delayed annexation approach." SCR-AR 103 at 1; *see* SCR-AR 74 at 77 (June 2020 email from City Planner).

Further, a May 2020 email from Mr. Reed demonstrates that AIRW continued to engage with the City on the possibility of service, but the City's position remained unchanged:

> In addition, nothing Wes said on our call yesterday should have been construed as the City entertaining providing wastewater service to this project in the ETJ. We have had multiple meetings and communications with Matt Hiles on this topic, have explained our position in detail, and **there is no need to revisit this request as the City's position remains the same;** annexation will be required in order to receive wastewater service from the City.

SCR-AR 101 at 1.

Record evidence presented by the City itself also demonstrates the City's position that annexation was required for service, and that the City was not interested in AIRW's alternative proposals. *See* SCR-AR 131 at 12. (GT Ex. 1, Reed Prefiled Direct Testimony).

In support of its regionalization determinations during permit review, Executive Director Staff offered the testimony of Mr. Gordon Cooper, the Commission permit reviewer who conducted the Commission's regionalization review on AIRW's permit application.[16] SCR-AR 124 (ED Ex. GC-1) at pdf 3-5. Mr. Cooper stated that issuance of the permit is consistent with the state's regionalization policy. *Id.* at pdf 12, 15.

Mr. Cooper further testified that AIRW provided communications with two nearby providers showing that it was unable to reach an agreement for service. *See* SCR-AR 124 (ED Ex. GC-1) at pdf 9. At the hearing, Mr. Cooper testified regarding an additional email from the City that stated annexation would be required if AIRW desired to connect to the City's wastewater system. SCR-AR 181 (Hearing Tr.) at 641; SCR-AR 74 (AIRW Ex. 4) at 77. Mr. Cooper explained the Commission looks for whether communication and negotiations took place, and here, AIRW and the City were unable to reach an agreement. The City placed a condition on supplying service—annexation. SCR-AR 124 (ED Ex. GC-1) at pdf 7-8. Mr. Cooper further testified that the City's

---

[16] Mr. Cooper has worked on over 195 wastewater applications. SCR-AR 124 at pdf 2.

29

conditional requirement that AIRW accept annexation in order to receive service was a denial of service. SCR-AR 181 (Hearing Tr.) at 637-42.

Ultimately, the Commission was unpersuaded by the City's argument that the permit should be denied because it was technically possible that city council ultimately would waive the annexation prerequisite for service. *See* SCR-AR 66 (Order) at FOF 41-42, COL 10-11. A possibility is not a fact, and it is not in record evidence here.

The Commission's finding of fact 42 states: "AIRW received a conditional offer for sewer service from the City. The City denied AIRW's request for service unless AIRW agreed to annexation and land use restrictions." SCR-AR 66. The Commission also found that there was "no evidence that the City was willing to waive the annexation and land use requirements." And, contrary to the district court's statement that "there is no way to know" if the City would be willing to waive the annexation requirement, record evidence demonstrates the City's unwavering insistence on annexation with its attendant land-use restrictions as a prerequisite for service. *See* SCR-AR 74 at 77; SCR-AR 100; SCR-AR 101; SCR-AR 103.

### C. No formal denial from the city council is required for the Commission to determine that the permit is needed and complies with regionalization policy.

The Commission's assessment of the City's response to AIRW also comports with a recent Texas Supreme Court pronouncement that a refusal does not require formalities—it can be shown through action, or inaction when action is called for. *Morath v. Lampasas Indep. Sch. Dist.*, 686 S.W.3d 725, 735 & n. 30 (Tex. 2024), *reh'g denied* (Apr. 19, 2024).

Even more recently, the Supreme Court recognized that actions and positions taken by a city can indicate a final decision has been made, even without a formal determination. *The Commons of Lake Houston, Ltd. v. City of Houston*, No. 23-0474, 2025 WL 876710, at *10 (Tex. Mar. 21, 2025). Therein, the Court addressed ripeness in the context of an inverse-condemnation claim brought by the Commons after the City of Houston passed a floodplain ordinance raising required elevations for structures where The Commons was planning to build. *Id.* at *1-2.

The City of Houston filed a plea to the jurisdiction, arguing that the claims were unripe because the city had not made a final decision on a permit or application. *Id.* at *2. The Commons argued that its claims

were ripe under the futility doctrine. *See id.* at *10 (*citing Mayhew v. Town of Sunnyvale,* 964 S.W.2d 922, 929-32 (Tex. 1998) ("The Town clearly was not going to approve the Mayhews' development proposal for 3,600 units, making a subsequent application or variance request for 3,600 units a futile act.")).

The Court concluded that the city's assertion indicated the finality of the city's decision (and a rejection of the Common's request) and thus held that The Commons's takings claims were ripe. *Id.* at *10-11.

What's more, the district court's insistence on formalistic protocol in the interchange between AIRW and the City loses sight of the fact that the approval under judicial review is the Commission's—not the City's. Nothing in the Water Code requires the City's approval or formal decision on any matter at any stage of the process relevant to this case.[17] Unlike in takings claim cases such as *The Commons of Lake Houston*, the City is not the regulator making the final determination on the permit at issue. Instead, the Commission determines whether to grant a

---

[17] As the Commission recognized, the City is not a Regional Entity with exclusive service rights. SCR-AR 66 at FOF 49; *see* 30 Tex. Admin. Code Ch. 351 (Regionalization).

TPDES permit and whether AIRW's application is consistent with regionalization.

The "final and authoritative determination"[18] on the TPDES permit should turn on the Commission's decision—just as the Legislature envisioned. The determination should not be constructively hijacked by a municipality seeking to control how land outside its boundaries is used by forcing annexation or a futile exercise of going through approval processes for waivers that the City has given no indication would ever be granted.[19] Tex. Water Code §§ 5.122, 26.027; SCR-AR 66 at FOF 40-41, COL 1 and 10-11.

> **D.** **The Commission's findings on costs, including consideration of economic costs, are consistent with regionalization policy and supported by record evidence.**

Substantial evidence demonstrates that cost considerations support the Commission's finding of need and permit issuance. Mr. Cooper testified that AIRW provided financial information about the costs to link to the City's wastewater facility, and the information

---

[18] *See The Commons of Lake Houston* at *9.

[19] "There was no indication that the City was willing to waive the annexation and land use requirements." SCR-AR FOF 41.

AIRW provided satisfied the requirement to provide an analysis of expenditures for connecting to an adjacent collection system. SCR-AR 124 (ED Ex. GC-1) at 8. Mr. Cooper stated that applicants like AIRW are not required to accept a nearby facility's terms if the terms outweigh the costs of a new facility. *Id*.

Additionally, AIRW witness David Tuckfield testified that the "great disparity" between the cost of building the plant versus the costs that arise from connecting to the City justify concluding that connection should not be required. SCR-AR 94 (AIRW Ex. 24) at pdf 25-26. Mr. Tuckfield discussed each of several other evidentiary exhibits in the record related to costs, including:

- AIRW Ex. 37: Letter to Executive Director stating annexation will "reduce the value of the applicant's developed project by over $20 million" (SCR-AR 107)

- AIRW Ex. 38: Letter to Executive Director stating annexation requirement for connection to the City's system "affects the value of the project by 22.222 to 25 times the annual property tax amount" (SCR-AR 108)

- AIRW Ex. 23: Appraisal concluding lost value to the project to be $20 million due to annexation (SCR-AR 93)

- AIRW's Exs. 21 and 22: AIRW's cost analysis (SCR-AR 91 and 92).

AR 94 (AIRW Ex. 24) at pdf 25-26.

After finding that the cost of connecting to the City's system is lower than the cost to construct, but that "the City's condition of annexation to connect to its system . . . carries with it an approximately $20 million cost due to diminution in property value," the Commission found that "[c]osts weigh in favor of granting AIRW's application." SCR-AR 66 (Order) at FOFs 44-46.

The Commission's finding is a proper exercise of its authority under the Water Code. *See* Tex. Water Code §§ 26.003 (discretion to determine and use "reasonable methods" to further regionalization) and 26.0282 (discretion to consider need in regionalization context). The Commission acted reasonably in exercising its discretion, consistent with its guidance document, to allow for a more expansive review of regionalization and need. *See* AR 98 (GT Ex. 15) at 2; AR 147 (AIRW Ex. 28) at 2 (stating that an applicant can satisfy regionalization concerns "based on costs, affordable rates, or other relevant factors").

### E. The district court improperly imposed a novel legal standard not provided by statute or Commission rule.

The district court's judgment, stating that the Commission "should not have determined" that the City denied AIRW service or that the connection would have cost $20 million, applies requirements not found

in the Texas Water Code. *See* Tex. Water Code §§ 26.003, 26.0282, 26.081. Approval of a permit consistent with Texas regionalization policy does not require that a nearby provider deny service; nor does it require that an applicant first exhaust all possible municipal avenues before the Commission may approve the permit. *Id.;* SCR-AR at 1-2. When the Commission reviews an application and considers need and regionalization policy, the Commission takes many things into account, including whether nearby providers have denied service, and the cost of connection. SCR-AR 98 at 2. However, under the guidance provided on the Commission's website, excessive costs are a separate scenario than denial for purposes of determining consistency with regionalization policy. SCR-AR 98 at 2.

The Regionalization Guidance provides four independent scenarios illustrating that the Commission can approve applications, including when there is another wastewater-treatment facility or collection system nearby. SCR-AR 98 at 1-2. The guidance lists the scenario that service is requested from a facility within three miles, but the request is denied, and also lists a scenario in which the applicant can successfully demonstrate that an exception to regionalization should be granted for

36

other reasons. *Id.* at 2. In this latter scenario, the Commission reserves its discretion to consider "costs, affordable rates, and/or other relevant factors." This is precisely what the Commission did in its Order. *See* SCR-AR 66 at FOF 40-52.

The district court found both that a denial of service cannot be obtained without first receiving a formal denial of an annexation waiver request, and that the Commission could not consider costs arising from complying with the City's requirements for service (i.e. annexation and land use restrictions). By doing so, the district court collapsed two independent concepts (denial of service, exception for costs related to service on City's terms, and other factors) that the Commission has expressly, independently, recognized as consistent with regionalization policy. By stating that the Commission can neither consider the request for service from the City to be denied, nor consider the costs that would be incurred to meet the City's required conditions for service connection, the district court creates a catch-22 scenario that disables the applicant—and the Commission—from moving forward with a TPDES permit application without the nearby local governmental entity's city council first formally acting. This is neither required nor contemplated in the

Texas Water Code's regionalization policy provisions. *See* Tex. Water Code §§ 26.003, 26.0282, 26.081. The district court erred by imposing standards contrary to applicable law, thereby infringing upon the Commission's legislatively authorized discretion.

## F. The district court overlooked other Commission findings related to availability and regionalization, and substantial evidence indicates the City could not provide service even if it had agreed to do so.

In addition to finding that there was no evidence presented that the City would consider an annexation waiver, the Commission's Order included findings that weigh against the notion of service availability from the City. The Commission found the Facility and its associated development are partially within Jonah's Special Utility District (SUD) boundaries. SCR-AR 78 (AIRW-Ex. 8). The Commission's Order included these findings:

49. There is no regional provider designated for the area where the Facility is proposed to be located.

50. The proposed Facility and its discharge are not within the sewer CCN of any retail public utility.

51. The proposed Facility and its discharge are partially within Jonah's district boundaries and wholly within Jonah's water CCN area.

52. The City did not request Jonah's consent to provide wastewater service to the Facility, and Jonah has not

given consent for the City to operate within its boundaries.

SCR-AR 66 (Order) at FOF 49-52; *see Id.* at FOF 34-42. The district court's determination that a formal "no" was required from the City's city council (on either annexation and land-use waiver or on service) fails to account for the fact that the record does not demonstrate service availability from the City.

The City indisputably does not have either a wastewater Certificate of Convenience and Necessity (CCN) or Jonah's consent to provide wastewater services within its SUD boundaries. SCR-AR 94 (AIRW Ex. 24) at 31. There is no record evidence demonstrating the contrary. By statute, "[e]xcept as otherwise provided . . . a retail public utility may not provide retail water or sewer utility service within the boundaries of a district that provides the same type of retail water or sewer utility service without the district's consent, unless the retail public utility has a CCN to provide retail water or sewer utility service to that area." 16 Tex. Admin. Code § 24.225(c). Given that Jonah does not consent to the City serving within its boundaries, the City would be prohibited from serving the property proposed to be served by AIRW's facility, even if the City was

willing to waive other barriers to connection. *See* SCR-AR 66 at FOF 52; SCR-AR 94 (AIRW Ex. 24) at pdf 32; *See also* SCR-AR 59 (PFD) at 29-30.

Applying the evidence presented to the applicable provisions of the Water Code, the Commission reasonably concluded that the "Application demonstrates a need for the [permit]" and "demonstrates compliance with TCEQ's regionalization policy." SCR-AR 66 (Order) at COLs 10-11.

## II. The remainder of the order is supported by substantial evidence and was issued in accordance with applicable law and policy.

In addition to complying with Texas regionalization policy,[20] the Commission's Order is otherwise supported by substantial evidence, considering the reliable and probative evidence in the Record as a whole.[21] This includes the Commission's determination that the permit will protect and maintain the existing water quality and uses, including protecting aquatic and terrestrial wildlife, as is required by the

---

[20] The District Court identified no error outside of the regionalization issues discussed *supra* Section I.

[21] *See e.g.,* SCR-AR 71-77 (AIRW Exs. 1-7) (Prima Facie Demonstration); SCR-AR 84 (AIRW Ex. 14)(Price Direct); SCR-AR 111 (AIRW Ex. 41)(ED's Response to Comment); SCR-AR 124 (ED Ex. GC-1)(Cooper Direct); SCR-AR 127 (ED Ex. JL-1)(Lueg Direct), SCR-AR 129 (ED Ex. JL-3)(Implementation Procedures); SCR-AR 130 (ED Ex. JL-4)(Nutrient Screening Memo).

Commission's water-quality rules and antidegradation policy. SCR-AR 66 at COL 8-9, 12-14, 16; *see* 30 Tex. Admin. Code ch. 307.

## A. The statutory prima facie demonstration supports the Commission's Order granting the permit.

As an initial matter, under the Texas Government Code, certain information, when filed at the State Office of Administrative Hearings and entered into the evidentiary record, constitutes a prima facie demonstration that "all state and federal legal and technical requirements" are met "and a permit, if issued consistent with the draft permit, would protect human health and safety, the environment, and physical property." Tex. Gov't Code § 2003.047(i-1). This demonstration was made in the Commission proceeding at issue: "The Application, the Draft Permit, and the other materials listed in Texas Government Code section 2003.047(i-l), which are collectively referred to as the prima facie demonstration, were offered and admitted into the record at the preliminary hearing." SCR-AR 59 (PFD) at 7; *see* SCR-AR 25 (Order No. 1) at 1; SCR-AR 71-77 (AIRW Exs. 1-7); *see also* SCR-AR 66 (Order) at FOF 23.

The Government Code also provides an opportunity for parties to rebut the prima facie demonstration through controverting evidence and

allows the applicant and the Executive Director to provide additional information to support the draft permit. Tex. Gov't Code § 2003.047(i-2), (i-3). However, the City did not provide credible evidence that the draft permit does not comply with applicable requirements. As the Proposal For Decision explains:

> The City failed to rebut the prima facie determination because its arguments were conclusory and unverifiable due to a lack of underlying data to support its conclusions. The City alleged that the Application lacked information regarding the receiving streams and existing and known future uses and that TCEQ's review of the Application was incorrect; however, the ALJs find that the City's allegations are not supported by any credible evidence. The City did not present evidence disputing the accuracy of the [Aquatic Life Use], [dissolved oxygen] determinations, or effluent limits or how such determinations and limits are not protective of existing uses and wildlife.

SCR-AR 59 (Proposal For Decision) at 19 (pdf 24). Using the standards found in Texas Government Code sections 2003.047(i-1)-(i-3), the Commission properly concluded that the City did not rebut the prima facie demonstration by showing that one or more provisions in the permit violate a specifically applicable state or federal requirement that relates to a matter referred for contested-case hearing by the Commission. SCR-AR 66 (Order) at COL 7. By finding that the prima facie demonstration was unrebutted, the Commission determined that AIRW had satisfied its

42

burden to demonstrate that all state and federal legal and technical requirements for the permit were met and that the permit would be protective of human health and safety, the environment, and physical property. *See* Tex. Gov't Code § 2003.047(i-1). The evidence comprising the prima facie demonstration is "part of the reliable and probative record as a whole" and under Texas Government Code section 2001.174 serves as substantial evidence supporting the Order.

**B.    Testimony in the record demonstrating that the permit complies with the Commission's antidegradation policy and Water Quality Standards also supports the Commission's Order.**

In addition to the prima facie demonstration admitted into the record (SCR-AR 71-77), expert testimony also supported the permit, including aquatic scientist Jenna Lueg who testified that the permit would maintain and protect existing uses, will not harm aquatic or terrestrial wildlife, and does not violate the Commission's antidegradation policy. SCR-AR 127 (ED Ex. JL-1) at 10; *see* 30 Tex. Admin. Code § 307.5(b)(antidegradation policy).

Executive Director Staff conducts antidegradation reviews for new TPDES permit applications like AIRW's to ensure that the existing water quality and existing uses are maintained in accordance with the

Commission's antidegradation policy (30 Tex. Admin. Code § 307.5) and its Implementation Procedures. Record evidence shows that Executive Director Staff did so in this case. SCR-AR 127 (ED Ex. JL-1) at 7; SCR-AR 84 (AIRW Ex. 14) at 10-11; *see* SCR-AR 129 (ED Ex. JL-3) (Implementation Procedures).

Following the procedures set forth in the Implementation Procedures, Ms. Lueg testified that she performed both a Tier 1 and a Tier 2 antidegradation review for the proposed discharge in the same manner as she has completed prior permit reviews. SCR-AR 127 (ED Ex. J-1) at 7, 8, 10, 12. As a result of her review, Ms. Lueg concluded that the permit would satisfy Tier 1's requirements because existing uses will not be impaired and that numerical and narrative criteria to protect existing uses will be maintained. *Id.* at 8.

Executive Director witness James Michalk used Ms. Lueg's adjustments when modelling the proposed discharge and found that the effluent limits listed in his modelling memo would be adequate to ensure dissolved oxygen levels would be maintained above the appropriate criteria for the entire length of the discharge route. SCR-AR 73 (AIRW Ex. 3) at pdf 45 (modelling memo). In turn, Executive Director witness

Mr. Cooper took Mr. Michalk's effluent limits and incorporated them into the Draft Permit. SCR-AR 73 (AIRW Ex.3) at pdf 3 (draft permit); *compare Id.* at 45 (modelling memo).

> Executive Director Staff's review also considered impact on aquatic life and terrestrial life such as livestock; these considerations were directly addressed in the Executive Director's response to public comments and confirmed in comment 6 that the controlling standard was followed. SCR-AR 111 (AIRW Ex. 41) (ED's Response to Comments) at 10. Further. the Executive Director's Comment also confirmed that operations following the permit limitations will be safe for terrestrial and aquatic life.

*Id.* at 10-11.

Ms. Lueg also conducted a Tier 2 review of Mankins Branch—which has been identified as having high aquatic life use—and determined that no significant degradation[22] of water quality is expected. *Id.* at 8-9, 10, 12. Ms. Lueg explained that "[a] Tier 2 review ensures that no activities subject to regulatory action causing degradation of waters that exceed fishable/swimmable quality are allowed unless it can be shown to the commissioner's satisfaction that the lowering of water quality is

---

[22] "No significant degradation" means no lowering of water quality by more than a de minimis extent. *See* 30 Tex. Admin. Code § 307.5(b)(2) (defining Degradation as "a lowering of water quality by more than a de minimis extent, but not to the extent that an existing use is impaired.").

necessary for important economic or social development." SCR-AR 127 (ED Ex. JL-1) at 6; *see* 30 Tex. Admin. Code § 307.5(b)(2).

"As part of the Tier 2 review, Ms. Lueg performed a nutrient screening and recommended a total phosphorus (TP) limit of 0.5 mg/L to prevent degradation and excessive growth of algae and other aquatic vegetation because Mankins Branch has a concern for nitrate and TP." SCR-AR 59 (PFD) (citing SCR-AR 130 (ED Ex. JL-4) at 8-9). Ms. Lueg's nutrient screening was conducted in accordance with the Implementation Procedures and is organized with direct citation to the pertinent Implementation Procedures pages. *See* SCR-AR 130 (ED Ex. JL-4).

The Commission evaluates applications for new or expanding domestic discharges to reservoirs, streams, and rivers to determine if an effluent limit is needed for total phosphorus to prevent violation of numerical nutrient criteria and/or preclude excessive growth of aquatic vegetation. SCR-AR 127 (ED Ex. JL-1) at 8-9. Correspondingly, Ms. Lueg's nutrient screening included the proposed discharge flow rates, instream dilution, substrate type, depth, stream type, shading, impoundments, water clarity, sensitivity to growth of aquatic vegetation,

existing water quality concerns and impairments, and consistency with other permits in the area. *Id.* As a result of her nutrient screening and Tier 2 review, Ms. Lueg's recommended that a total phosphorus effluent limit of 0.5 mg/L be added to the permit. *Id.* at 9; SCR-AR 66 (Order and Permit) at pdf 19.

In addition to Ms. Lueg's review and testimony, Mr. Gordon Cooper testified that the permit requires testing for total suspended solids, ammonia nitrogen, total phosphorus, E. coli, and BOD,[23] with testing frequencies determined by rule in section 319.9(a), which sets out appropriate monitoring requirements for this type of facility. 30 Tex. Admin. Code § 319.9(a), Table 1; SCR-AR 124 (ED Ex. GC-1) at 10; SCR-AR 181 (Tr.) at 670.

Mr. Cooper further testified that the AIRW draft permit complies with all applicable TCEQ rules and regulations, and therefore is protective of water quality. SCR-AR 124 (ED Ex. GC-1) at 13.

Put simply, the permit requirements, including monitoring and testing frequency, are designed to ensure that the discharged treated water "'will not be toxic to man from ingestion of water, consumption of

---

[23] Biochemical Oxygen Demand.

aquatic organisms, or contact with the skin, or to terrestrial or aquatic life.'" *Id.* (citing 30 Tex. Admin. Code § 307.4(d)). The antidegradation evidence in the record more than clears the substantial-evidence standard. The Commission's antidegradation determination should be upheld. *See* SCR-AR 66 (Order) at FOFs 26-32, 55-61, 65-70, 74-75. COLs 4-9, 12, 14, 16.

**C. The Commission's additional findings on the protectiveness of the permit similarly are supported by substantial evidence.**

There is substantial evidence in the record to support all of the Commission's findings and conclusions with respect to the protectiveness of the permit, including the agency's findings that the permit complies will all nuisance-odors requirements (FOFs 66-67, COL 12), has sufficient operational requirements, (FOFs 74-75, COL 15-16, *see* FOFs 71-73) and will be protective of human health, (FOFs 55-59, COL 9). SCR-AR 66 (Order). The City failed to meet its burden of demonstrating otherwise. *See Heritage on San Gabriel*, 393 S.W.3d at 424.

**1. Witness testimony and AIRW's Application materials demonstrate satisfaction of all applicable nuisance- odor requirements.**

Wastewater permitting includes odor-abatement and prevention requirements to prevent possible adverse effects on the receiving body of

water, such as interference with its use. *See* Tex. Water Code § 26.030(a). Commission rules require abating and controlling nuisance odors and provide applicants three options for siting wastewater-treatment units for this purpose. 30 Tex. Admin. Code § 309.13(e). One of those options is ownership of a buffer zone of at least 150 feet between wastewater-treatment plant units and the nearest property line. *Id.* § 309.13(e)(1). To satisfy this option, the applicant must hold legal title or have other sufficient property interest to a contiguous tract of land necessary to meet the distance requirement. *Id.*

AIRW's application establishes ownership of a 150-foot buffer zone from all wastewater-treatment units[24] at the site. SCR-AR 74 at pdf 16, 70. The application includes a map of the property showing the location of the treatment plant units in relation to the property line. SCR-AR 74 at pdf 70. This map confirms that all units will be located at least 150 feet from the property line in all directions. *Id.*

---

[24] Wastewater-treatment units include "any apparatus necessary for the purpose of providing treatment of wastewater (*i.e.*, aeration basins, splitter boxes, bar screens, sludge drying beds, clarifiers, overland flow sites, treatment ponds or basins that contain wastewater, etc.)." 30 Tex. Admin. Code § 309.11(9). For purposes of the buffer zone requirements, "this definition does not include off-site bar screens, off-site lift stations, flow metering equipment, or post-aeration structures needed to meet permitted effluent minimum dissolved oxygen limitations." *Id.*

49

In addition, testimony from two different witnesses further showed satisfaction of the 150-foot buffer zone requirement. AIRW's Professional Engineer, Mark Perkins, testified that "[t]here will be a 150-foot buffer between the treatment units and the nearest property line" and that "ample space is available [at the property] to accommodate all major treatment units within the 150-foot buffer provided." SCR-AR 180 at 452:10-14; SCR-AR 87 at 7:13-16; *see also* SCR-AR 180 at 452:13-14. Executive Director Staff witness Gordon Cooper also reviewed the permit and testified that the draft permit adequately addresses nuisance-odor requirements, including compliance with the 150-foot buffer-zone requirements. SCR-AR 124 at 11:5-11. This record evidence, separately and collectively, supports the Commission's findings and conclusions that AIRW's proposed wastewater-treatment plant complies with the applicable nuisance-odor requirements.

Further addressing nuisance-odor requirements, the Commission also found that "evidence failed to show that the discharge will go into any body of water that crosses or abuts any park, playground, or schoolyard within one mile of the point of discharge." SCR-AR 66 at FOF 61. Supporting the Commission's finding, record evidence shows that

there are no parks, playgrounds, or schools on the Patterson Ranch property at issue. SCR-AR 180 (Tr.) at 417-18.

### 2. Record evidence demonstrates that human health is protected and that the operational requirements in the permit are sufficient.

Record evidence further supports the Commission's finding that the permit is protective of human health, including that of nearby residents. SCR-AR 66 (Order) at FOF 59; *see Id.* at FOF 55-58; COL 9. First, the statutory prima facie demonstration was made; this evidence, admitted in the record as AIRW Exhibits 1-7, by statute demonstrates that AIRW's permit protects human health and safety, the environment, and physical property. Tex. Gov't Code § 2003.047(i-1)(2); 30 Tex. Admin. Code § 80.17; SCR-AR 71-77; SCR-AR 66 at FOF 23. The Commission determined that the City did not rebut this presumption, and thus, the prima facie evidence provides sufficient support for the Order as substantial evidence in the reliable and probative record as a whole. SCR-AR 66 (Order) at FOF 55, COL 7; *see id.* at FOFs 26, 65, 74; SCR-AR 59 (PFD) at 49.

Additionally, Jenna Lueg testified that the draft permit was developed to protect aquatic life and human health in accordance with

the Water Quality Standards, which require that the receiving "surface waters must not be toxic to man from ingestion of water, consumption of aquatic organisms, or contact with the skin, or to terrestrial or aquatic life." 30 Tex. Admin. Code § 307.4(d); SCR-AR 127 (ED Ex. JL-1) at 11.

The draft permit's terms ensure that the proposed discharge will not: 1) result in instream toxicity; 2) cause a violation of an applicable narrative or numerical standard; 3) result in the endangerment of a drinking-water supply, or 4) result in aquatic bioaccumulation that may threaten human health. *Id.* at 11; *see* SCR-AR 73 (AIRW Ex. 3-AR Tab C) at pdf 2-35 (Draft Permit). As Ms. Lueg stated, the draft permit resulting from ED Staff's review is protective of human health of nearby residents. SCR-AR 127 (ED Ex. JL-1) at 11.

Moreover, substantial evidence supports the Commission's finding that operational requirements in the permit are sufficient to ensure continued protection of water quality. SCR-AR 66 at FOFs 74-75. In addition to the statutory prima facie demonstration, AIRW witness Mr. Price addressed protections related to *E. coli*. SCR-AR 84 (AIRW Ex. 14). Mr. Price testified that the chlorine residual in the

effluent (discharge) is to be maintained between 1.0 and 4.0 mg/L and will be sampled and reported five times per week, and therefore, the effluent will be free of significant numbers of pathogens and more frequent sampling for *E. coli* is unnecessary. SCR-AR 84 (AIRW Ex. 14) at pdf 15.

Similarly, Executive Director Witness Mr. Cooper testified that the sampling provided for by Table 1 in the Water Quality Standards is the appropriate frequency and method of sampling for facilities with a flow of 0.2 MGD, as proposed in this case. *Id.* at 48; AR 181 (Tr.) at 670. Mr. Cooper explained that testing frequencies for pollutants limited in the permit are standardized—based on both the design capacity of the treatment facility and on section 319.9(a) of the Commission's rules. SCR-AR 124 (ED Ex. GC-1) at pdf 10; *see* 30 Tex. Admin. Code § 319.9.

The Administrative Law Judges had all this evidence before them and noted that it established that the draft permit would maintain and protect human health, "even given a hypothetical relating to viral pathogens causing illness." SCR-AR 59 (PFD) at 47;

53

*see Id.* at 49. The Commission had the benefit of all of this evidence in reaching its final determination.

## PRAYER

For these reasons, the Texas Commission on Environmental Quality respectfully prays that this Court reverse the district court's judgment and render judgment affirming the Commission's Order in all respects. The Commission further prays for such other and further relief to which it may be entitled.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

AUSTIN KINGHORN
Deputy Attorney General for Civil Litigation

AARON L. NIELSON
Solicitor General

WILLIAM F. COLE
Principal Deputy Solicitor General

KELLIE E. BILLINGS-RAY
Chief, Environmental Protection Division

*/s/ Sara J. Ferris*
SARA J. FERRIS
Assistant Attorney General
State Bar No. 50511915
Sara.Ferris@oag.texas.gov

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
P.O. Box 12548 (MC-066)
Austin, Texas 78711-2548
(512) 463-2012
(512) 320-0911 (Fax)

***Attorneys for Texas Commission on Environmental Quality***

54

## CERTIFICATE OF COMPLIANCE

I certify that Brief of Appellant, Texas Commission on Environmental Quality contains 10,323 words and therefore complies with the word limit found in Tex. R. App. P. 9.4(i)(2)(B).

*/s/ Sara J. Ferris*
SARA J. FERRIS

## CERTIFICATE OF SERVICE

I certify that the Brief of Appellant, Texas Commission on Environmental Quality was electronically filed with the Clerk of the Court using the electronic case filing system of the Court, and that a true and correct copy was served upon counsel for each party of record, listed below, by electronic service or email on May 21, 2025:

John J. Carlton
john@carltonlawaustin.com
Kelli A. N. Carlton
kelli@carltonlawaustin.com
Erin R. Selvera
erin@carltonlawaustin.com
Michael Parsons
michael@carltonlawaustin.com
THE CARLTON LAW FIRM, PLLC
4301 Westbank Dr., Suite B130
Austin, TX 78746-6568

***Attorneys for Jonah Water Special District***

Andrew B. Davis
andrew@lkcfirm.com
William T. Thompson
will@lkcfirm.com

William A. Faulk, III
cfaulk@spencerfane.com
Carlota Hopkins-Baul
chbaul@spencerfane.com
Maris M. Chambers
mchambers@spencerfane.com
SPENCER FANE, LLP
816 Congress Ave., Suite 1200
Austin, TX 78701

Patricia Erlinger Carls
tcarls@tcarlslaw.com
LAW OFFICE OF PATRICIA ERLINGER CARLS
3100 Glenview Ave.
Austin, TX 78703

***Attorneys City of Georgetown, TX***

Todd Disher
todd@lkcfirm.com
LEHOTSKY KELLER COHN, LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701

Helen S. Gilbert
hgilbert@bartonbensonjones.com
BARTON BENSON JONES, PLLC
7000 N. MoPac Expwy, Suite 200
Austin, TX 78731

Edmond McCarthy
Ed@ermlawfirm.com
MCCARTHY & MCCARTHY, LLP
1122 Colorado St., Suite 2399
Austin, TX 78701

***Attorneys for AIRW 2017-7, L.P.,
600 Westinghouse Investments,
LLC, And 800 Westinghouse
Investments, LLC***

/s/ Sara J. Ferris
SARA J. FERRIS

56

# APPENDIX TO BRIEF OF APPELLANT
# TEXAS COMMISSION ON ENVIRONMENTAL QUALITY

| Appendix Item | Description | Record Citation |
|---|---|---|
| 1 | **District Court Final Judgment** | **CR 730-32** |
| 2 | **Commission's Final Order and Permit** | **AR 66 at 5-52** |
| | ·Texas Commission on Environmental Quality's Order (Nov. 28, 2022) | AR 66 at 5-17 |
| | ·AIRW's TPDES Permit No. WQ0015878001 (Issued Nov. 28, 2022) | AR 66 at 18-52 |
| 3 | **Executive Director's Response to Public Comment** | **AR 111** |
| 4 | **Texas Government Code Provisions** | |
| | ·Tex. Gov't Code §§ 2001.174, 2001.175, | |
| | ·Tex. Gov't Code § 2003.047 | |
| 5 | **Texas Water Code – Regionalization Provisions** | |
| | · Tex. Water Code §§ 26.003, 26.0282, 26.081 | |
| 6 | **Texas Water Code – Other Provisions** | |
| | · Tex. Water Code §§ 5.122, 5.351 | |

| | | |
|---|---|---|
| | • Tex. Water Code §§ 26.027, 26.030 | |
| **7** | **Texas Administrative Code Provisions** | |
| | • 16 Tex. Admin. Code § 24.225 | |
| | • 30 Tex. Admin. Code § 80.17 | |
| | • 30 Tex. Admin. Code §§ 307.4, 307.5 | |
| | • 30 Tex. Admin. Code §§ 309.11, 309.13 | |
| | • 30 Tex. Admin. Code § 319.9 | |
| **8** | **Georgetown Unified Development Code Provisions** | |
| | • Uniform Development Code §§ 1.01, 13.05 | |
| **9** | **TCEQ Regionalization Guidance Webpage** | **AR 98** |

# Appendix Item 1

District Court Final Judgment

CAUSE NO. D-1-GN-23-001004

| | | |
|---|---|---|
| **CITY OF GEORGETOWN, TEXAS** | § | **IN THE DISTRICT COURT OF** |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | |
| | § | **TRAVIS COUNTY, TEXAS** |
| **TEXAS COMMISSION ON** | § | |
| **ENVIRONMENTAL QUALITY,** | § | |
| | § | |
| **Defendant.** | § | **261ST JUDICIAL DISTRICT** |

## FINAL JUDGMENT REVERSING ORDER OF
## TEXAS COMMISSION ON ENVIRONMENTAL QUALITY

This case is an appeal of a final agency order relating to the issuance by the Texas Commission on Environmental Quality ("TCEQ") to Intervenor AIRW 2017-7, L.P. ("AIRW") of a new Texas Pollutant Discharge Elimination System permit (the "Permit") to discharge up to 200,000 gallons per day of treated domestic wastewater from a proposed wastewater treatment facility within the extraterritorial jurisdiction of the plaintiff, City of Georgetown ("City" or "Plaintiff"). On October 31, 2024, this Court held a hearing on the merits of this cause. Having considered the Texas Administrative Procedure Act, pleadings, administrative record, briefing, and argument of counsel, the Court finds that the TCEQ's order under review in this case should be and is hereby **REVERSED AND REMANDED** to Defendant for further proceedings for the following reasons:

1. Defendant erred by determining that the Permit complies with Texas's regionalization policy.

2. Because Intervenor AIRW failed to seek a waiver from Plaintiff's city council, there is no way to know whether the city council would be willing to waive the annexation requirement. It is unreasonable to assume that City staff—who are bound by the city council—speak for the city council, which is not bound and has both the power to waive requirements and the ability to act under political

considerations. This means that Defendant should not have determined both that (1) Plaintiff denied Intervenor AIRW service; and (2) connection to Plaintiff's system would cost Intervenor AIRW $20 million.

IT IS ORDERED, ADJUDGED, AND DECREED that TCEQ's order is **REVERSED AND REMANDED TO THE TCEQ FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS ORDER**.

This Judgment is final, disposes of all parties and claims, and is appealable.

~~SIGNED this ___ of November, 2024.~~

Date: December 2, 2024

_____
JUDGE PRESIDING
LAURIE EISERLOH
455th District Court

2

AGREED AS TO FORM:

_(signature)_

William A. Faulk III
SPENCER FANE, LLP
cfaulk@spencerfane.com
**Counsel for Plaintiff, City of Georgetown**

_(signature)_

Sara J. Ferris
Erin K. Snody
OFFICE OF THE ATTORNEY GENERAL
sara.ferris@oag.texas.gov
erin.snody@oag.texas.gov
**Counsel for Defendant Texas Commission on Environmental Quality**

_(signature)_

Andrew B. Davis
LEH0TSKY KELLER COHN LLP
andrew@lkcfirm.com
Helen Gilbert
BARTON BENSON JONESPLLC
hgilbert@bartonbensonjones.com
Edmond McCarthy
MCCARTHY & MCCARTHY, LLP
ed@ermlawfirm.com
**Counsel for Intervenors**
**AIRW 2017-7, L.P., 600 Westinghouse Investments, LLC,**
**and 800 Westinghouse Investments, LLC**

_(signature)_

John J. Carlton
THE CARLTON LAW FIRM, PLLC
john@carltonlawaustin.com
**Counsel for Intervenor Jonah Water Special Utility District**

3

# Appendix Item 2

Commission's Final Order and Permit

# TEXAS COMMISSION ON ENVIRONMENTAL QUALITY



**AN ORDER**     GRANTING THE APPLICATION BY AIR-W 2017-7 L.P. FOR TPDES PERMIT NO. WQ0015878001 IN WILLIAMSON COUNTY, TEXAS; SOAH DOCKET NO. 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; TCEQ DOCKET NO. 2021-1214-MWD

On November 16, 2022, the Texas Commission on Environmental Quality (TCEQ or Commission) considered the application of AIR-W 2017-7 L.P. (AIRW) for a new Texas Pollutant Discharge Elimination System (TPDES) Permit No. WQ0015878001 in Williamson County, Texas. A Proposal for Decision (PFD) was presented by Andrew Lutostanski and Katerina DeAngelo, Administrative Law Judges (ALJs) with the State Office of Administrative Hearings (SOAH), who conducted an evidentiary hearing concerning the application on May 23-25, 2022, in Austin, Texas via Zoom videoconferencing. After considering the PFD, the Commission makes the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT

### Application

1. AIRW filed its application (Application) for a new TPDES permit with TCEQ on April 6, 2020.

2. The Application requested authorization to discharge treated domestic wastewater from a proposed plant site, the Rockride Lane Water Resource Reclamation Facility (Facility), to be located approximately 500 feet southeast of the intersection of Rockride Lane (County Road 110) and Westinghouse Road (County Road 111), in Williamson County, Texas 78626. AIRW proposes to build the Facility to serve the Mansions of Georgetown III development, an 880-house subdivision.

1

3.  The treated effluent will be discharged via pipe, thence through a culvert, thence to an unnamed tributary, thence to Mankins Branch, thence to the San Gabriel/North Fork San Gabriel River in Segment No. 1248 of the Brazos River Basin. The unclassified receiving water uses are limited aquatic life use for the unnamed tributary and Mankins Branch (intermittent with perennial pools), and high aquatic life use for Mankins Branch (perennial). The designated uses for Segment No. 1248 are primary contact recreation, public water supply, aquifer protection, and high aquatic life use.

4.  The Executive Director (ED) declared the Application administratively complete on June 19, 2020, and technically complete on October 26, 2020.

5.  The ED completed the technical review of the Application, prepared a draft permit (Draft Permit) and made it available for public review and comment.

6.  AIRW currently owns the site at which the proposed Facility will be located.

7.  AIRW, through its affiliate, entered into Non-Standard Service Agreements (NSSAs) with Jonah Water Special Utility District (Jonah) on April 20, 2022, for the provision of retail wastewater services to the development.

8.  Under the NSSAs, Jonah will own and operate the Facility once the TPDES permit is issued and transferred to it under 30 Texas Administrative Code section 305.64.

**The Draft Permit**

9.  The Draft Permit would authorize a discharge of treated domestic wastewater at a daily average flow not to exceed 200,000 gallons per day (or 0.20 million gallons per day (MGD)).

10. The Facility will have treatment units including aeration basins, a final clarifier, a cloth effluent filter, chemical injection for phosphorus removal, aerated sludge holding and thickening tank, and a chlorine contact chamber. The Facility has not been constructed.

11. The unclassified receiving water uses are limited aquatic life use for the unnamed tributary and Mankins Branch (intermittent with perennial pools), and high aquatic life use for Mankins Branch (perennial). The designated uses for Segment No. 1248 are primary contact recreation, public water supply, aquifer protection, and high aquatic life use.

2

12. The effluent limitations in the Draft Permit, based on a 30 day average, include: 7 milligram per liter (mg/L) Five-Day Carbonaceous Biochemical Oxygen Demand; 10 mg/L Total Suspended Solids; 2 mg/L Ammonia Nitrogen; 0.5 mg/L Total Phosphorus; a minimum dissolved oxygen (DO) of 4.0 mg/L, pH in the range of 6.0 to 9.0, and Escherichia coli (E. coli) not to exceed 126 colony forming units/most probable number per 100 milliliter.

13. The effluent shall contain a chlorine residual of at least 1.0 mg/L and shall not exceed a chlorine residual of 4.0 mg/L after a detention of at least 20 minutes based on peak flow.

**Notice and Jurisdiction**

14. The Notice of Receipt of the Application and Intent to Obtain Water Quality Permit was published on June 28, 2020, in the *Williamson County Sun* in English and, on June 25, 2020, in *El Mundo Newspaper* in Spanish.

15. The Combined Notice of Receipt and Intent to Obtain a Water Quality Permit and Notice of Application and Preliminary Decision was published on December 13, 2020, in the *Williamson County Sun* in English and, on December 17, 2020, in *El Mundo Newspaper* in Spanish.

16. The comment period for the Application closed on January 19, 2021.

17. TCEQ's Office of the Chief Clerk received timely comments from various individuals and the City of Georgetown (the City). The City also timely filed a request for a Contested Case Hearing based upon issues raised during the public comment period.

18. The ED filed his Response to Public Comments on August 6, 2021.

19. On November 3, 2021, the Commission considered the hearing request at its open meeting and, on November 9, 2021, issued an Interim Order, directing that the following eight issues be referred to SOAH, denying all issues not referred, and setting the maximum duration of the hearing at 180 days from the date of the preliminary hearing until the date the PFD is issued by SOAH:

A) Issue A: Whether the Draft Permit is protective of water quality and the existing uses of the receiving waters in accordance with applicable Texas Surface Water Quality

3

Standards (TSQWS), including protection of aquatic and terrestrial wildlife;

B) Issue B: Whether the Draft Permit is consistent with the state's regionalization policy and demonstration of need for the volume requested in the application for a new discharge permit pursuant to Texas Water Code section 26.0282;

C) Issue C: Whether the Draft Permit is protective of the health of the nearby residents;

D) Issue D: Whether the Draft Permit complies with applicable requirements regarding nuisance odors;

E) Issue E: Whether the Application is substantially complete and accurate;

F) Issue F: Whether the Draft Permit complies with the TCEQ's antidegradation policy and procedures;

G) Issue G: Whether the Draft Permit should be altered or denied based on the AIRW's compliance history; and

H) Issue H: Whether the Draft Permit contains sufficient provisions to ensure protection of water quality, including necessary operational requirements.

20. On January 16, 2022, notice of the preliminary hearing was published in English in the *Williamson County Sun* and, on January 13, 2022, in Spanish in *El Mundo Newspaper*. The notice included the time, date, and place of the hearing, as well as the matters asserted, in accordance with the applicable statutes and rules.

**Proceedings at SOAH**

21. On February 24, 2022, a preliminary hearing was convened in this case via videoconference by SOAH ALJs Andrew Lutostanski and Ross Henderson. Attorney Helen Gilbert appeared for AIRW; attorney Patricia Carls appeared for the City; attorney Bobby Salehi appeared for the ED; attorney Jennifer Jamison appeared for the Office of Public Interest Counsel (OPIC); Jim Webb appeared for himself; and John Carlton appeared for Jonah.

22. Mr. Webb and Jonah sought party status at the preliminary hearing, and the ALJs granted those requests. Mr. Webb submitted his withdrawal from the proceeding on May 17, 2022.

23. Jurisdiction was noted by the ALJs and the Administrative Record, and AIRW's exhibits AIRW Exhibit 1-7 were admitted.

24. A second preliminary hearing was held via videoconference by SOAH ALJs Lutostanski and Katerina DeAngelo on May 12, 2022. All parties appeared through their respective representatives and the ALJs ruled on all timely-filed motions and objections.

25. On May 23-25, 2022, ALJs Lutostanski and DeAngelo convened the hearing on the merits via videoconference and all parties appeared through their respective representatives. The record closed on June 24, 2022, after the parties filed post-hearing briefs.

**Protection of Water Quality and Existing Uses, Including Aquatic and Terrestrial Wildlife**

26. The prima facie demonstration that the Draft Permit is protective of water quality and the existing uses of the receiving waters in accordance with applicable Texas Surface Water Quality Standards (TSWQS), including protection of aquatic and terrestrial wildlife, was not rebutted.

27. TSWQS apply to surface water in the state and are set by the Commission at levels designed to be protective of public health, aquatic resources, terrestrial life, and other environmental and economic resources. The applicable water quality standards are the TSWQS in 30 Texas Administrative Code Chapter 307.

28. The TSWQS consist of general standards, narrative standards, surface water segment-specific numeric standards, numeric standards for toxic substances, and antidegradation review.

29. The TSWQS establish specific uses for each classified water body in the state and also provide numeric criteria for each classified stream.

30. The provisions of the Draft Permit are protective of water quality and are in accordance with the TSWQS.

31. The Draft Permit is protective of water quality and existing uses of the receiving water.

32. The Draft Permit is protective of aquatic and terrestrial wildlife.

**Regionalization**

33. To effectuate its policy of encouraging regionalization of wastewater services, TCEQ requires an applicant to provide certain information to allow TCEQ to conduct a regionalization analysis.

34. No part of the Facility or development is within the City's corporate limits.

35. The proposed Facility and its discharge are within the City's extraterritorial jurisdiction.

36. Properties in the City's extraterritorial jurisdiction that desire wastewater services from the City must first submit a petition for voluntary annexation.

37. The ordinance requiring annexation for wastewater services may be waived by the City Council.

38. As part of its Application, AIRW provided email correspondence to and from nearby providers regarding whether they would provide sewer service.

39. AIRW's written communications with nearby providers were sufficient, and AIRW was not required to submit certified letters because the emails provide similar tracking and traceability.

40. AIRW explored securing wastewater services from the City, and the City placed conditions on providing service, including: the Facility site would have to be annexed into the City and comply with the City's land use restrictions.

41. There was no indication that the City was willing to waive the annexation and land use requirements.

42. AIRW received a conditional offer for sewer service from the City. The City denied AIRW's request for service unless AIRW agreed to annexation and land use restrictions.

43. The ED requested from AIRW a cost analysis of expenditures that includes the cost of connecting to the CCN facilities versus the cost of the proposed facility or expansion.

44. Constructing a new plant will cost approximately $300,000 more than connecting to the City's system.

45. Because of the higher property tax rate inside the City than outside it in the unincorporated area and the City's condition of annexation to connect to its system, connecting carries with it an approximately $20 million cost due to diminution in property value.

46. Costs weigh in favor of granting AIRW's application.

47. The evidence fails to show that easements and the delay inherent to acquiring them are impediments to connecting to the City's system.

48. Even if easements were needed, the evidence fails to show that AIRW tried and failed to secure them.

49. There is no regional provider designated for the area where the Facility is proposed to be located.

50. The proposed Facility and its discharge are not within the sewer CCN of any retail public utility.

51. The proposed Facility and its discharge are partially within Jonah's district boundaries and wholly within Jonah's water CCN area.

52. The City did not request Jonah's consent to provide wastewater service to the Facility, and Jonah has not given consent for the City to operate within its boundaries.

53. DELETED

7

54.    DELETED

**Nearby Residents**

55.    The prima facie demonstration that the Draft Permit is protective of the health of nearby residents was not rebutted.

56.    The Draft Permit contains adequate permit limits and monitoring requirements to protect the health of nearby residents.

57.    The monitoring and sampling requirements in the Draft Permit comply with the Commission rules.

58.    The Draft Permit contains appropriate effluent limits.

59.    The Draft Permit is protective of human health, including those of nearby residents.

**Nuisance Odors**

60.    AIRW will control nuisance odors by owning the 150-foot buffer zone from the wastewater treatment plant units to the property line.

61.    The evidence failed to show that the discharge will go into any body of water that crosses or abuts any park, playground, or schoolyard within one mile of the point of discharge.

**Completeness and Accuracy of Application**

62.    The prima facie demonstration that the Application is substantially complete and accurate was not rebutted.

63.    The Application went through both an administrative and a technical review.

64.    The Application included all required information and was substantially complete and accurate.

## Antidegradation

65. The prima facie demonstration that the Draft Permit complies with TCEQ's antidegradation policy and procedures was not rebutted.

66. The ED performed a Tier 1 and Tier 2 antidegradation review of the receiving waters in accordance with 30 Texas Administrative Code section 307.5.

67. The narrative and numeric criteria to protect existing uses will be maintained throughout the receiving waters; therefore, existing water quality uses will be maintained and protected.

68. The existing water quality uses of the receiving waters of the unnamed tributary of unnamed tributary, Mankins Branch, the San Gabriel/North Fork San Gabriel River in Segment No. 1248 of the Brazos River Basin will not be impaired by the Draft Permit as long as AIRW complies with the Draft Permit, which will satisfy the antidegradation Tier 1 requirements.

69. The Draft Permit will not cause significant degradation of water quality in the receiving waters of the unnamed tributary, Mankins Branch, the San Gabriel/North Fork San Gabriel River in Segment No. 1248 of the Brazos River Basin as long as AIRW complies with the Draft Permit, which will satisfy the antidegradation Tier 2 requirements.

70. The Draft Permit complies with TCEQ's antidegradation policy and procedures.

## Compliance History

71. AIRW's compliance status is unclassified.

72. No evidence was presented that indicated that AIRW's compliance history should alter or result in permit denial.

73. AIRW's compliance history of unclassified does not serve as a basis for alteration or denial of the Draft Permit.

## Operational Requirements

74. The prima facie demonstration that the Draft Permit contains sufficient provisions to ensure protection of water quality, including necessary operational requirements, was not rebutted.

75. The operational requirements in the Draft Permit are sufficient to ensure protection of water quality.

## Transcription Costs

76. Reporting and transcription of the hearing on the merits was warranted because the hearing lasted for three days.

77. All parties fully participated in the hearing by presenting witnesses and cross-examining witnesses; however, Jonah's participation in the hearing was minor and disproportionate to the City and AIRW.

78. Both the City and AIRW participated roughly equally in the hearing and cited to the transcript in their closing arguments; therefore, both sides benefitted from having a transcript.

79. There was no evidence that any party subject to allocation of costs is financially unable to pay a share of the costs.

80. The total cost for recording and transcribing the preliminary hearing and the hearing on the merits was $8,848.75.

81. AIRW and the City should each pay one-half of the transcription costs.

## II. CONCLUSIONS OF LAW

1. TCEQ has jurisdiction over this matter. Tex. Water Code, chs. 5, 26.

2. SOAH has jurisdiction to conduct a hearing and to prepare a PFD in contested cases referred by the Commission under Texas Government Code section 2003.047.

10

3. Notice was provided in accordance with Texas Water Code sections 5.114 and 26.028; Texas Government Code sections 2001.051 and 2001.052; and 30 Texas Administrative Code sections 39.405 and 39.551.

4. The Application is subject to the requirements in Senate Bill 709, effective September 1, 2015. Tex. Gov't Code § 2003.047(i-1)-(i-3).

5. AIRW's filing of the Administrative Record established a prima facie case that: (1) the Draft Permit meets all state and federal legal and technical requirements; and (2) a permit, if issued consistent with the Draft Permit, would protect human health and safety, the environment, and physical property. Tex. Gov't Code § 2003.047(i-1); 30 Tex. Admin. Code § 80.17.

6. AIRW retains the burden of proof on the issues regarding the sufficiency of the Application and compliance with the necessary statutory and regulatory requirements. 30 Tex. Admin. Code § 80.17(a).

7. The City did not rebut the prima facie demonstration by demonstrating that one or more provisions in the Draft Permit violate a specifically applicable state or federal requirement that relates to a matter referred by TCEQ. Tex. Gov't Code § 2003.047(i-2); 30 Tex. Admin. Code § 80.117(c).

8. The Draft Permit is protective of water quality and the existing uses of the receiving waters in accordance with applicable TSWQS, including protection of aquatic and terrestrial wildlife.

9. The Draft Permit is protective of the health of residents near the proposed Facility and discharge route.

10. The Application demonstrates compliance with TCEQ's regionalization policy. Tex. Water Code §§ 26.003, 26.081(a)-(b), (d); 26.0282.

11. The Application demonstrates a need for the Draft Permit. Tex. Water Code § 26.0282.

12. The Draft Permit contains sufficient provisions to prevent nuisance odors. 30 Tex. Admin. Code §§ 217.38, 309.13(e).

13. The Application is substantially complete and accurate.

11

14. The Draft Permit complies with TCEQ's antidegradation policy. 30 Texas Admin. Code §§ 307.5, 307.6(b)(4).

15. AIRW's compliance history does not raise issues regarding AIRW's ability to comply with the material terms of the Draft Permit or that would warrant altering the terms of the Draft Permit.

16. The Draft Permit contains sufficient provisions, including necessary operational requirements, to ensure protection of water quality.

17. No transcript costs may be assessed against the ED or OPIC because TCEQ's rules prohibit the assessment of any cost to a statutory party who is precluded by law from appealing any ruling, decision, or other act of the Commission. 30 Tex. Admin. Code § 80.23(d)(2).

18. Factors to be considered in assessing transcript costs include: the party who requested the transcript; the financial ability of the party to pay the costs; the extent to which the party participated in the hearing; the relative benefits to the various parties of having a transcript; the budgetary constraints of a state or federal administrative agency participating in the proceeding; and any other factor which is relevant to a just and reasonable assessment of the costs. 30 Tex. Admin. Code § 80.23(d)(1).

19. Considering the factors in 30 Texas Administrative Code section 80.23(d)(1), a reasonable assessment of hearing transcript costs against parties to the contested case proceeding is: one-half to AIRW and one-half to the City.

## III. EXPLAINATION OF CHANGES

1. The Commission determined to adopt the Administrative Law Judges' proposed Order with changes.

2. The Commission determined to amend the second sentence in Finding of Fact #3 based on the Executive Director's Exceptions and agreed to by the Administrative Law Judges to read: "The unclassified receiving water uses are limited aquatic life use for the unnamed tributary and Mankins Branch (intermittent with perennial pools), and high aquatic life use for Mankins Branch (perennial)."

12

3. The Commission determined to amend Finding of Fact #51 based on Jonah's Exceptions and agreed to by the Administrative Law Judges to read: "The proposed Facility and its discharge are partially within Jonah's district boundaries and wholly within Jonah's water CCN area."

4. The Commission determined to delete Findings of Fact #53 and #54 as unnecessary to the Commission's regionalization policy consideration in this case.

**NOW, THEREFORE, BE IT ORDERED BY THE TEXAS COMMISSION ON ENVIRONMENTAL QUALITY, IN ACCORDANCE WITH THESE FINDINGS OF FACT AND CONCLUSIONS OF LAW, THAT:**

1. AIRW's Application for Texas Pollutant Discharge Elimination System Permit No. WQ0015878001 is granted as set forth in the Draft Permit.

2. AIRW and the City must each pay one-half of the transcription costs.

3. The Commission adopts the ED's Response to Public Comment in accordance with 30 Texas Administrative Code section 50.117.

4. All other motions, requests for entry of specific Findings of Fact or Conclusions of Law, and any other requests for general or specific relief, if not expressly granted herein, are hereby denied.

5. The effective date of this Order is the date the Order is final, as provided by Texas Government Code section 2001.144 and 30 Texas Administrative Code section 80.273.

6. TCEQ's Chief Clerk shall forward a copy of this Order to all parties.

7. If any provision, sentence, clause, or phrase of this Order is for any reason held to be invalid, the invalidity of any provision shall not affect the validity of the remaining portions of this Order.

ISSUED: November 28, 2022    TEXAS COMMISSION ON
ENVIRONMENTAL QUALITY


Jon Niermann, Chairman

13



TEXAS COMMISSION ON ENVIRONMENTAL QUALITY
P.O. Box 13087
Austin, Texas 78711-3087

<u>PERMIT TO DISCHARGE WASTES</u>
under provisions of
Section 402 of the Clean Water Act
and Chapter 26 of the Texas Water Code

AIRW 2017-7, L.P.

whose mailing address is

2505 North State Highway 360, Suite 800
Grand Prairie, Texas 75050

is authorized to treat and discharge wastes from the Rockride Lane Water Resource Reclamation Facility, SIC Code 4952

located approximately 500 feet southeast of the intersection of Rockride Lane (County Road 110) and Westinghouse Road (County Road 111), in Williamson County, Texas 78626

via pipe, thence through a culvert, thence to an unnamed tributary, thence to Mankins Branch, thence the San Gabriel/North Fork San Gabriel River in Segment No. 1248 of the Brazos River Basin

only according to effluent limitations, monitoring requirements, and other conditions set forth in this permit, as well as the rules of the Texas Commission on Environmental Quality (TCEQ), the laws of the State of Texas, and other orders of the TCEQ. The issuance of this permit does not grant to the permittee the right to use private or public property for conveyance of wastewater along the discharge route described in this permit. This includes, but is not limited to, property belonging to any individual, partnership, corporation, or other entity. Neither does this permit authorize any invasion of personal rights nor any violation of federal, state, or local laws or regulations. It is the responsibility of the permittee to acquire property rights as may be necessary to use the discharge route.

This permit shall expire at midnight, **five years from the date of issuance**.

ISSUED DATE: *November 28, 2022*

_____
For the Commission

EFFLUENT LIMITATIONS AND MONITORING REQUIREMENTS

1.  During the period beginning upon the date of issuance and lasting through the date of expiration, the permittee is authorized to discharge subject to the following effluent limitations:

The daily average flow of effluent shall not exceed 0.20 million gallons per day (MGD), nor shall the average discharge during any two-hour period (2-hour peak) exceed 556 gallons per minute.

| Effluent Characteristic | Discharge Limitations | | | | Min. Self-Monitoring Requirements | |
| --- | --- | --- | --- | --- | --- | --- |
| | Daily Avg | 7-day Avg | Daily Max | Single Grab | Report Daily Avg. & Max. Single Grab | |
| | mg/l (lbs/day) | mg/l | mg/l | mg/l | Measurement Frequency | Sample Type |
| Flow, MGD | Report | N/A | Report | N/A | Continuous | Totalizing Meter |
| Carbonaceous Biochemical Oxygen Demand (5-day) | 7 (12) | 12 | 22 | 32 | One/week | Grab |
| Total Suspended Solids | 10 (17) | 15 | 25 | 35 | One/week | Grab |
| Ammonia Nitrogen | 2 (3.3) | 5 | 10 | 15 | One/week | Grab |
| Total Phosphorus | 0.5 (0.8) | 1 | 2 | 3 | One/week | Grab |
| E. coli, CFU or MPN* per 100 ml | 126 | N/A | N/A | 399 | One/month | Grab |

*CFU or MPN* - colony-forming units or most probable number

2.  The effluent shall contain a chlorine residual of at least 1.0 mg/l and shall not exceed a chlorine residual of 4.0 mg/l after a detention time of at least 20 minutes (based on peak flow), and shall be monitored five times per week by grab sample. An equivalent method of disinfection may be substituted only with prior approval of the Executive Director.

3.  The pH shall not be less than 6.0 standard units nor greater than 9.0 standard units and shall be monitored once per month by grab sample.

4.  There shall be no discharge of floating solids or visible foam in other than trace amounts and no discharge of visible oil.

5.  Effluent monitoring samples shall be taken at the following location(s): Following the final treatment unit.

6.  The effluent shall contain a minimum dissolved oxygen of 4.0 mg/l and shall be monitored once per week by grab sample.

**DEFINITIONS AND STANDARD PERMIT CONDITIONS**

As required by Title 30 Texas Administrative Code (TAC) Chapter 305, certain regulations appear as standard conditions in waste discharge permits. 30 TAC § 305.121 - 305.129 (relating to Permit Characteristics and Conditions) as promulgated under the Texas Water Code (TWC) §§ 5.103 and 5.105, and the Texas Health and Safety Code (THSC) §§ 361.017 and 361.024(a), establish the characteristics and standards for waste discharge permits, including sewage sludge, and those sections of 40 Code of Federal Regulations (CFR) Part 122 adopted by reference by the Commission. The following text includes these conditions and incorporates them into this permit. All definitions in TWC § 26.001 and 30 TAC Chapter 305 shall apply to this permit and are incorporated by reference. Some specific definitions of words or phrases used in this permit are as follows:

1. Flow Measurements

    a. Annual average flow - the arithmetic average of all daily flow determinations taken within the preceding 12 consecutive calendar months. The annual average flow determination shall consist of daily flow volume determinations made by a totalizing meter, charted on a chart recorder and limited to major domestic wastewater discharge facilities with one million gallons per day or greater permitted flow.

    b. Daily average flow - the arithmetic average of all determinations of the daily flow within a period of one calendar month. The daily average flow determination shall consist of determinations made on at least four separate days. If instantaneous measurements are used to determine the daily flow, the determination shall be the arithmetic average of all instantaneous measurements taken during that month. Daily average flow determination for intermittent discharges shall consist of a minimum of three flow determinations on days of discharge.

    c. Daily maximum flow - the highest total flow for any 24-hour period in a calendar month.

    d. Instantaneous flow – the measured flow during the minimum time required to interpret the flow measuring device.

    e. 2-hour peak flow (domestic wastewater treatment plants) - the maximum flow sustained for a two-hour period during the period of daily discharge. The average of multiple measurements of instantaneous maximum flow within a two-hour period may be used to calculate the 2-hour peak flow.

    f. Maximum 2-hour peak flow (domestic wastewater treatment plants) - the highest 2-hour peak flow for any 24-hour period in a calendar month.

2. Concentration Measurements

    a. Daily average concentration - the arithmetic average of all effluent samples, composite or grab as required by this permit, within a period of one calendar month, consisting of at least four separate representative measurements.

        i. For domestic wastewater treatment plants - When four samples are not available in a calendar month, the arithmetic average (weighted by flow) of all values in the previous four consecutive month period consisting of at least four measurements shall be utilized as the daily average concentration.

ii.   For all other wastewater treatment plants - When four samples are not available in a calendar month, the arithmetic average (weighted by flow) of all values taken during the month shall be utilized as the daily average concentration.

b.   7-day average concentration - the arithmetic average of all effluent samples, composite or grab as required by this permit, within a period of one calendar week, Sunday through Saturday.

c.   Daily maximum concentration - the maximum concentration measured on a single day, by the sample type specified in the permit, within a period of one calendar month.

d.   Daily discharge - the discharge of a pollutant measured during a calendar day or any 24-hour period that reasonably represents the calendar day for purposes of sampling. For pollutants with limitations expressed in terms of mass, the daily discharge is calculated as the total mass of the pollutant discharged over the sampling day. For pollutants with limitations expressed in other units of measurement, the daily discharge is calculated as the average measurement of the pollutant over the sampling day.

The daily discharge determination of concentration made using a composite sample shall be the concentration of the composite sample. When grab samples are used, the daily discharge determination of concentration shall be the arithmetic average (weighted by flow value) of all samples collected during that day.

e.   Bacteria concentration (*E. coli* or Enterococci) - Colony Forming Units (CFU) or Most Probable Number (MPN) of bacteria per 100 milliliters effluent. The daily average bacteria concentration is a geometric mean of the values for the effluent samples collected in a calendar month. The geometric mean shall be determined by calculating the nth root of the product of all measurements made in a calendar month, where n equals the number of measurements made; or, computed as the antilogarithm of the arithmetic mean of the logarithms of all measurements made in a calendar month. For any measurement of bacteria equaling zero, a substituted value of one shall be made for input into either computation method. If specified, the 7-day average for bacteria is the geometric mean of the values for all effluent samples collected during a calendar week.

f.   Daily average loading (lbs/day) - the arithmetic average of all daily discharge loading calculations during a period of one calendar month. These calculations must be made for each day of the month that a parameter is analyzed. The daily discharge, in terms of mass (lbs/day), is calculated as (Flow, MGD x Concentration, mg/l x 8.34).

g.   Daily maximum loading (lbs/day) - the highest daily discharge, in terms of mass (lbs/day), within a period of one calendar month.

3.   Sample Type

a.   Composite sample - For domestic wastewater, a composite sample is a sample made up of a minimum of three effluent portions collected in a continuous 24-hour period or during the period of daily discharge if less than 24 hours, and combined in volumes proportional to flow, and collected at the intervals required by 30 TAC § 319.9 (a). For industrial wastewater, a composite sample is a sample made up of a minimum of three effluent portions collected in a continuous 24-hour period or during the period of daily discharge if less than 24 hours, and combined in volumes proportional to flow, and collected at the intervals required by 30 TAC § 319.9 (b).

    b.  Grab sample - an individual sample collected in less than 15 minutes.

4.  Treatment Facility (facility) - wastewater facilities used in the conveyance, storage, treatment, recycling, reclamation and/or disposal of domestic sewage, industrial wastes, agricultural wastes, recreational wastes, or other wastes including sludge handling or disposal facilities under the jurisdiction of the Commission.

5.  The term "sewage sludge" is defined as solid, semi-solid, or liquid residue generated during the treatment of domestic sewage in 30 TAC Chapter 312. This includes the solids that have not been classified as hazardous waste separated from wastewater by unit processes.

6.  Bypass - the intentional diversion of a waste stream from any portion of a treatment facility.

## MONITORING AND REPORTING REQUIREMENTS

1.  Self-Reporting

Monitoring results shall be provided at the intervals specified in the permit. Unless otherwise specified in this permit or otherwise ordered by the Commission, the permittee shall conduct effluent sampling and reporting in accordance with 30 TAC §§ 319.4 - 319.12. Unless otherwise specified, effluent monitoring data shall be submitted each month, to the Compliance Monitoring Team of the Enforcement Division (MC 224), by the 20th day of the following month for each discharge which is described by this permit whether or not a discharge is made for that month. Monitoring results must be submitted online using the NetDMR reporting system available through the TCEQ website unless the permittee requests and obtains an electronic reporting waiver. Monitoring results must be signed and certified as required by Monitoring and Reporting Requirements No. 10.

As provided by state law, the permittee is subject to administrative, civil and criminal penalties, as applicable, for negligently or knowingly violating the Clean Water Act (CWA); TWC §§ 26, 27, and 28; and THSC § 361, including but not limited to knowingly making any false statement, representation, or certification on any report, record, or other document submitted or required to be maintained under this permit, including monitoring reports or reports of compliance or noncompliance, or falsifying, tampering with or knowingly rendering inaccurate any monitoring device or method required by this permit or violating any other requirement imposed by state or federal regulations.

2.  Test Procedures

    a.  Unless otherwise specified in this permit, test procedures for the analysis of pollutants shall comply with procedures specified in 30 TAC §§ 319.11 - 319.12. Measurements, tests, and calculations shall be accurately accomplished in a representative manner.

    b.  All laboratory tests submitted to demonstrate compliance with this permit must meet the requirements of 30 TAC § 25, Environmental Testing Laboratory Accreditation and Certification.

3.  Records of Results

    a.  Monitoring samples and measurements shall be taken at times and in a manner so as to be representative of the monitored activity.

    b.  Except for records of monitoring information required by this permit related to the permittee's sewage sludge use and disposal activities, which shall be retained for a period

of at least five years (or longer as required by 40 CFR Part 503), monitoring and reporting records, including strip charts and records of calibration and maintenance, copies of all records required by this permit, records of all data used to complete the application for this permit, and the certification required by 40 CFR § 264.73(b)(9) shall be retained at the facility site, or shall be readily available for review by a TCEQ representative for a period of three years from the date of the record or sample, measurement, report, application or certification. This period shall be extended at the request of the Executive Director.

c. Records of monitoring activities shall include the following:

   i.   date, time and place of sample or measurement;

   ii.  identity of individual who collected the sample or made the measurement.

   iii. date and time of analysis;

   iv.  identity of the individual and laboratory who performed the analysis;

   v.   the technique or method of analysis; and

   vi.  the results of the analysis or measurement and quality assurance/quality control records.

The period during which records are required to be kept shall be automatically extended to the date of the final disposition of any administrative or judicial enforcement action that may be instituted against the permittee.

4. Additional Monitoring by Permittee

If the permittee monitors any pollutant at the location(s) designated herein more frequently than required by this permit using approved analytical methods as specified above, all results of such monitoring shall be included in the calculation and reporting of the values submitted on the approved self-report form. Increased frequency of sampling shall be indicated on the self-report form.

5. Calibration of Instruments

All automatic flow measuring or recording devices and all totalizing meters for measuring flows shall be accurately calibrated by a trained person at plant start-up and as often thereafter as necessary to ensure accuracy, but not less often than annually unless authorized by the Executive Director for a longer period. Such person shall verify in writing that the device is operating properly and giving accurate results. Copies of the verification shall be retained at the facility site and/or shall be readily available for review by a TCEQ representative for a period of three years.

6. Compliance Schedule Reports

Reports of compliance or noncompliance with, or any progress reports on, interim and final requirements contained in any compliance schedule of the permit shall be submitted no later than 14 days following each schedule date to the Regional Office and the Compliance Monitoring Team of the Enforcement Division (MC 224).

7. Noncompliance Notification

a. In accordance with 30 TAC § 305.125(9) any noncompliance which may endanger human health or safety, or the environment shall be reported by the permittee to the TCEQ. Except as allowed by 30 TAC § 305.132, report of such information shall be provided orally or by facsimile transmission (FAX) to the Regional Office within 24 hours of becoming aware of the noncompliance. A written submission of such information shall also be provided by the permittee to the Regional Office and the Compliance Monitoring Team of the Enforcement Division (MC 224) within five working days of becoming aware of the noncompliance. For Publicly Owned Treatment Works (POTWs), effective December 21, 2023, the permittee must submit the written report for unauthorized discharges and unanticipated bypasses that exceed any effluent limit in the permit using the online electronic reporting system available through the TCEQ website unless the permittee requests and obtains an electronic reporting waiver. The written submission shall contain a description of the noncompliance and its cause; the potential danger to human health or safety, or the environment; the period of noncompliance, including exact dates and times; if the noncompliance has not been corrected, the time it is expected to continue; and steps taken or planned to reduce, eliminate, and prevent recurrence of the noncompliance, and to mitigate its adverse effects.

b. The following violations shall be reported under Monitoring and Reporting Requirement 7.a.:

    i. Unauthorized discharges as defined in Permit Condition 2(g).

    ii. Any unanticipated bypass that exceeds any effluent limitation in the permit.

    iii. Violation of a permitted maximum daily discharge limitation for pollutants listed specifically in the Other Requirements section of an Industrial TPDES permit.

c. In addition to the above, any effluent violation which deviates from the permitted effluent limitation by more than 40% shall be reported by the permittee in writing to the Regional Office and the Compliance Monitoring Team of the Enforcement Division (MC 224) within 5 working days of becoming aware of the noncompliance.

d. Any noncompliance other than that specified in this section, or any required information not submitted or submitted incorrectly, shall be reported to the Compliance Monitoring Team of the Enforcement Division (MC 224) as promptly as possible. For effluent limitation violations, noncompliances shall be reported on the approved self-report form.

8. In accordance with the procedures described in 30 TAC §§ 35.301 - 35.303 (relating to Water Quality Emergency and Temporary Orders) if the permittee knows in advance of the need for a bypass, it shall submit prior notice by applying for such authorization.

9. Changes in Discharges of Toxic Substances

All existing manufacturing, commercial, mining, and silvicultural permittees shall notify the Regional Office, orally or by facsimile transmission within 24 hours, and both the Regional Office and the Compliance Monitoring Team of the Enforcement Division (MC 224) in writing within five (5) working days, after becoming aware of or having reason to believe:

a. That any activity has occurred or will occur which would result in the discharge, on a routine or frequent basis, of any toxic pollutant listed at 40 CFR Part 122, Appendix D, Tables II and III (excluding Total Phenols) which is not limited in the permit, if that discharge will exceed the highest of the following "notification levels":

i. One hundred micrograms per liter (100 µg/L);

ii. Two hundred micrograms per liter (200 µg/L) for acrolein and acrylonitrile; five hundred micrograms per liter (500 µg/L) for 2,4-dinitrophenol and for 2-methyl-4,6-dinitrophenol; and one milligram per liter (1 mg/L) for antimony;

iii. Five (5) times the maximum concentration value reported for that pollutant in the permit application; or

iv. The level established by the TCEQ.

b. That any activity has occurred or will occur which would result in any discharge, on a nonroutine or infrequent basis, of a toxic pollutant which is not limited in the permit, if that discharge will exceed the highest of the following "notification levels":

i. Five hundred micrograms per liter (500 µg/L);

ii. One milligram per liter (1 mg/L) for antimony;

iii. Ten (10) times the maximum concentration value reported for that pollutant in the permit application; or

iv. The level established by the TCEQ.

10. Signatories to Reports

All reports and other information requested by the Executive Director shall be signed by the person and in the manner required by 30 TAC § 305.128 (relating to Signatories to Reports).

11. All POTWs must provide adequate notice to the Executive Director of the following:

a. Any new introduction of pollutants into the POTW from an indirect discharger which would be subject to CWA § 301 or § 306 if it were directly discharging those pollutants;

b. Any substantial change in the volume or character of pollutants being introduced into that POTW by a source introducing pollutants into the POTW at the time of issuance of the permit; and

c. For the purpose of this paragraph, adequate notice shall include information on:

i. The quality and quantity of effluent introduced into the POTW; and

ii. Any anticipated impact of the change on the quantity or quality of effluent to be discharged from the POTW.

**PERMIT CONDITIONS**

1. General

   a. When the permittee becomes aware that it failed to submit any relevant facts in a permit application, or submitted incorrect information in an application or in any report to the Executive Director, it shall promptly submit such facts or information.

   b. This permit is granted on the basis of the information supplied and representations made by the permittee during action on an application, and relying upon the accuracy and completeness of that information and those representations. After notice and opportunity for a hearing, this permit may be modified, suspended, or revoked, in whole or in part, in accordance with 30 TAC Chapter 305, Subchapter D, during its term for good cause including, but not limited to, the following:

      i. Violation of any terms or conditions of this permit;

      ii. Obtaining this permit by misrepresentation or failure to disclose fully all relevant facts; or

      iii. A change in any condition that requires either a temporary or permanent reduction or elimination of the authorized discharge.

   c. The permittee shall furnish to the Executive Director, upon request and within a reasonable time, any information to determine whether cause exists for amending, revoking, suspending or terminating the permit. The permittee shall also furnish to the Executive Director, upon request, copies of records required to be kept by the permit.

2. Compliance

   a. Acceptance of the permit by the person to whom it is issued constitutes acknowledgment and agreement that such person will comply with all the terms and conditions embodied in the permit, and the rules and other orders of the Commission.

   b. The permittee has a duty to comply with all conditions of the permit. Failure to comply with any permit condition constitutes a violation of the permit and the Texas Water Code or the Texas Health and Safety Code, and is grounds for enforcement action, for permit amendment, revocation, or suspension, or for denial of a permit renewal application or an application for a permit for another facility.

   c. It shall not be a defense for a permittee in an enforcement action that it would have been necessary to halt or reduce the permitted activity in order to maintain compliance with the conditions of the permit.

   d. The permittee shall take all reasonable steps to minimize or prevent any discharge or sludge use or disposal or other permit violation that has a reasonable likelihood of adversely affecting human health or the environment.

   e. Authorization from the Commission is required before beginning any change in the permitted facility or activity that may result in noncompliance with any permit requirements.

   f. A permit may be amended, suspended and reissued, or revoked for cause in accordance

with 30 TAC §§ 305.62 and 305.66 and TWC§ 7.302. The filing of a request by the permittee for a permit amendment, suspension and reissuance, or termination, or a notification of planned changes or anticipated noncompliance, does not stay any permit condition.

g. There shall be no unauthorized discharge of wastewater or any other waste. For the purpose of this permit, an unauthorized discharge is considered to be any discharge of wastewater into or adjacent to water in the state at any location not permitted as an outfall or otherwise defined in the Other Requirements section of this permit.

h. In accordance with 30 TAC § 305.535(a), the permittee may allow any bypass to occur from a TPDES permitted facility which does not cause permitted effluent limitations to be exceeded or an unauthorized discharge to occur, but only if the bypass is also for essential maintenance to assure efficient operation.

i. The permittee is subject to administrative, civil, and criminal penalties, as applicable, under TWC §§ 7.051 - 7.075 (relating to Administrative Penalties), 7.101 - 7.111 (relating to Civil Penalties), and 7.141 - 7.202 (relating to Criminal Offenses and Penalties) for violations including, but not limited to, negligently or knowingly violating the federal CWA §§ 301, 302, 306, 307, 308, 318, or 405, or any condition or limitation implementing any sections in a permit issued under the CWA § 402, or any requirement imposed in a pretreatment program approved under the CWA §§ 402 (a)(3) or 402 (b)(8).

3. Inspections and Entry

   a. Inspection and entry shall be allowed as prescribed in the TWC Chapters 26, 27, and 28, and THSC § 361.

   b. The members of the Commission and employees and agents of the Commission are entitled to enter any public or private property at any reasonable time for the purpose of inspecting and investigating conditions relating to the quality of water in the state or the compliance with any rule, regulation, permit or other order of the Commission. Members, employees, or agents of the Commission and Commission contractors are entitled to enter public or private property at any reasonable time to investigate or monitor or, if the responsible party is not responsive or there is an immediate danger to public health or the environment, to remove or remediate a condition related to the quality of water in the state. Members, employees, Commission contractors, or agents acting under this authority who enter private property shall observe the establishment's rules and regulations concerning safety, internal security, and fire protection, and if the property has management in residence, shall notify management or the person then in charge of his presence and shall exhibit proper credentials. If any member, employee, Commission contractor, or agent is refused the right to enter in or on public or private property under this authority, the Executive Director may invoke the remedies authorized in TWC § 7.002. The statement above, that Commission entry shall occur in accordance with an establishment's rules and regulations concerning safety, internal security, and fire protection, is not grounds for denial or restriction of entry to any part of the facility, but merely describes the Commission's duty to observe appropriate rules and regulations during an inspection.

4. Permit Amendment and/or Renewal

a. The permittee shall give notice to the Executive Director as soon as possible of any planned physical alterations or additions to the permitted facility if such alterations or additions would require a permit amendment or result in a violation of permit requirements. Notice shall also be required under this paragraph when:

    i. The alteration or addition to a permitted facility may meet one of the criteria for determining whether a facility is a new source in accordance with 30 TAC § 305.534 (relating to New Sources and New Dischargers); or

    ii. The alteration or addition could significantly change the nature or increase the quantity of pollutants discharged. This notification applies to pollutants that are subject neither to effluent limitations in the permit, nor to notification requirements in Monitoring and Reporting Requirements No. 9; or

    iii. The alteration or addition results in a significant change in the permittee's sludge use or disposal practices, and such alteration, addition, or change may justify the application of permit conditions that are different from or absent in the existing permit, including notification of additional use or disposal sites not reported during the permit application process or not reported pursuant to an approved land application plan.

b. Prior to any facility modifications, additions, or expansions that will increase the plant capacity beyond the permitted flow, the permittee must apply for and obtain proper authorization from the Commission before commencing construction.

c. The permittee must apply for an amendment or renewal at least 180 days prior to expiration of the existing permit in order to continue a permitted activity after the expiration date of the permit. If an application is submitted prior to the expiration date of the permit, the existing permit shall remain in effect until the application is approved, denied, or returned. If the application is returned or denied, authorization to continue such activity shall terminate upon the effective date of the action. If an application is not submitted prior to the expiration date of the permit, the permit shall expire and authorization to continue such activity shall terminate.

d. Prior to accepting or generating wastes which are not described in the permit application or which would result in a significant change in the quantity or quality of the existing discharge, the permittee must report the proposed changes to the Commission. The permittee must apply for a permit amendment reflecting any necessary changes in permit conditions, including effluent limitations for pollutants not identified and limited by this permit.

e. In accordance with the TWC § 26.029(b), after a public hearing, notice of which shall be given to the permittee, the Commission may require the permittee, from time to time, for good cause, in accordance with applicable laws, to conform to new or additional conditions.

f. If any toxic effluent standard or prohibition (including any schedule of compliance specified in such effluent standard or prohibition) is promulgated under CWA § 307(a) for a toxic pollutant which is present in the discharge and that standard or prohibition is more stringent than any limitation on the pollutant in this permit, this permit shall be modified or revoked and reissued to conform to the toxic effluent standard or prohibition. The permittee shall comply with effluent standards or prohibitions established under CWA § 307(a) for toxic pollutants within the time provided in the

regulations that established those standards or prohibitions, even if the permit has not yet been modified to incorporate the requirement.

5. Permit Transfer

   a. Prior to any transfer of this permit, Commission approval must be obtained. The Commission shall be notified in writing of any change in control or ownership of facilities authorized by this permit. Such notification should be sent to the Applications Review and Processing Team (MC 148) of the Water Quality Division.

   b. A permit may be transferred only according to the provisions of 30 TAC § 305.64 (relating to Transfer of Permits) and 30 TAC § 50.133 (relating to Executive Director Action on Application or WQMP update).

6. Relationship to Hazardous Waste Activities

   This permit does not authorize any activity of hazardous waste storage, processing, or disposal that requires a permit or other authorization pursuant to the Texas Health and Safety Code.

7. Relationship to Water Rights

   Disposal of treated effluent by any means other than discharge directly to water in the state must be specifically authorized in this permit and may require a permit pursuant to TWC Chapter 11.

8. Property Rights

   A permit does not convey any property rights of any sort, or any exclusive privilege.

9. Permit Enforceability

   The conditions of this permit are severable, and if any provision of this permit, or the application of any provision of this permit to any circumstances, is held invalid, the application of such provision to other circumstances, and the remainder of this permit, shall not be affected thereby.

10. Relationship to Permit Application

    The application pursuant to which the permit has been issued is incorporated herein; provided, however, that in the event of a conflict between the provisions of this permit and the application, the provisions of the permit shall control.

11. Notice of Bankruptcy

    a. Each permittee shall notify the Executive Director, in writing, immediately following the filing of a voluntary or involuntary petition for bankruptcy under any chapter of Title 11 (Bankruptcy) of the United States Code (11 USC) by or against:

       i. the permittee;

       ii. an entity (as that term is defined in 11 USC, § 101(14)) controlling the permittee or listing the permit or permittee as property of the estate; or

       iii. an affiliate (as that term is defined in 11 USC, § 101(2)) of the permittee.

b. This notification must indicate:

    i.   the name of the permittee;

    ii.  the permit number(s);

    iii. the bankruptcy court in which the petition for bankruptcy was filed; and

    iv. the date of filing of the petition.

## OPERATIONAL REQUIREMENTS

1. The permittee shall at all times ensure that the facility and all of its systems of collection, treatment, and disposal are properly operated and maintained. This includes, but is not limited to, the regular, periodic examination of wastewater solids within the treatment plant by the operator in order to maintain an appropriate quantity and quality of solids inventory as described in the various operator training manuals and according to accepted industry standards for process control. Process control, maintenance, and operations records shall be retained at the facility site, or shall be readily available for review by a TCEQ representative, for a period of three years.

2. Upon request by the Executive Director, the permittee shall take appropriate samples and provide proper analysis in order to demonstrate compliance with Commission rules. Unless otherwise specified in this permit or otherwise ordered by the Commission, the permittee shall comply with all applicable provisions of 30 TAC Chapter 312 concerning sewage sludge use and disposal and 30 TAC §§ 319.21 - 319.29 concerning the discharge of certain hazardous metals.

3. Domestic wastewater treatment facilities shall comply with the following provisions:

    a. The permittee shall notify the Municipal Permits Team, Wastewater Permitting Section (MC 148) of the Water Quality Division, in writing, of any facility expansion at least 90 days prior to conducting such activity.

    b. The permittee shall submit a closure plan for review and approval to the Municipal Permits Team, Wastewater Permitting Section (MC 148) of the Water Quality Division, for any closure activity at least 90 days prior to conducting such activity. Closure is the act of permanently taking a waste management unit or treatment facility out of service and includes the permanent removal from service of any pit, tank, pond, lagoon, surface impoundment and/or other treatment unit regulated by this permit.

4. The permittee is responsible for installing prior to plant start-up, and subsequently maintaining, adequate safeguards to prevent the discharge of untreated or inadequately treated wastes during electrical power failures by means of alternate power sources, standby generators, and/or retention of inadequately treated wastewater.

5. Unless otherwise specified, the permittee shall provide a readily accessible sampling point and, where applicable, an effluent flow measuring device or other acceptable means by which effluent flow may be determined.

6.  The permittee shall remit an annual water quality fee to the Commission as required by 30 TAC Chapter 21. Failure to pay the fee may result in revocation of this permit under TWC § 7.302(b)(6).

7.  Documentation

    For all written notifications to the Commission required of the permittee by this permit, the permittee shall keep and make available a copy of each such notification under the same conditions as self-monitoring data are required to be kept and made available. Except for information required for TPDES permit applications, effluent data, including effluent data in permits, draft permits and permit applications, and other information specified as not confidential in 30 TAC §§ 1.5(d), any information submitted pursuant to this permit may be claimed as confidential by the submitter. Any such claim must be asserted in the manner prescribed in the application form or by stamping the words confidential business information on each page containing such information. If no claim is made at the time of submission, information may be made available to the public without further notice. If the Commission or Executive Director agrees with the designation of confidentiality, the TCEQ will not provide the information for public inspection unless required by the Texas Attorney General or a court pursuant to an open records request. If the Executive Director does not agree with the designation of confidentiality, the person submitting the information will be notified.

8.  Facilities that generate domestic wastewater shall comply with the following provisions; domestic wastewater treatment facilities at permitted industrial sites are excluded.

    a.  Whenever flow measurements for any domestic sewage treatment facility reach 75% of the permitted daily average or annual average flow for three consecutive months, the permittee must initiate engineering and financial planning for expansion and/or upgrading of the domestic wastewater treatment and/or collection facilities. Whenever the flow reaches 90% of the permitted daily average or annual average flow for three consecutive months, the permittee shall obtain necessary authorization from the Commission to commence construction of the necessary additional treatment and/or collection facilities. In the case of a domestic wastewater treatment facility which reaches 75% of the permitted daily average or annual average flow for three consecutive months, and the planned population to be served or the quantity of waste produced is not expected to exceed the design limitations of the treatment facility, the permittee shall submit an engineering report supporting this claim to the Executive Director of the Commission.

        If in the judgment of the Executive Director the population to be served will not cause permit noncompliance, then the requirement of this section may be waived. To be effective, any waiver must be in writing and signed by the Director of the Enforcement Division (MC 219) of the Commission, and such waiver of these requirements will be reviewed upon expiration of the existing permit; however, any such waiver shall not be interpreted as condoning or excusing any violation of any permit parameter.

    b.  The plans and specifications for domestic sewage collection and treatment works associated with any domestic permit must be approved by the Commission and failure to secure approval before commencing construction of such works or making a discharge is a violation of this permit and each day is an additional violation until approval has been secured.

c.   Permits for domestic wastewater treatment plants are granted subject to the policy of the Commission to encourage the development of area-wide waste collection, treatment, and disposal systems. The Commission reserves the right to amend any domestic wastewater permit in accordance with applicable procedural requirements to require the system covered by this permit to be integrated into an area-wide system, should such be developed; to require the delivery of the wastes authorized to be collected in, treated by or discharged from said system, to such area-wide system; or to amend this permit in any other particular to effectuate the Commission's policy. Such amendments may be made when the changes required are advisable for water quality control purposes and are feasible on the basis of waste treatment technology, engineering, financial, and related considerations existing at the time the changes are required, exclusive of the loss of investment in or revenues from any then existing or proposed waste collection, treatment or disposal system.

9.   Domestic wastewater treatment plants shall be operated and maintained by sewage plant operators holding a valid certificate of competency at the required level as defined in 30 TAC Chapter 30.

10.  For Publicly Owned Treatment Works (POTWs), the 30-day average (or monthly average) percent removal for BOD and TSS shall not be less than 85%, unless otherwise authorized by this permit.

11.  Facilities that generate industrial solid waste as defined in 30 TAC § 335.1 shall comply with these provisions:

a.   Any solid waste, as defined in 30 TAC § 335.1 (including but not limited to such wastes as garbage, refuse, sludge from a waste treatment, water supply treatment plant or air pollution control facility, discarded materials, discarded materials to be recycled, whether the waste is solid, liquid, or semisolid), generated by the permittee during the management and treatment of wastewater, must be managed in accordance with all applicable provisions of 30 TAC Chapter 335, relating to Industrial Solid Waste Management.

b.   Industrial wastewater that is being collected, accumulated, stored, or processed before discharge through any final discharge outfall, specified by this permit, is considered to be industrial solid waste until the wastewater passes through the actual point source discharge and must be managed in accordance with all applicable provisions of 30 TAC Chapter 335.

c.   The permittee shall provide written notification, pursuant to the requirements of 30 TAC § 335.8(b)(1), to the Corrective Action Section (MC 127) of the Remediation Division informing the Commission of any closure activity involving an Industrial Solid Waste Management Unit, at least 90 days prior to conducting such an activity.

d.   Construction of any industrial solid waste management unit requires the prior written notification of the proposed activity to the Registration and Reporting Section (MC 129) of the Permitting and Registration Support Division. No person shall dispose of industrial solid waste, including sludge or other solids from wastewater treatment processes, prior to fulfilling the deed recordation requirements of 30 TAC § 335.5.

e.  The term "industrial solid waste management unit" means a landfill, surface impoundment, waste-pile, industrial furnace, incinerator, cement kiln, injection well, container, drum, salt dome waste containment cavern, or any other structure vessel, appurtenance, or other improvement on land used to manage industrial solid waste.

f.  The permittee shall keep management records for all sludge (or other waste) removed from any wastewater treatment process. These records shall fulfill all applicable requirements of 30 TAC § 335 and must include the following, as it pertains to wastewater treatment and discharge:

    i.    Volume of waste and date(s) generated from treatment process;
    ii.   Volume of waste disposed of on-site or shipped off-site;
    iii.  Date(s) of disposal;
    iv.   Identity of hauler or transporter;
    v.    Location of disposal site; and
    vi.   Method of final disposal.

    The above records shall be maintained on a monthly basis. The records shall be retained at the facility site, or shall be readily available for review by authorized representatives of the TCEQ for at least five years.

12. For industrial facilities to which the requirements of 30 TAC § 335 do not apply, sludge and solid wastes, including tank cleaning and contaminated solids for disposal, shall be disposed of in accordance with THSC § 361.

TCEQ Revision 08/2008

**SLUDGE PROVISIONS**

The permittee is authorized to dispose of sludge only at a Texas Commission on Environmental Quality (TCEQ) authorized land application site, co-disposal landfill, wastewater treatment facility, or facility that further processes sludge. **The disposal of sludge by land application on property owned, leased or under the direct control of the permittee is a violation of the permit unless the site is authorized with the TCEQ. This provision does not authorize Distribution and Marketing of Class A or Class AB Sewage Sludge. This provision does not authorize the permittee to land apply sludge on property owned, leased or under the direct control of the permittee.**

**SECTION I.        REQUIREMENTS APPLYING TO ALL SEWAGE SLUDGE LAND APPLICATION**

**A. General Requirements**

1. The permittee shall handle and dispose of sewage sludge in accordance with 30 TAC § 312 and all other applicable state and federal regulations in a manner that protects public health and the environment from any reasonably anticipated adverse effects due to any toxic pollutants that may be present in the sludge.

2. In all cases, if the person (permit holder) who prepares the sewage sludge supplies the sewage sludge to another person for land application use or to the owner or lease holder of the land, the permit holder shall provide necessary information to the parties who receive the sludge to assure compliance with these regulations.

**B. Testing Requirements**

1. Sewage sludge shall be tested once during the term of this permit in accordance with the method specified in both 40 CFR Part 261, Appendix II and 40 CFR Part 268, Appendix I [Toxicity Characteristic Leaching Procedure (TCLP)] or other method that receives the prior approval of the TCEQ for the contaminants listed in 40 CFR Part 261.24, Table 1. Sewage sludge failing this test shall be managed according to RCRA standards for generators of hazardous waste, and the waste's disposition must be in accordance with all applicable requirements for hazardous waste processing, storage, or disposal. Following failure of any TCLP test, the management or disposal of sewage sludge at a facility other than an authorized hazardous waste processing, storage, or disposal facility shall be prohibited until such time as the permittee can demonstrate the sewage sludge no longer exhibits the hazardous waste toxicity characteristics (as demonstrated by the results of the TCLP tests). A written report shall be provided to both the TCEQ Registration and Reporting Section (MC 129) of the Permitting and Registration Support Division and the Regional Director (MC Region 11) within seven (7) days after failing the TCLP Test.

The report shall contain test results, certification that unauthorized waste management has stopped, and a summary of alternative disposal plans that comply with RCRA standards for the management of hazardous waste. The report shall be addressed to: Director, Permitting and Registration Support Division (MC 129), Texas Commission on Environmental Quality, P.O. Box 13087, Austin, Texas 78711-3087. In addition, the permittee shall prepare an annual report on the results of all sludge toxicity testing. This annual report shall be submitted to the TCEQ Regional Office (MC Region 11) and the Compliance Monitoring Team (MC 224) of the Enforcement Division by September 30th of each year. The permittee must submit this annual report using the online electronic reporting system available through the TCEQ website unless the permittee requests and obtains an electronic reporting waiver.

2. Sewage sludge shall not be applied to the land if the concentration of the pollutants exceeds the pollutant concentration criteria in Table 1. The frequency of testing for pollutants in Table 1 is found in Section I.C. of this permit.

## TABLE 1

| Pollutant | Ceiling Concentration (Milligrams per kilogram)* |
|---|---|
| Arsenic | 75 |
| Cadmium | 85 |
| Chromium | 3000 |
| Copper | 4300 |
| Lead | 840 |
| Mercury | 57 |
| Molybdenum | 75 |
| Nickel | 420 |
| PCBs | 49 |
| Selenium | 100 |
| Zinc | 7500 |

* Dry weight basis

3. Pathogen Control

All sewage sludge that is applied to agricultural land, forest, a public contact site, or a reclamation site must be treated by one of the following methods to ensure that the sludge meets either the Class A, Class AB or Class B pathogen requirements.

a. For sewage sludge to be classified as Class A with respect to pathogens, the density of fecal coliform in the sewage sludge must be less than 1,000 most probable number (MPN) per gram of total solids (dry weight basis), or the density of Salmonella sp. bacteria in the sewage sludge must be less than three MPN per four grams of total solids (dry weight basis) at the time the sewage sludge is used or disposed. In addition, one of the alternatives listed below must be met:

Alternative 1 - The temperature of the sewage sludge that is used or disposed shall be maintained at or above a specific value for a period of time. See 30 TAC § 312.82(a)(2)(A) for specific information;

Alternative 5 (PFRP) - Sewage sludge that is used or disposed of must be treated in one of the Processes to Further Reduce Pathogens (PFRP) described in 40 CFR Part 503, Appendix B. PFRP include composting, heat drying, heat treatment, and thermophilic aerobic digestion; or

Alternative 6 (PFRP Equivalent) - Sewage sludge that is used or disposed of must be treated in a process that has been approved by the U. S. Environmental Protection Agency as being equivalent to those in Alternative 5.

b.  For sewage sludge to be classified as Class AB with respect to pathogens, the density of fecal coliform in the sewage sludge must be less than 1,000 MPN per gram of total solids (dry weight basis), or the density of *Salmonella* sp. bacteria in the sewage sludge be less than three MPN per four grams of total solids (dry weight basis) at the time the sewage sludge is used or disposed. In addition, one of the alternatives listed below must be met:

Alternative 2 - The pH of the sewage sludge that is used or disposed shall be raised to above 12 std. units and shall remain above 12 std. units for 72 hours.

The temperature of the sewage sludge shall be above 52° Celsius for 12 hours or longer during the period that the pH of the sewage sludge is above 12 std. units.

At the end of the 72-hour period during which the pH of the sewage sludge is above 12 std. units, the sewage sludge shall be air dried to achieve a percent solids in the sewage sludge greater than 50%; or

Alternative 3 - The sewage sludge shall be analyzed for enteric viruses prior to pathogen treatment. The limit for enteric viruses is less than one Plaque-forming Unit per four grams of total solids (dry weight basis) either before or following pathogen treatment. See 30 TAC § 312.82(a)(2)(C)(i-iii) for specific information. The sewage sludge shall be analyzed for viable helminth ova prior to pathogen treatment. The limit for viable helminth ova is less than one per four grams of total solids (dry weight basis) either before or following pathogen treatment. See 30 TAC § 312.82(a)(2)(C)(iv-vi) for specific information; or

Alternative 4 - The density of enteric viruses in the sewage sludge shall be less than one Plaque-forming Unit per four grams of total solids (dry weight basis) at the time the sewage sludge is used or disposed. The density of viable helminth ova in the sewage sludge shall be less than one per four grams of total solids (dry weight basis) at the time the sewage sludge is used or disposed.

c.  Sewage sludge that meets the requirements of Class AB sewage sludge may be classified a Class A sewage sludge if a variance request is submitted in writing that is supported by substantial documentation demonstrating equivalent methods for reducing odors and written approval is granted by the executive director. The executive director may deny the variance request or revoke that approved variance if it is determined that the variance may potentially endanger human health or the environment, or create nuisance odor conditions.

d.  Three alternatives are available to demonstrate compliance with Class B criteria for sewage sludge.

Alternative 1

i.   A minimum of seven random samples of the sewage sludge shall be collected within 48 hours of the time the sewage sludge is used or disposed of during each monitoring episode for the sewage sludge.

ii.  The geometric mean of the density of fecal coliform in the samples collected shall be less than either 2,000,000 MPN per gram of total solids (dry weight basis) or 2,000,000 Colony Forming Units per gram of total solids (dry weight basis).

Alternative 2 - Sewage sludge that is used or disposed of shall be treated in one of the Processes to Significantly Reduce Pathogens (PSRP) described in 40 CFR Part 503, Appendix B, so long as all of the following requirements are met by the generator of the sewage sludge.

i.   Prior to use or disposal, all the sewage sludge must have been generated from a single location, except as provided in paragraph v. below;

ii.  An independent Texas Licensed Professional Engineer must make a certification to the generator of a sewage sludge that the wastewater treatment facility generating the sewage sludge is designed to achieve one of the PSRP at the permitted design loading of the facility. The certification need only be repeated if the design loading of the facility is increased. The certification shall include a statement indicating the design meets all the applicable standards specified in Appendix B of 40 CFR Part 503;

iii. Prior to any off-site transportation or on-site use or disposal of any sewage sludge generated at a wastewater treatment facility, the chief certified operator of the wastewater treatment facility or other responsible official who manages the processes to significantly reduce pathogens at the wastewater treatment facility for the permittee, shall certify that the sewage sludge underwent at least the minimum operational requirements necessary in order to meet one of the PSRP. The acceptable processes and the minimum operational and record keeping requirements shall be in accordance with established U.S. Environmental Protection Agency final guidance;

iv.  All certification records and operational records describing how the requirements of this paragraph were met shall be kept by the generator for a minimum of three years and be available for inspection by commission staff for review; and

v.   If the sewage sludge is generated from a mixture of sources, resulting from a person who prepares sewage sludge from more than one wastewater treatment facility, the resulting derived product shall meet one of the PSRP, and shall meet the certification, operation, and record keeping requirements of this paragraph.

Alternative 3 - Sewage sludge shall be treated in an equivalent process that has been approved by the U.S. Environmental Protection Agency, so long as all of the following requirements are met by the generator of the sewage sludge.

i.   Prior to use or disposal, all the sewage sludge must have been generated from a single location, except as provided in paragraph v. below;

ii. Prior to any off-site transportation or on-site use or disposal of any sewage sludge generated at a wastewater treatment facility, the chief certified operator of the wastewater treatment facility or other responsible official who manages the processes to significantly reduce pathogens at the wastewater treatment facility for the permittee, shall certify that the sewage sludge underwent at least the minimum operational requirements necessary in order to meet one of the PSRP. The acceptable processes and the minimum operational and record keeping requirements shall be in accordance with established U.S. Environmental Protection Agency final guidance;

iii. All certification records and operational records describing how the requirements of this paragraph were met shall be kept by the generator for a minimum of three years and be available for inspection by commission staff for review;

iv. The Executive Director will accept from the U.S. Environmental Protection Agency a finding of equivalency to the defined PSRP; and

v. If the sewage sludge is generated from a mixture of sources resulting from a person who prepares sewage sludge from more than one wastewater treatment facility, the resulting derived product shall meet one of the Processes to Significantly Reduce Pathogens, and shall meet the certification, operation, and record keeping requirements of this paragraph.

In addition to the Alternatives 1 – 3, the following site restrictions must be met if Class B sludge is land applied:

i. Food crops with harvested parts that touch the sewage sludge/soil mixture and are totally above the land surface shall not be harvested for 14 months after application of sewage sludge.

ii. Food crops with harvested parts below the surface of the land shall not be harvested for 20 months after application of sewage sludge when the sewage sludge remains on the land surface for 4 months or longer prior to incorporation into the soil.

iii. Food crops with harvested parts below the surface of the land shall not be harvested for 38 months after application of sewage sludge when the sewage sludge remains on the land surface for less than 4 months prior to incorporation into the soil.

iv. Food crops, feed crops, and fiber crops shall not be harvested for 30 days after application of sewage sludge.

v. Animals shall not be allowed to graze on the land for 30 days after application of sewage sludge.

vi. Turf grown on land where sewage sludge is applied shall not be harvested for 1 year after application of the sewage sludge when the harvested turf is placed on either land with a high potential for public exposure or a lawn.

vii. Public access to land with a high potential for public exposure shall be restricted for 1 year after application of sewage sludge.

viii. Public access to land with a low potential for public exposure shall be restricted for 30 days after application of sewage sludge.

ix. Land application of sludge shall be in accordance with the buffer zone requirements found in 30 TAC § 312.44.

4. Vector Attraction Reduction Requirements

All bulk sewage sludge that is applied to agricultural land, forest, a public contact site, or a reclamation site shall be treated by one of the following Alternatives 1 through 10 for vector attraction reduction.

Alternative 1 - The mass of volatile solids in the sewage sludge shall be reduced by a minimum of 38%.

Alternative 2 - If Alternative 1 cannot be met for an anaerobically digested sludge, demonstration can be made by digesting a portion of the previously digested sludge anaerobically in the laboratory in a bench-scale unit for 40 additional days at a temperature between 30° and 37° Celsius. Volatile solids must be reduced by less than 17% to demonstrate compliance.

Alternative 3 - If Alternative 1 cannot be met for an aerobically digested sludge, demonstration can be made by digesting a portion of the previously digested sludge with percent solids of two percent or less aerobically in the laboratory in a bench-scale unit for 30 additional days at 20° Celsius. Volatile solids must be reduced by less than 15% to demonstrate compliance.

Alternative 4 - The specific oxygen uptake rate (SOUR) for sewage sludge treated in an aerobic process shall be equal to or less than 1.5 milligrams of oxygen per hour per gram of total solids (dry weight basis) at a temperature of 20° Celsius.

Alternative 5 - Sewage sludge shall be treated in an aerobic process for 14 days or longer. During that time, the temperature of the sewage sludge shall be higher than 40° Celsius and the average temperature of the sewage sludge shall be higher than 45° Celsius.

Alternative 6 - The pH of sewage sludge shall be raised to 12 or higher by alkali addition and, without the addition of more alkali shall remain at 12 or higher for two hours and then remain at a pH of 11.5 or higher for an additional 22 hours at the time the sewage sludge is prepared for sale or given away in a bag or other container.

Alternative 7 - The percent solids of sewage sludge that does not contain unstabilized solids generated in a primary wastewater treatment process shall be equal to or greater than 75% based on the moisture content and total solids prior to mixing with other materials. Unstabilized solids are defined as organic materials in sewage sludge that have not been treated in either an aerobic or anaerobic treatment process.

Alternative 8 -    The percent solids of sewage sludge that contains unstabilized solids generated in a primary wastewater treatment process shall be equal to or greater than 90% based on the moisture content and total solids prior to mixing with other materials at the time the sludge is used. Unstabilized solids are defined as organic materials in sewage sludge that have not been treated in either an aerobic or anaerobic treatment process.

Alternative 9 -    i.    Sewage sludge shall be injected below the surface of the land.

     ii.    No significant amount of the sewage sludge shall be present on the land surface within one hour after the sewage sludge is injected.

     iii.    When sewage sludge that is injected below the surface of the land is Class A or Class AB with respect to pathogens, the sewage sludge shall be injected below the land surface within eight hours after being discharged from the pathogen treatment process.

Alternative 10-    i.    Sewage sludge applied to the land surface or placed on a surface disposal site shall be incorporated into the soil within six hours after application to or placement on the land.

     ii.    When sewage sludge that is incorporated into the soil is Class A or Class AB with respect to pathogens, the sewage sludge shall be applied to or placed on the land within eight hours after being discharged from the pathogen treatment process.

## C. Monitoring Requirements

| | |
|---|---|
| Toxicity Characteristic Leaching Procedure (TCLP) Test | - once during the term of this permit |
| PCBs | - once during the term of this permit |

All metal constituents and fecal coliform or *Salmonella* sp. bacteria shall be monitored at the appropriate frequency shown below, pursuant to 30 TAC § 312.46(a)(1):

| Amount of sewage sludge (*) metric tons per 365-day period | Monitoring Frequency |
|---|---|
| 0 to less than 290 | Once/Year |
| 290 to less than 1,500 | Once/Quarter |
| 1,500 to less than 15,000 | Once/Two Months |
| 15,000 or greater | Once/Month |

(*) *The amount of bulk sewage sludge applied to the land (dry wt. basis).*

Representative samples of sewage sludge shall be collected and analyzed in accordance with the methods referenced in 30 TAC § 312.7

Identify each of the analytic methods used by the facility to analyze enteric viruses, fecal coliforms, helminth ova, *Salmonella* sp., and other regulated parameters.

Identify in the following categories (as applicable) the sewage sludge treatment process or processes at the facility: preliminary operations (e.g., sludge grinding and degritting), thickening (concentration), stabilization, anaerobic digestion, aerobic digestion, composting, conditioning, disinfection (e.g., beta ray irradiation, gamma ray irradiation, pasteurization), dewatering (e.g., centrifugation, sludge drying beds, sludge lagoons), heat drying, thermal reduction, and methane or biogas capture and recovery.

Identify the nature of material generated by the facility (such as a biosolid for beneficial use or land-farming, or sewage sludge for disposal at a monofill) and whether the material is ultimately conveyed off-site in bulk or in bags.

**SECTION II.**   **REQUIREMENTS SPECIFIC TO BULK SEWAGE SLUDGE FOR APPLICATION TO THE LAND MEETING CLASS A, CLASS AB or B PATHOGEN REDUCTION AND THE CUMULATIVE LOADING RATES IN TABLE 2, OR CLASS B PATHOGEN REDUCTION AND THE POLLUTANT CONCENTRATIONS IN TABLE 3**

For those permittees meeting Class A, Class AB or B pathogen reduction requirements and that meet the cumulative loading rates in Table 2 below, or the Class B pathogen reduction requirements and contain concentrations of pollutants below listed in Table 3, the following conditions apply:

**A. Pollutant Limits**

Table 2

| Pollutant | Cumulative Pollutant Loading Rate (pounds per acre)* |
|---|---|
| Arsenic | 36 |
| Cadmium | 35 |
| Chromium | 2677 |
| Copper | 1339 |
| Lead | 268 |
| Mercury | 15 |
| Molybdenum | Report Only |
| Nickel | 375 |
| Selenium | 89 |
| Zinc | 2500 |

Table 3

| Pollutant | Monthly Average Concentration (milligrams per kilogram)* |
|---|---|
| Arsenic | 41 |
| Cadmium | 39 |
| Chromium | 1200 |
| Copper | 1500 |
| Lead | 300 |
| Mercury | 17 |
| Molybdenum | Report Only |
| Nickel | 420 |
| Selenium | 36 |
| Zinc | 2800 |

*Dry weight basis

**B. Pathogen Control**

All bulk sewage sludge that is applied to agricultural land, forest, a public contact site, a reclamation site, shall be treated by either Class A, Class AB or Class B pathogen reduction requirements as defined above in Section I.B.3.

## C. Management Practices

1. Bulk sewage sludge shall not be applied to agricultural land, forest, a public contact site, or a reclamation site that is flooded, frozen, or snow-covered so that the bulk sewage sludge enters a wetland or other waters in the State.

2. Bulk sewage sludge not meeting Class A requirements shall be land applied in a manner which complies with Applicability in accordance with 30 TAC §312.41 and the Management Requirements in accordance with 30 TAC § 312.44.

3. Bulk sewage sludge shall be applied at or below the agronomic rate of the cover crop.

4. An information sheet shall be provided to the person who receives bulk sewage sludge sold or given away. The information sheet shall contain the following information:

   a. The name and address of the person who prepared the sewage sludge that is sold or given away in a bag or other container for application to the land.

   b. A statement that application of the sewage sludge to the land is prohibited except in accordance with the instruction on the label or information sheet.

   c. The annual whole sludge application rate for the sewage sludge application rate for the sewage sludge that does not cause any of the cumulative pollutant loading rates in Table 2 above to be exceeded, unless the pollutant concentrations in Table 3 found in Section II above are met.

## D. Notification Requirements

1. If bulk sewage sludge is applied to land in a State other than Texas, written notice shall be provided prior to the initial land application to the permitting authority for the State in which the bulk sewage sludge is proposed to be applied. The notice shall include:

   a. The location, by street address, and specific latitude and longitude, of each land application site.

   b. The approximate time period bulk sewage sludge will be applied to the site.

   c. The name, address, telephone number, and National Pollutant Discharge Elimination System permit number (if appropriate) for the person who will apply the bulk sewage sludge.

2. The permittee shall give 180 days prior notice to the Executive Director in care of the Wastewater Permitting Section (MC 148) of the Water Quality Division of any change planned in the sewage sludge disposal practice.

## E. Record Keeping Requirements

The sludge documents will be retained at the facility site and/or shall be readily available for review by a TCEQ representative. The person who prepares bulk sewage sludge or a sewage sludge material shall develop the following information and shall retain the information at

the facility site and/or shall be readily available for review by a TCEQ representative for a period of five years. If the permittee supplies the sludge to another person who land applies the sludge, the permittee shall notify the land applier of the requirements for record keeping found in 30 TAC § 312.47 for persons who land apply.

1.  The concentration (mg/kg) in the sludge of each pollutant listed in Table 3 above and the applicable pollutant concentration criteria (mg/kg), or the applicable cumulative pollutant loading rate and the applicable cumulative pollutant loading rate limit (lbs/ac) listed in Table 2 above.

2.  A description of how the pathogen reduction requirements are met (including site restrictions for Class AB and Class B sludge, if applicable).

3.  A description of how the vector attraction reduction requirements are met.

4.  A description of how the management practices listed above in Section II.C are being met.

5.  The following certification statement:

    "I certify, under penalty of law, that the applicable pathogen requirements in 30 TAC § 312.82(a) or (b) and the vector attraction reduction requirements in 30 TAC § 312.83(b) have been met for each site on which bulk sewage sludge is applied. This determination has been made under my direction and supervision in accordance with the system designed to ensure that qualified personnel properly gather and evaluate the information used to determine that the management practices have been met. I am aware that there are significant penalties for false certification including fine and imprisonment."

6.  The recommended agronomic loading rate from the references listed in Section II.C.3. above, as well as the actual agronomic loading rate shall be retained. The person who applies bulk sewage sludge or a sewage sludge material shall develop the following information and shall retain the information at the facility site and/or shall be readily available for review by a TCEQ representative indefinitely. If the permittee supplies the sludge to another person who land applies the sludge, the permittee shall notify the land applier of the requirements for record keeping found in 30 TAC § 312.47 for persons who land apply:

    a.  A certification statement that all applicable requirements (specifically listed) have been met, and that the permittee understands that there are significant penalties for false certification including fine and imprisonment. See 30 TAC § 312.47(a)(4)(A)(ii) or 30 TAC § 312.47(a)(5)(A)(ii), as applicable, and to the permittee's specific sludge treatment activities.

    b.  The location, by street address, and specific latitude and longitude, of each site on which sludge is applied.

    c.  The number of acres in each site on which bulk sludge is applied.

    d.  The date and time sludge is applied to each site.

e.  The cumulative amount of each pollutant in pounds/acre listed in Table 2 applied to each site.

f.  The total amount of sludge applied to each site in dry tons.

The above records shall be maintained on-site on a monthly basis and shall be made available to the Texas Commission on Environmental Quality upon request.

## F. Reporting Requirements

The permittee shall report annually to the TCEQ Regional Office (MC Region 11) and Compliance Monitoring Team (MC 224) of the Enforcement Division, by September 30th of each year the following information. The permittee must submit this annual report using the online electronic reporting system available through the TCEQ website unless the permittee requests and obtains an electronic reporting waiver.

1.  Identify in the following categories (as applicable) the sewage sludge treatment process or processes at the facility: preliminary operations (e.g., sludge grinding and degritting), thickening (concentration), stabilization, anaerobic digestion, aerobic digestion, composting, conditioning, disinfection (e.g., beta ray irradiation, gamma ray irradiation, pasteurization), dewatering (e.g., centrifugation, sludge drying beds, sludge lagoons), heat drying, thermal reduction, and methane or biogas capture and recovery.

2.  Identify the nature of material generated by the facility (such as a biosolid for beneficial use or land-farming, or sewage sludge for disposal at a monofill) and whether the material is ultimately conveyed off-site in bulk or in bags.

3.  Results of tests performed for pollutants found in either Table 2 or 3 as appropriate for the permittee's land application practices.

4.  The frequency of monitoring listed in Section I.C. that applies to the permittee.

5.  Toxicity Characteristic Leaching Procedure (TCLP) results.

6.  PCB concentration in sludge in mg/kg.

7.  Identity of hauler(s) and TCEQ transporter number.

8.  Date(s) of transport.

9.  Texas Commission on Environmental Quality registration number, if applicable.

10. Amount of sludge disposal dry weight (lbs/acre) at each disposal site.

11. The concentration (mg/kg) in the sludge of each pollutant listed in Table 1 (defined as a monthly average) as well as the applicable pollutant concentration criteria (mg/kg) listed in Table 3 above, or the applicable pollutant loading rate limit (lbs/acre) listed in Table 2 above if it exceeds 90% of the limit.

12. Level of pathogen reduction achieved (Class A, Class AB or Class B).

13. Alternative used as listed in Section I.B.3.(a. or b.). Alternatives describe how the pathogen reduction requirements are met. If Class B sludge, include information on how site restrictions were met.

14. Identify each of the analytic methods used by the facility to analyze enteric viruses, fecal coliforms, helminth ova, *Salmonella* sp., and other regulated parameters.

15. Vector attraction reduction alternative used as listed in Section I.B.4.

16. Amount of sludge transported in dry tons/year.

17. The certification statement listed in either 30 TAC § 312.47(a)(4)(A)(ii) or 30 TAC § 312.47(a)(5)(A)(ii) as applicable to the permittee's sludge treatment activities, shall be attached to the annual reporting form.

18. When the amount of any pollutant applied to the land exceeds 90% of the cumulative pollutant loading rate for that pollutant, as described in Table 2, the permittee shall report the following information as an attachment to the annual reporting form.

    a. The location, by street address, and specific latitude and longitude.

    b. The number of acres in each site on which bulk sewage sludge is applied.

    c. The date and time bulk sewage sludge is applied to each site.

    d. The cumulative amount of each pollutant (i.e., pounds/acre) listed in Table 2 in the bulk sewage sludge applied to each site.

    e. The amount of sewage sludge (i.e., dry tons) applied to each site.

    The above records shall be maintained on a monthly basis and shall be made available to the Texas Commission on Environmental Quality upon request.

**SECTION III.**   **REQUIREMENTS APPLYING TO ALL SEWAGE SLUDGE DISPOSED IN A MUNICIPAL SOLID WASTE LANDFILL**

A. The permittee shall handle and dispose of sewage sludge in accordance with 30 TAC § 330 and all other applicable state and federal regulations to protect public health and the environment from any reasonably anticipated adverse effects due to any toxic pollutants that may be present. The permittee shall ensure that the sewage sludge meets the requirements in 30 TAC § 330 concerning the quality of the sludge disposed in a municipal solid waste landfill.

B. If the permittee generates sewage sludge and supplies that sewage sludge to the owner or operator of a municipal solid waste landfill (MSWLF) for disposal, the permittee shall provide to the owner or operator of the MSWLF appropriate information needed to be in compliance with the provisions of this permit.

C. The permittee shall give 180 days prior notice to the Executive Director in care of the Wastewater Permitting Section (MC 148) of the Water Quality Division of any change planned in the sewage sludge disposal practice.

D. Sewage sludge shall be tested once during the term of this permit in accordance with the method specified in both 40 CFR Part 261, Appendix II and 40 CFR Part 268, Appendix I (Toxicity Characteristic Leaching Procedure) or other method, which receives the prior approval of the TCEQ for contaminants listed in Table 1 of 40 CFR § 261.24. Sewage sludge failing this test shall be managed according to RCRA standards for generators of hazardous waste, and the waste's disposition must be in accordance with all applicable requirements for hazardous waste processing, storage, or disposal.

Following failure of any TCLP test, the management or disposal of sewage sludge at a facility other than an authorized hazardous waste processing, storage, or disposal facility shall be prohibited until such time as the permittee can demonstrate the sewage sludge no longer exhibits the hazardous waste toxicity characteristics (as demonstrated by the results of the TCLP tests). A written report shall be provided to both the TCEQ Registration and Reporting Section (MC 129) of the Permitting and Registration Support Division and the Regional Director (MC Region 11) of the appropriate TCEQ field office within 7 days after failing the TCLP Test.

The report shall contain test results, certification that unauthorized waste management has stopped, and a summary of alternative disposal plans that comply with RCRA standards for the management of hazardous waste. The report shall be addressed to: Director, Permitting and Registration Support Division (MC 129), Texas Commission on Environmental Quality, P. O. Box 13087, Austin, Texas 78711-3087. In addition, the permittee shall prepare an annual report on the results of all sludge toxicity testing. This annual report shall be submitted to the TCEQ Regional Office (MC Region 11) and the Compliance Monitoring Team (MC 224) of the Enforcement Division by September 30 of each year.

E. Sewage sludge shall be tested as needed, in accordance with the requirements of 30 TAC Chapter 330.

F. Record Keeping Requirements

The permittee shall develop the following information and shall retain the information for five years.

1. The description (including procedures followed and the results) of all liquid Paint Filter Tests performed.

2. The description (including procedures followed and results) of all TCLP tests performed.

The above records shall be maintained on-site on a monthly basis and shall be made available to the Texas Commission on Environmental Quality upon request.

G. Reporting Requirements

The permittee shall report annually to the TCEQ Regional Office (MC Region 11) and Compliance Monitoring Team (MC 224) of the Enforcement Division by September 30th of each year the following information. The permittee must submit this annual report using the online electronic reporting system available through the TCEQ website unless the permittee requests and obtains an electronic reporting waiver.

1. Identify in the following categories (as applicable) the sewage sludge treatment process or processes at the facility: preliminary operations (e.g., sludge grinding and degritting), thickening (concentration), stabilization, anaerobic digestion, aerobic digestion, composting, conditioning, disinfection (e.g., beta ray irradiation, gamma ray irradiation, pasteurization), dewatering (e.g., centrifugation, sludge drying beds, sludge lagoons), heat drying, thermal reduction, and methane or biogas capture and recovery.

2. Toxicity Characteristic Leaching Procedure (TCLP) results.

3. Annual sludge production in dry tons/year.

4. Amount of sludge disposed in a municipal solid waste landfill in dry tons/year.

5. Amount of sludge transported interstate in dry tons/year.

6. A certification that the sewage sludge meets the requirements of 30 TAC § 330 concerning the quality of the sludge disposed in a municipal solid waste landfill.

7. Identity of hauler(s) and transporter registration number.

8. Owner of disposal site(s).

9. Location of disposal site(s).

10. Date(s) of disposal.

The above records shall be maintained on-site on a monthly basis and shall be made available to the Texas Commission on Environmental Quality upon request.

**SECTION IV.    REQUIREMENTS APPLYING TO SLUDGE TRANSPORTED TO
                ANOTHER FACILITY FOR FURTHER PROCESSING**

These provisions apply to sludge that is transported to another wastewater treatment facility or facility that further processes sludge. These provisions are intended to allow transport of sludge to facilities that have been authorized to accept sludge. These provisions do not limit the ability of the receiving facility to determine whether to accept the sludge, nor do they limit the ability of the receiving facility to request additional testing or documentation.

**A.  General Requirements**

1.  The permittee shall handle and dispose of sewage sludge in accordance with 30 TAC Chapter 312 and all other applicable state and federal regulations in a manner that protects public health and the environment from any reasonably anticipated adverse effects due to any toxic pollutants that may be present in the sludge.

2.  Sludge may only be transported using a registered transporter or using an approved pipeline.

**B.  Record Keeping Requirements**

1.  For sludge transported by an approved pipeline, the permittee must maintain records of the following:

    a.    the amount of sludge transported;

    b.    the date of transport;

    c.    the name and TCEQ permit number of the receiving facility or facilities;

    d.    the location of the receiving facility or facilities;

    e.    the name and TCEQ permit number of the facility that generated the waste; and

    f.    copy of the written agreement between the permittee and the receiving facility to accept sludge.

2.  For sludge transported by a registered transporter, the permittee must maintain records of the completed trip tickets in accordance with 30 TAC § 312.145(a)(1)-(7) and amount of sludge transported.

3.  The above records shall be maintained on-site on a monthly basis and shall be made available to the TCEQ upon request. These records shall be retained for at least five years.

## C. Reporting Requirements

The permittee shall report the following information annually to the TCEQ Regional Office (MC Region 11) and Compliance Monitoring Team (MC 224) of the Enforcement Division, by September 30th of each year. The permittee must submit this annual report using the online electronic reporting system available through the TCEQ website unless the permittee requests and obtains an electronic reporting waiver.

1. Identify in the following categories (as applicable) the sewage sludge treatment process or processes at the facility: preliminary operations (e.g., sludge grinding and degritting), thickening (concentration), stabilization, anaerobic digestion, aerobic digestion, composting, conditioning, disinfection (e.g., beta ray irradiation, gamma ray irradiation, pasteurization), dewatering (e.g., centrifugation, sludge drying beds, sludge lagoons), heat drying, thermal reduction, and methane or biogas capture and recovery.

2. the annual sludge production;

3. the amount of sludge transported;

4. the owner of each receiving facility;

5. the location of each receiving facility; and

6. the date(s) of disposal at each receiving facility.

TCEQ Revision 10/2019

**OTHER REQUIREMENTS**

1.  The permittee shall employ or contract with one or more licensed wastewater treatment facility operators or wastewater system operations companies holding a valid license or registration according to the requirements of 30 TAC Chapter 30, Occupational Licenses and Registrations, and in particular 30 TAC Chapter 30, Subchapter J, Wastewater Operators and Operations Companies.

    This Category C facility must be operated by a chief operator or an operator holding a Class C license or higher. The facility must be operated a minimum of five days per week by the licensed chief operator or an operator holding the required level of license or higher. The licensed chief operator or operator holding the required level of license or higher must be available by telephone or pager seven days per week. Where shift operation of the wastewater treatment facility is necessary, each shift that does not have the on-site supervision of the licensed chief operator must be supervised by an operator in charge who is licensed not less than one level below the category for the facility.

2.  The facility is not located in the Coastal Management Program boundary.

3.  The permittee shall comply with the requirements of 30 TAC § 309.13(a) through (d). In addition, by ownership of the required buffer zone area, the permittee shall comply with the requirements of 30 TAC § 309.13(e).

4.  The permittee shall provide facilities for the protection of its wastewater treatment facility from a 100-year flood.

5.  In accordance with 30 TAC § 319.9, a permittee that has at least twelve months of uninterrupted compliance with its bacteria limit may notify the commission in writing of its compliance and request a less frequent measurement schedule. To request a less frequent schedule, the permittee shall submit a written request to the TCEQ Wastewater Permitting Section (MC 148) for each phase that includes a different monitoring frequency. The request must contain all of the reported bacteria values (Daily Avg. and Daily Max/Single Grab) for the twelve consecutive months immediately prior to the request. If the Executive Director finds that a less frequent measurement schedule is protective of human health and the environment, the permittee may be given a less frequent measurement schedule. For this permit, 1/month may be reduced to 1/quarter. **A violation of any bacteria limit by a facility that has been granted a less frequent measurement schedule will require the permittee to return to the standard frequency schedule and submit written notice to the TCEQ Wastewater Permitting Section (MC 148).** The permittee may not apply for another reduction in measurement frequency for at least 24 months from the date of the last violation. The Executive Director may establish a more frequent measurement schedule if necessary to protect human health or the environment.

6.  Prior to construction of the treatment facility, the permittee shall submit to the TCEQ Wastewater Permitting Section (MC 148) a summary transmittal letter in accordance with the requirements in 30 TAC § 217.6(d). If requested by the Wastewater Permitting Section, the permittee shall submit plans and specifications and a final engineering design report which comply with 30 TAC Chapter 217, Design Criteria for Domestic Wastewater Systems. The permittee shall clearly show how the treatment system will meet the permitted effluent limitations required on Page 2 of this permit. A copy of the summary transmittal letter shall be available at the plant site for inspection by authorized representatives of the TCEQ.

7.  Reporting requirements according to 30 TAC §§ 319.1-319.11 and any additional effluent reporting requirements contained in this permit are suspended from the effective date of the permit until plant startup or discharge from the facility described by this permit, whichever occurs first. The permittee shall provide written notice to the TCEQ Regional Office (MC Region 11) and the Applications Review

and Processing Team (MC 148) of the Water Quality Division at least forty-five (45) days prior to plant startup or anticipated discharge, whichever occurs first, on Notification of Completion Form 20007.

# Appendix Item 3

Executive Director's Response to Public Comment

## TCEQ PERMIT NO. WQ0015878001

| | | |
|---|---|---|
| **APPLICATION BY** | § | **BEFORE THE** |
| **AIRW 2017-7 L.P.** | § | **TEXAS COMMISSION** |
| **FOR TPDES PERMIT NO.** | § | **ON** |
| **WQ0015878001** | § | **ENVIRONMENTAL QUALITY** |

## EXECUTIVE DIRECTOR'S RESPONSE TO PUBLIC COMMENT

The Executive Director (ED) of the Texas Commission on Environmental Quality (the Commission or TCEQ) files this Response to Public Comment (Response) on the application by the AIRW 2017-7, L.P. (Applicant) for a new Texas Pollutant Discharge Elimination System (TPDES) Permit No. WQ0015878001, and on the ED's preliminary decision. As required by 30 Texas Administrative Code (TAC) Section (§) 55.156, before an application is approved, the ED prepares a response to all timely, relevant and material, or significant comments. This Response addresses all timely filed public comments received, whether or not withdrawn. The Office of the Chief Clerk received timely comments from Glenn Patterson, Barbara Kay Patterson, Jim C. Webb, and Patricia Erlinger Carls on behalf of the City of Georgetown. If you need more information about this permit application or the wastewater permitting process, please call the TCEQ Public Education Program at 1-800-687-4040. General information about the TCEQ can be found at our website at http://www.tceq.texas.gov.

## BACKGROUND

*Description of Facility*

The Applicant applied for a new TPDES permit to authorize the discharge of treated domestic wastewater at a daily average flow not to exceed 200,000 gallons per day (gpd).

**AIRW-EXH. 41**

AIRW000531

The Rockride Lane Water Resource Reclamation Facility will be located approximately 500 feet southeast of the intersection of Rockride Lane (County Road 110) and Westinghouse Road (County Road 111), in Williamson County, Texas 78626. The proposed AIRW 2017-7, L.P., Rockride Lane Water Resource Reclamation Facility will serve The Mansions of Georgetown III residential development.

Treatment units include aeration basins, a final clarifier, a cloth effluent filter, chemical injection for phosphorus removal, aerated sludge holding and thickening tank, and a chlorine contact chamber. The facility has not been constructed.

The draft permit authorizes a discharge of treated domestic wastewater at a daily average flow not to exceed 0.200 million gallons per day (MGD).

The effluent limitations in the draft permit, based on a 30-day average, are 7 mg/L five-day carbonaceous biochemical oxygen demand ($CBOD_5$), 10 mg/L total suspended solids (TSS), 2 mg/L ammonia-nitrogen ($NH_3$-N), 0.5 mg/L total phosphorus, 126 CFU or MPN of *E. coli* per 100 ml and 4.0 mg/L minimum dissolved oxygen (DO). The effluent shall contain a chlorine residual of at least 1.0 mg/L and shall not exceed a chlorine residual of 4.0 mg/L after a detention time of at least 20 minutes based on peak flow.

The treated effluent will be discharged via pipe, thence through a culvert, thence to an unnamed tributary, thence to Mankins Branch, thence the San Gabriel/North Fork San Gabriel River in Segment No. 1248 of the Brazos River Basin. The unclassified receiving water uses are limited aquatic life use for the unnamed tributary and Mankins Branch (intermittent with perennial pools), and high aquatic life use for Mankins Branch (perennial). The designated uses for Segment No. 1248 are primary contact recreation, public water supply, aquifer protection, and high aquatic life use.

AIRW-EXH. 41
AIRW000532

The effluent limitations in the draft permit will maintain and protect the existing instream uses.

In accordance with 30 Texas Administrative Code Section 307.5 and the TCEQ's *Procedures to Implement the Texas Surface Water Quality Standards (June 2010)*, an antidegradation review of the receiving waters was performed. A Tier 1 antidegradation review has preliminarily determined that existing water quality uses will not be impaired by this permit action. Numerical and narrative criteria to protect existing uses will be maintained. A Tier 2 review has preliminarily determined that no significant degradation of water quality is expected in Mankins Branch (perennial), which has been identified as having high aquatic life uses. Existing uses will be maintained and protected. The preliminary determination can be reexamined and may be modified if new information is received.

Segment No. 1248 is not currently listed on the State's inventory of impaired and threatened waters (2018 Clean Water Act Section 303(d) list). However, Mankins Branch is currently listed on the 2018 303(d) list. The Mankins Branch listing is specifically for elevated bacteria levels (recreation use) from the confluence with the San Gabriel River upstream to the intersection of County Road 105 and County Road 104 in Williamson County (Assessment Unit 1248C_01).

The discharge from this permit action is not expected to have an effect on any federal endangered or threatened aquatic or aquatic-dependent species or proposed species or their critical habitat. This determination is based on the United States Fish and Wildlife Service's (USFWS's) biological opinion on the State of Texas authorization of the TPDES (September 14, 1998; October 21, 1998, update). To make this determination for TPDES permits, TCEQ and EPA only considered aquatic or aquatic-dependent species occurring in watersheds of critical concern or high priority as listed

**AIRW-EXH. 41**
AIRW000533

in Appendix A of the USFWS biological opinion. The determination is subject to reevaluation due to subsequent updates or amendments to the biological opinion. The permit does not require EPA review with respect to the presence of endangered or threatened species.

*Procedural Background*

TCEQ received the application for a new permit on April 6, 2020, and declared it administratively complete on June 19, 2020. The Applicant published the Notice of Receipt and Intent to Obtain a Water Quality Permit (NORI) in English on June 28, 2020, in the *Williamson County Sun* and in Spanish on June 25, 2020, in *El Mundo Newspaper.* The application was determined technically complete on October 26, 2020. The Applicant published the Combined NORI and Notice of Application and Preliminary Decision (NAPD) in English on December 13, 2020, in the *Williamson County Sun* and in Spanish on December 17, 2020, in *El Mundo Newspaper.* The comment period for this application closed on January 19, 2021. This application was filed on or after February 12, 2019; therefore, this application is subject to the procedural requirements adopted pursuant to House Bill (HB) 801, 76th Legislature (1999), and Senate Bill (SB) 709, 84th Legislature (2015), both implemented by the Commission in its rules in 30 TAC Chapter 39, 50, and 55. The Texas Legislature enacted Senate Bill 709, effective September 1, 2015, amending the requirements for comments and contested case hearings. This application is subject to those changes in the law.

*Access to Rules, Laws and Records*

Please consult the following websites to access the rules and regulations applicable to this permit:

- for the Secretary of State website: http://www.sos.state.tx.us;

**AIRW-EXH. 41**

AIRW000534

- for TCEQ rules in Title 30 of the Texas Administrative Code (TAC): www.sos.state.tx.us/tac/ (select "View the current Texas Administrative Code" on the right, then "Title 30 Environmental Quality");

- for Texas statutes: http://www.statutes.legis.state.tx.us/;

- to access the TCEQ website: www.tceq.texas.gov (for downloadable rules in Adobe PDF format, select "Rules" then "Download TCEQ Rules");

- for Federal rules in Title 40 of the Code of Federal Regulations: www.ecfr.gov; and

- for Federal environmental laws: http://www2.epa.gov/laws-regulations.

Commission records for this application and draft permit are available for viewing and copying at the TCEQ's main office in Austin, 12100 Park 35 Circle, Building F, 1st Floor (Office of the Chief Clerk), until final action is taken. The draft permit, the Statement of Basis/Technical Summary, and the ED's Preliminary Decision, are available for viewing and copying at Georgetown Public Library, Reference Desk, 402 West 8th Street, Georgetown, Texas.

## COMMENTS AND RESPONSES

**Comment 1:**

Glenn Patterson, Barbara Patterson, and the City of Georgetown commented that the proposed facility does not comply with TCEQ's regionalization policy set out by Texas Water Code § 26.003 and that there are existing City wastewater lines near the proposed facility and that the proposed facility is not needed. Glenn Patterson and Barbara Patterson commented that there are alternative options for connection near the proposed facility.

**Response 1:**

Texas Water Code § 26.081 enumerates the state's regionalization policy. Section 26.081 states that the policy should "encourage and promote the development

**AIRW-EXH. 41**
AIRW000535

and use of regional and area-wide waste collection, treatment, and disposal systems to serve the waste disposal needs of the citizens of the state and to prevent pollution and maintain and enhance the quality of the water in the state." In furtherance of that policy TWC § 26.0282 authorizes the TCEQ, when considering the issuance of a permit to discharge waste, to deny or alter the terms and conditions of a proposed permit based on need and the availability of existing or proposed area-wide or regional waste collection, treatment, and disposal systems.

Domestic Technical Report 1.1 of the application requires information concerning regionalization of wastewater treatment plants. Applicants requesting a new permit or certain major amendments are required to review a three-mile area surrounding the proposed facility to determine if there is a wastewater treatment plant or sewer collection lines within the area that the permittee can utilize. Applicants are required to contact those facilities to inquire if they currently have the capacity or are willing to expand to accept the volume of wastewater proposed. If an existing wastewater facility does have the capacity and is willing to accept the proposed wastewater, the applicant must demonstrate that it is not feasible to connect to another permitted wastewater treatment facility or collection system located within three miles. Finally, applicants are required to provide copies of all correspondence with the owners of existing plants within three miles of the proposed plant regarding regionalization with their system.

The applicant has demonstrated that connecting to an existing wastewater collection system would be cost prohibitive compared to the proposed facility.

**Comment 2:**

Glenn Patterson comments that there is a dry weather creek that divides his ranch that he and livestock traverse. He expressed concern that the discharge up to

**AIRW-EXH. 41**

AIRW000536

200,000 gallons of treated sewage per day through the dry creek will make it wet with treated sewage year-round, which will create environmental and access issues for both his ranch and the livestock.

**Response 2:**

The TCEQ has a statutory responsibility to protect water quality in the State of Texas and to authorize TPDES permits under Texas Water Code (TWC) Chapter 26, and regulatory authority under 30 TAC Chapters 305, 307 and 309, including specific rules regarding wastewater treatment systems under 30 TAC Chapters 217 and 309. The proposed draft permit was developed in accordance with the Texas Surface Water Quality Standards to be protective of water quality, provided that the Applicant operates and maintains the proposed facility according to TCEQ rules and the proposed permit's requirements.

The TCEQ was given the authority to issue TPDES permits for the discharge of waste or pollutant into or adjacent to water in the state. The draft permit does not authorize any injury to persons or property or an invasion of other property rights, or limit the ability of nearby landowners to use common law remedies for trespass, nuisance, or other causes of action in response to activities that may or actually do result in injury or adverse effects on human health or welfare, animal life, vegetation, or property, or that may or actually do interfere with the normal use and enjoyment of animal life, vegetation, or property.

As specified in the Texas Surface Water Quality Standards (TSWQS), water in the state must be maintained to preclude adverse toxic effects on aquatic life, terrestrial life, livestock, and domestic animals resulting from contact, consumption of aquatic organisms, consumption of water, or any combination of the three. Water in the state must also be maintained to preclude adverse toxic effects on human health resulting

**AIRW-EXH. 41**

AIRW000537

from contact recreation, consumption of aquatic organisms, consumption of drinking water, or any combination of the three.

Discharges of the treated effluent from the proposed Rockride Lane Water Resource Reclamation Facility will be via pipe, thence through a culvert, thence to an unnamed tributary, thence to Mankins Branch, thence the San Gabriel/North Fork San Gabriel River in Segment No. 1248 of the Brazos River Basin. The unclassified receiving water uses are limited aquatic life use for the unnamed tributary and Mankins Branch (intermittent with perennial pools), and high aquatic life use for Mankins Branch (perennial).

The draft permit includes provisions to ensure that the TSWQS will be maintained. Conventional domestic sewage does not typically contain toxic compounds in measurable quantities that might result in toxic effects in the receiving waterbodies, unless there are significant industrial users contributing to the waste stream. Additionally, more stringent effluent limitations have been placed in the draft permit, based on the requirements of the Colorado River Watershed Protection rules located in 30 TAC 311, Subchapter E.

In accordance with 30 Texas Administrative Code Section 307.5 and the TCEQ's *Procedures to Implement the Texas Surface Water Quality Standards (June 2010)*, an antidegradation review of the receiving waters was performed. A Tier 1 antidegradation review has preliminarily determined that existing water quality uses will not be impaired by this permit action. Numerical and narrative criteria to protect existing uses will be maintained. A Tier 2 review has preliminarily determined that no significant degradation of water quality is expected in Mankins Branch (perennial), which has been identified as having high aquatic life uses. Existing uses will be maintained and protected.

**AIRW-EXH. 41**
AIRW000538

**Comment 4:**

Glenn Patterson commented that the proposed TPDES permit will circumvent the City of Georgetown's UDC code.

**Response 4:**

The TCEQ does not have jurisdiction or authority to speak on issues concerning the City of Georgetown's UDC code.

**Comment 5:**

Glenn Patterson commented that there are two livestock ponds that he keeps stocked with fish to control algae growth, create a healthy drinking source for the cattle, and used for fishing and recreation.

**Response 5:**

As specified in the Texas Surface Water Quality Standards (TSWQS), water in the state must be maintained to preclude adverse toxic effects on aquatic life, terrestrial life, livestock, and domestic animals resulting from contact, consumption of aquatic organisms, consumption of water, or any combination of the three. Water in the state must also be maintained to preclude adverse toxic effects on human health resulting from contact recreation, consumption of aquatic organisms, consumption of drinking water, or any combination of the three. The TCEQ issues permits that describe the conditions under which the wastewater facility must operate. All facilities must be designed, operated, and maintained consistent with applicable TCEQ rules. These provisions require that a facility is properly operated and maintained at all times.

Phosphorus is a key nutrient necessary for algae growth and is often in limited supply in freshwater systems. By restricting the amount of phosphorus in the treated wastewater, the likelihood of the discharge stimulating excessive growth of algae or other aquatic vegetation is reduced significantly. To ensure the effluent from the

**AIRW-EXH. 41**

AIRW000539

Rockride Lane Water Resource Reclamation Facility will not cause an excessive accumulation of algae, the Executive Director performed a nutrient screening which indicated that because of the high clarity of the water column, lack of shade along the banks, and minimal dilution, a total phosphorus limit is needed in the draft permit. The Executive Director included a total phosphorus limit of 0.5 mg/L to preclude the excessive accumulation of algae.

**Comment 6:**

Barbara Kay Patterson commented that this proposed plant would discharge treated sewage through a normally dry creek and that the creek leads to two tanks used to furnish clean water to cattle, for fishing and recreation for their family.

**Response 6:**

The draft permit was developed in accordance with the Texas Surface Water Quality Standards (TSWQA) located in 30 TAC Chapter 307 which designates criteria for the protection of aquatic life and human health and the environment, provided the Applicant operates and maintains the facility according to TCEQ rules and the requirements in the draft permit. Water in the state must be maintained to preclude adverse toxic effects on aquatic life, terrestrial life, livestock, and domestic animals resulting from contact, consumption of aquatic organisms, consumption of water, or any combination of the three. TSWQS states that "surface waters will not be toxic to man from ingestion of water, consumption of aquatic organisms, or contact with the skin, or to terrestrial or aquatic life." 30 TAC § 307.4(d). As part of the permit application process, TCEQ must determine the uses of the receiving water and set effluent limits that are protective of those uses. The ED's staff developed the effluent limitations in the draft permit to maintain and protect existing instream uses. The Executive Director determined that these uses should be protected if the facility is

**AIRW-EXH. 41**

AIRW000540

operated and maintained as required by the proposed permit and regulations. This protection includes downstream ponds.

**Comment 7:**

Jimmy C. Webb commented that he opposes the proposed permit. Mr. Webb raised water quality concerns for the creek and impacts on fish and cattle that depend on his pond water. Additionally, he raised concerns about his property value and the use and enjoyment of his property as fishing will be impacted. Finally, he is concerned with increased water flow resulting in erosion and making it difficult for him to access his property when he needs to cross the creek.

**Response 7:**

The TCEQ has statutory responsibility to protect water quality in the State of Texas and to authorize TPDES permits under Texas Water Code (TWC) Chapter 26, and regulatory authority under 30 TAC Chapters 305, 307 and 309, including specific rules regarding wastewater treatment systems under 30 TAC Chapters 217 and 309. The proposed draft permit was developed in accordance with the Texas Surface Water Quality Standards to be protective of water quality, provided that the Applicant operates and maintains the proposed facility according to TCEQ rules and the proposed permit's requirements.

The TCEQ was given the authority to issue TPDES permits for the discharge of waste or pollutant into or adjacent to water in the state. The draft permit does not limit the ability of nearby landowners to use common law remedies for trespass, nuisance, or other causes of action in response to activities that may or actually do result in injury or adverse effects on human health or welfare, animal life, vegetation, or property, or that may or actually do interfere with the normal use and enjoyment of animal life, vegetation, or property.

**AIRW-EXH. 41**
AIRW000541

As specified in the Texas Surface Water Quality Standards (TSWQS), water in the state must be maintained to preclude adverse toxic effects on aquatic life, terrestrial life, livestock, and domestic animals resulting from contact, consumption of aquatic organisms, consumption of water, or any combination of the three. Water in the state must also be maintained to preclude adverse toxic effects on human health resulting from contact recreation, consumption of aquatic organisms, consumption of drinking water, or any combination of the three. Therefore, there should be no impact to cattle or fish if the applicant complies with the draft permit.

The TCEQ does not have jurisdiction to address erosion and flooding issues and property values and the possibility of reduced grass grazing area for the cattle are not a consideration in the wastewater permitting process. The Applicant is required to comply with all the numeric and narrative effluent limitations and other conditions in the proposed permit at all times, including during flooding conditions.

**Comment 8:**

The City of Georgetown is concerned that there are three ponds downstream of the proposed discharge location. The City is concerned with water quality in those ponds stimulating algae growth and other unsanitary or unsafe water quality conditions in the ponds and the receiving watercourses.

**Response 8:**

Phosphorus is a key nutrient necessary for algae growth and is often in limited supply in freshwater systems. By restricting the amount of phosphorus in the treated wastewater, the likelihood of the discharge stimulating excessive growth of algae or other aquatic vegetation is reduced significantly. To ensure the effluent from the Rockride Lane Water Resource Reclamation Facility will not cause an excessive accumulation of algae, the Executive Director performed a nutrient screening which

**AIRW-EXH. 41**
AIRW000542

indicated that because of the high clarity of the water column, lack of shade along the banks, and minimal dilution, a total phosphorus limit is needed in the draft permit. The Executive Director included a total phosphorus limit of 0.5 mg/L to preclude the excessive accumulation of algae.

As specified in the Texas Surface Water Quality Standards (TSWQS), water in the state must be maintained to preclude adverse toxic effects on aquatic life, terrestrial life, livestock, and domestic animals resulting from contact, consumption of aquatic organisms, consumption of water, or any combination of the three. Water in the state must also be maintained to preclude adverse toxic effects on human health resulting from contact recreation, consumption of aquatic organisms, consumption of drinking water, or any combination of the three.

**Comment 9:**

The City of Georgetown expressed concern that the discharge route is within the City's extraterritorial jurisdiction and its City limits. In particular, because the discharge would be into a creek that runs through the City, the City is concerned about the quality of water in the creek and the health and safety of its citizens.

**Response 9:**

The TCEQ has a statutory responsibility to protect water quality in the State of Texas and to authorize TPDES permits under Texas Water Code (TWC) Chapter 26, and regulatory authority under 30 TAC Chapters 305, 307 and 309, including specific rules regarding wastewater treatment systems under 30 TAC Chapters 217 and 309. The proposed draft permit was developed in accordance with the Texas Surface Water Quality Standards to be protective of water quality, provided that the Applicant operates and maintains the proposed facility according to TCEQ rules and the proposed permit's requirements.

**AIRW-EXH. 41**

AIRW000543

The TCEQ was given the authority to issue TPDES permits for the discharge of waste or pollutant into or adjacent to water in the state. The draft permit does not limit the ability of nearby landowners to use common law remedies for trespass, nuisance, or other causes of action in response to activities that may or actually do result in injury or adverse effects on human health or welfare, animal life, vegetation, or property, or that may or actually do interfere with the normal use and enjoyment of animal life, vegetation, or property.

The Executive Director's review of an application for a TPDES permit focuses on controlling the discharge of pollutants into water in the state, which includes both navigable and non-navigable water bodies. As specified in the Texas Surface Water Quality Standards (TSWQS), water in the state must be maintained to preclude adverse toxic effects on aquatic life, terrestrial life, livestock, and domestic animals resulting from contact, consumption of aquatic organisms, consumption of water, or any combination of the three. Water in the state must also be maintained to preclude adverse toxic effects on human health resulting from contact recreation, consumption of aquatic organisms, consumption of drinking water, or any combination of the three.

In accordance with 30 Texas Administrative Code Section 307.5 and the TCEQ's *Procedures to Implement the Texas Surface Water Quality Standards (June 2010)*, an antidegradation review of the receiving waters was performed. A Tier 1 antidegradation review has preliminarily determined that existing water quality uses will not be impaired by this permit action. Numerical and narrative criteria to protect existing uses will be maintained. A Tier 2 review has preliminarily determined that no significant degradation of water quality is expected in Mankins Branch (perennial), which has been identified as having high aquatic life uses. Existing uses will be maintained and protected.

The draft permit includes provisions to ensure that the TSWQS will be maintained. Conventional domestic sewage does not typically contain toxic compounds in measurable quantities that might result in toxic effects in the receiving waterbodies, unless there are significant industrial users contributing to the waste stream. Additionally, more stringent effluent limitations have been placed in the draft permit, based on the requirements of the Colorado River Watershed Protection rules located in 30 TAC Chapter 311, Subchapter E.

**Comment 10:**

The City of Georgetown expresses its concerns about potential noise, odors, and discharged solids affecting other residents and businesses in the area.

**Response 10:**

The TCEQ does not have the authority to address noise as part of the wastewater permitting process. TWC Chapter 26 and applicable wastewater regulations do not authorize the TCEQ to consider issues such as noise.

However, the permit does not limit the ability of an individual to seek legal remedies against the Applicant regarding any potential trespass, nuisance, or other causes of action in response to activities that may result in injury to human health or property or that may interfere with the normal use and enjoyment of property.

All wastewater treatment facilities have the potential to generate odors. To control and abate odors the TCEQ rules require domestic WWTPs to meet buffer zone requirements for the abatement and control of nuisance odor according to 30 TAC § 309.13(e), which provides three options for applicants to satisfy the nuisance odor abatement and control requirements. the Applicant can comply with the rule by: 1) ownership of the buffer zone area; 2) restrictive easement from the adjacent property

**AIRW-EXH. 41**

AIRW000545

owners for any part of the buffer zone not owned by the Applicant; or 3) providing nuisance odor control.

According to its application, the Applicant intends to comply with the requirement to abate and control nuisance of odor by locating the treatment units at least 150 feet from the nearest property line. This requirement is incorporated in the draft permit. Therefore, nuisance odor is not expected to occur as a result of the permitted activities at the facility if the permittee operates the facility in compliance with TCEQ's rules and the terms and conditions of the draft permit. The limits in the draft permit for total discharged solids meets the rule requirements for this type of facility according to 30 TAC § 309.4. The provisions in the permit are designed to help prevent unauthorized discharges of solids. If an unauthorized discharge occurs, the Applicant will be required to report it to the TCEQ within 24 hours. Finally, the Applicant is subject to potential enforcement action for failure to comply with TCEQ rules or the permit.

**Comment 11:**

The City expressed its concerns with the Applicant's technical, managerial, and financial capabilities to own and operate this facility over the long term.

**Response 11:**

The draft permit requires that the permittee shall employ or contract with one or more licensed wastewater treatment facility operators or wastewater system operations companies holding a valid license or registration according to the requirements of 30 TAC Chapter 30, Occupational Licenses and Registrations, and in particular 30 TAC Chapter 30, Subchapter J, Wastewater Operators and Operations Companies.

**AIRW-EXH. 41**

AIRW000546

The TCEQ Water Quality Standards and Implementation team has determined that the discharge route will be from the outfall, where the discharge leaves the proposed AIRW 2017-7, L.P. property line, and enters a pipe, thence through a culvert, thence to an unnamed tributary, thence to Mankins Branch, thence the San Gabriel/North Fork San Gabriel River. The method of treatment will be via an activated sludge with nitrification process plant operated in the conventional mode. Treatment units will include aeration basins, a final clarifier, a cloth effluent filter, chemical injection for phosphorus removal, aerated sludge holding and thickening tank, and a chlorine contact chamber. The method of disposal of treated effluent is based on the statutory provisions under TWC Chapter 26 and the regulatory provisions under 30 TAC Chapters 217, 305, 307 and 309.

The proposed permit requires the Applicant to submit a summary transmittal letter in accordance with the requirements in 30 TAC § 217.6(d) prior to construction of the facility. If requested by the Wastewater Permitting Section, the permittee shall submit plans and specifications and a final engineering design report which comply with 30 TAC Chapter 217, relating to "Design Criteria for Domestic Wastewater Systems." The permittee shall clearly show how the treatment system will meet the permitted effluent limitations required on Page 2 of the draft permit. The Executive Director's staff will ensure that the plant design can adequately treat the domestic wastewater in accordance with the effluent limitations in the proposed permit during the review of the plans and specifications for this facility.

**CHANGES MADE TO THE DRAFT PERMIT IN RESPONSE TO COMMENTS**

No changes to the draft permit have been made in response to public comment.

**AIRW-EXH. 41**

AIRW000547

Respectfully submitted,

Texas Commission on Environmental Quality

Toby Baker, Executive Director

Robert Martinez, Deputy Director
Environmental Law Division

*[signature]*

Bobby Salehi, Staff Attorney
Environmental Law Division
State Bar No. 24103912
P.O. Box 13087, MC 173
Austin, Texas 78711-3087
(512) 239-5930 (phone)
(512) 239-0606 (fax)

REPRESENTING THE
EXECUTIVE DIRECTOR OF THE
TEXAS COMMISSION ON
ENVIRONMENTAL QUALITY

## CERTIFICATE OF SERVICE

I certify that on August 6, 2021, the "Executive Director's Response to Public Comment" for Permit No. WQ0015878001 was filed with the Texas Commission on Environmental Quality's Office of the Chief Clerk.

*[signature]*

Bobby Salehi, Staff Attorney
Environmental Law Division
State Bar No. 24103912

**AIRW-EXH. 41**

AIRW000548

# Appendix Item 4

Texas Government Code Provisions
• Tex. Gov't Code §§ 2001.174, 2001.175
• Tex. Gov't Code § 2003.047

Vernon's Texas Statutes and Codes Annotated
　Government Code (Refs & Annos)
　　Title. 10. General Government (Refs & Annos)
　　　Subtitle A. Administrative Procedure and Practice
　　　　Chapter 2001. Administrative Procedure (Refs & Annos)
　　　　　Subchapter G. Contested Cases: Judicial Review (Refs & Annos)

V.T.C.A., Government Code § 2001.174

§ 2001.174. Review Under Substantial Evidence Rule or Undefined Scope of Review

Currentness

If the law authorizes review of a decision in a contested case under the substantial evidence rule or if the law does not define the scope of judicial review, a court may not substitute its judgment for the judgment of the state agency on the weight of the evidence on questions committed to agency discretion but:

(1) may affirm the agency decision in whole or in part; and

(2) shall reverse or remand the case for further proceedings if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:

(A) in violation of a constitutional or statutory provision;

(B) in excess of the agency's statutory authority;

(C) made through unlawful procedure;

(D) affected by other error of law;

(E) not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or

(F) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

**Credits**
Added by Acts 1993, 73rd Leg., ch. 268, § 1, eff. Sept. 1, 1993.

Notes of Decisions (514)

**O'CONNOR'S CROSS REFERENCES**

See also *O'Connor's Texas COA*, "Administrative remedies," ch. 24-A, §2.8.

V. T. C. A., Government Code § 2001.174, TX GOVT § 2001.174

Current through legislation effective May 13, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
　Government Code (Refs & Annos)
　　Title. 10. General Government (Refs & Annos)
　　　Subtitle A. Administrative Procedure and Practice
　　　　Chapter 2001. Administrative Procedure (Refs & Annos)
　　　　　Subchapter G. Contested Cases: Judicial Review (Refs & Annos)

V.T.C.A., Government Code § 2001.175

§ 2001.175. Procedures for Review Under Substantial Evidence Rule or Undefined Scope of Review

Currentness

(a) The procedures of this section apply if the manner of review authorized by law for the decision in a contested case that is the subject of complaint is other than by trial de novo.

(b) After service of the petition on a state agency and within the time permitted for filing an answer or within additional time allowed by the court, the agency shall send to the reviewing court the original or a certified copy of the entire record of the proceeding under review. The record shall be filed with the clerk of the court. The record may be shortened by stipulation of all parties to the review proceedings. The court may assess additional costs against a party who unreasonably refuses to stipulate to limit the record, unless the party is subject to a rule adopted under Section 2001.177 requiring payment of all costs of record preparation. The court may require or permit later corrections or additions to the record.

(c) A party may apply to the court to present additional evidence. If the court is satisfied that the additional evidence is material and that there were good reasons for the failure to present it in the proceeding before the state agency, the court may order that the additional evidence be taken before the agency on conditions determined by the court. The agency may change its findings and decision by reason of the additional evidence and shall file the additional evidence and any changes, new findings, or decisions with the reviewing court.

(d) The party seeking judicial review shall offer, and the reviewing court shall admit, the state agency record into evidence as an exhibit.

(e) A court shall conduct the review sitting without a jury and is confined to the agency record, except that the court may receive evidence of procedural irregularities alleged to have occurred before the agency that are not reflected in the record.

**Credits**
Added by Acts 1993, 73rd Leg., ch. 268, § 1, eff. Sept. 1, 1993.

Notes of Decisions (76)

V. T. C. A., Government Code § 2001.175, TX GOVT § 2001.175

Current through legislation effective May 13, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

 KeyCite Yellow Flag

Proposed Legislation

Vernon's Texas Statutes and Codes Annotated
  Government Code (Refs & Annos)
    Title. 10. General Government (Refs & Annos)
      Subtitle A. Administrative Procedure and Practice
        Chapter 2003. State Office of Administrative Hearings
          Subchapter C. Staff and Administration

V.T.C.A., Government Code § 2003.047

§ 2003.047. Hearings for Texas Commission on Environmental Quality

Currentness

(a) The office shall perform contested case hearings for the Texas Commission on Environmental Quality.

(b) The office shall conduct hearings relating to contested cases before the commission, other than a hearing conducted by one or more commissioners. The commission by rule may delegate to the office the responsibility to hear any other matter before the commission if consistent with the responsibilities of the office.

(c) The office may contract with qualified individuals to serve as temporary administrative law judges as necessary.

(d) To be eligible to preside at a hearing on behalf of the commission, an administrative law judge, regardless of temporary or permanent status, must be licensed to practice law in this state and have the expertise necessary to conduct hearings regarding technical or other specialized subjects that may come before the commission.

(e) In referring a matter for hearing, the commission shall provide to the administrative law judge a list of disputed issues. The commission shall specify the date by which the administrative law judge is expected to complete the proceeding and provide a proposal for decision to the commission. The administrative law judge may extend the proceeding if the administrative law judge determines that failure to grant an extension would deprive a party of due process or another constitutional right. The administrative law judge shall establish a docket control order designed to complete the proceeding by the date specified by the commission.

(e-1) This subsection applies only to a matter referred under Section 5.556, Water Code. Each issue referred by the commission must have been raised by an affected person in a comment submitted by that affected person in response to a permit application in a timely manner. The list of issues submitted under Subsection (e) must:

  (1) be detailed and complete; and

  (2) contain either:

(A) only factual questions; or

(B) mixed questions of fact and law.

(e-2) For a matter referred under Section 5.556 or 5.557, Water Code, the administrative law judge must complete the proceeding and provide a proposal for decision to the commission not later than the earlier of:

(1) the 180th day after the date of the preliminary hearing; or

(2) the date specified by the commission.

(e-3) The deadline specified by Subsection (e-2) or (e-6), as applicable, may be extended:

(1) by agreement of the parties with the approval of the administrative law judge; or

(2) by the administrative law judge if the judge determines that failure to extend the deadline would unduly deprive a party of due process or another constitutional right.

(e-4) For the purposes of Subsection (e-3)(2), a political subdivision has the same constitutional rights as an individual.

(e-5) This subsection applies only to a matter referred under Section 5.557, Water Code. The administrative law judge may not hold a preliminary hearing until after the executive director has issued a response to public comments under Section 5.555, Water Code.

(e-6) For a matter pertaining to an application described by Section 11.122(b-1), Water Code, the administrative law judge must complete the proceeding and provide a proposal for decision to the commission not later than the 270th day after the date the matter was referred to the office.

(f) Except as otherwise provided by this subsection, the scope of the hearing is limited to the issues referred by the commission. On the request of a party, the administrative law judge may consider an issue that was not referred by the commission if the administrative law judge determines that:

(1) the issue is material;

(2) the issue is supported by evidence; and

(3) there are good reasons for the failure to supply available information regarding the issue during the public comment period.

(g) The scope of permissible discovery is limited to:

(1) any matter reasonably calculated to lead to the discovery of admissible evidence regarding any issue referred to the administrative law judge by the commission or that the administrative law judge has agreed to consider; and

(2) the production of documents:

(A) reviewed or relied on in preparing application materials or selecting the site of the proposed facility; or

(B) relating to the ownership of the applicant or the owner or operator of the facility or proposed facility.

(h) The commission by rule shall:

(1) provide for subpoenas and commissions for depositions; and

(2) require that discovery be conducted in accordance with the Texas Rules of Civil Procedure, except that the commission by rule shall determine the level of discovery under Rule 190, Texas Rules of Civil Procedure, [1] appropriate for each type of case considered by the commission, taking into account the nature and complexity of the case.

(i) The office and the commission jointly shall adopt rules providing for certification to the commission of an issue that involves an ultimate finding of compliance with or satisfaction of a statutory standard the determination of which is committed to the discretion or judgment of the commission by law. The rules must address, at a minimum, the issues that are appropriate for certification and the procedure to be used in certifying the issue. Each agency shall publish the jointly adopted rules.

(i-1) In a contested case regarding a permit application referred under Section 5.556 or 5.557, Water Code, the filing with the office of the application, the draft permit prepared by the executive director of the commission, the preliminary decision issued by the executive director, and other sufficient supporting documentation in the administrative record of the permit application establishes a prima facie demonstration that:

(1) the draft permit meets all state and federal legal and technical requirements; and

(2) a permit, if issued consistent with the draft permit, would protect human health and safety, the environment, and physical property.

(i-2) A party may rebut a demonstration under Subsection (i-1) by presenting evidence that:

(1) relates to a matter referred under Section 5.557, Water Code, or an issue included in a list submitted under Subsection (e) in connection with a matter referred under Section 5.556, Water Code; and

(2) demonstrates that one or more provisions in the draft permit violate a specifically applicable state or federal requirement.

(i-3) If in accordance with Subsection (i-2) a party rebuts a presumption established under Subsection (i-1), the applicant and the executive director may present additional evidence to support the draft permit.

(j) An administrative law judge hearing a case on behalf of the commission, on the judge's own motion or on motion of a party and after notice and an opportunity for a hearing, may impose appropriate sanctions as provided by Subsection (k) against a party or its representative for:

(1) filing a motion or pleading that is groundless and brought:

(A) in bad faith;

(B) for the purpose of harassment; or

(C) for any other improper purpose, such as to cause unnecessary delay or needless increase in the cost of the proceeding;

(2) abuse of the discovery process in seeking, making, or resisting discovery; or

(3) failure to obey an order of the administrative law judge or the commission.

(k) A sanction imposed under Subsection (j) may include, as appropriate and justified, issuance of an order:

(1) disallowing further discovery of any kind or of a particular kind by the offending party;

(2) charging all or any part of the expenses of discovery against the offending party or its representatives;

(3) holding that designated facts be considered admitted for purposes of the proceeding;

(4) refusing to allow the offending party to support or oppose a designated claim or defense or prohibiting the party from introducing designated matters in evidence;

(5) disallowing in whole or in part requests for relief by the offending party and excluding evidence in support of those requests; and

(6) striking pleadings or testimony, or both, in whole or in part.

(l) After hearing evidence and receiving legal argument, an administrative law judge shall make findings of fact, conclusions of law, and any ultimate findings required by statute, all of which shall be separately stated. The administrative law judge shall make a proposal for decision to the commission and shall serve the proposal for decision on all parties. An opportunity shall be given to each party to file exceptions to the proposal for decision and briefs related to the issues addressed in the proposal for decision. The commission shall consider and act on the proposal for decision.

(m) Except as provided in Section 361.0832, Health and Safety Code, the commission shall consider the proposal for decision prepared by the administrative law judge, the exceptions of the parties, and the briefs and argument of the parties. The commission may amend the proposal for decision, including any finding of fact, but any such amendment thereto and order shall be based solely on the record made before the administrative law judge. Any such amendment by the commission shall be accompanied by an explanation of the basis of the amendment. The commission may also refer the matter back to the administrative law judge to reconsider any findings and conclusions set forth in the proposal for decision or take additional evidence or to make additional findings of fact or conclusions of law. The commission shall serve a copy of the commission's order, including its finding of facts and conclusions of law, on each party.

(n) The provisions of Chapter 2001 shall apply to contested case hearings for the commission to the extent not inconsistent with this section.

(o) An administrative law judge hearing a case on behalf of the commission may not, without the agreement of all parties, issue an order referring the case to an alternative dispute resolution procedure if the commission has already conducted an unsuccessful alternative dispute resolution procedure. If the commission has not already conducted an alternative dispute resolution procedure, the administrative law judge shall consider the commission's recommendation in determining whether to issue an order referring the case to the procedure.

**Credits**
Added by Acts 1995, 74th Leg., ch. 106, § 1, eff. Sept. 1, 1995. Amended by Acts 1997, 75th Leg., ch. 934, § 5, eff. Sept. 1, 1997; Acts 1999, 76th Leg., ch. 1350, § 6, eff. Sept. 1, 1999; Acts 2015, 84th Leg., ch. 116 (S.B. 709), § 1, eff. Sept. 1, 2015; Acts 2015, 84th Leg., ch. 228 (H.B. 2154), §§ 6, 7, eff. Sept. 1, 2015; Acts 2017, 85th Leg., ch. 429 (S.B. 1430), § 2, eff. Sept. 1, 2017; Acts 2017, 85th Leg., ch. 1097 (H.B. 3735), § 6, eff. Sept. 1, 2017.

Notes of Decisions (14)

**Footnotes**

1        Vernon's Ann.Rules Civ.Proc., rule 190.1 et seq.

V. T. C. A., Government Code § 2003.047, TX GOVT § 2003.047
Current through legislation effective May 13, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

# Appendix Item 5

Texas Water Code
Regionalization Provisions
- Tex. Water Code §§ 26.003, 26.0282, 26.081

Vernon's Texas Statutes and Codes Annotated
  Water Code (Refs & Annos)
    Title 2. Water Administration (Refs & Annos)
      Subtitle D. Water Quality Control
        Chapter 26. Water Quality Control (Refs & Annos)
          Subchapter A. Administrative Provisions (Refs & Annos)

V.T.C.A., Water Code § 26.003

§ 26.003. Policy of This Subchapter

Currentness

It is the policy of this state and the purpose of this subchapter to maintain the quality of water in the state consistent with the public health and enjoyment, the propagation and protection of terrestrial and aquatic life, and the operation of existing industries, taking into consideration the economic development of the state; to encourage and promote the development and use of regional and areawide waste collection, treatment, and disposal systems to serve the waste disposal needs of the citizens of the state; and to require the use of all reasonable methods to implement this policy.

**Credits**

Added by Acts 1977, 65th Leg., p. 2207, ch. 870, § 1, eff. Sept. 1, 1977. Amended by Acts 2001, 77th Leg., ch. 965, § 1.26, eff. Sept. 1, 2001.

V. T. C. A., Water Code § 26.003, TX WATER § 26.003
Current through legislation effective May 13, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

 KeyCite Yellow Flag

Proposed Legislation

> Vernon's Texas Statutes and Codes Annotated
>   Water Code (Refs & Annos)
>     Title 2. Water Administration (Refs & Annos)
>       Subtitle D. Water Quality Control
>         Chapter 26. Water Quality Control (Refs & Annos)
>           Subchapter B. General Powers and Duties

V.T.C.A., Water Code § 26.0282

§ 26.0282. Consideration of Need and Regional Treatment Options

Currentness

In considering the issuance, amendment, or renewal of a permit to discharge waste, the commission may deny or alter the terms and conditions of the proposed permit, amendment, or renewal based on consideration of need, including the expected volume and quality of the influent and the availability of existing or proposed areawide or regional waste collection, treatment, and disposal systems not designated as such by commission order pursuant to provisions of this subchapter. This section is expressly directed to the control and treatment of conventional pollutants normally found in domestic wastewater.

**Credits**

Added by Acts 1989, 71st Leg., ch. 757, § 1, eff. Sept. 1, 1989.

V. T. C. A., Water Code § 26.0282, TX WATER § 26.0282

Current through legislation effective May 13, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
   Water Code (Refs & Annos)
      Title 2. Water Administration (Refs & Annos)
         Subtitle D. Water Quality Control
            Chapter 26. Water Quality Control (Refs & Annos)
               Subchapter C. Regional and Area-Wide Systems

V.T.C.A., Water Code § 26.081

§ 26.081. Regional or Area-Wide Systems; General Policy

Currentness

(a) The legislature finds and declares that it is necessary to the health, safety, and welfare of the people of this state to implement the state policy to encourage and promote the development and use of regional and area-wide waste collection, treatment, and disposal systems to serve the waste disposal needs of the citizens of the state and to prevent pollution and maintain and enhance the quality of the water in the state.

(b) Within any standard metropolitan statistical area in the state, the commission is authorized to implement this policy in the manner and in accordance with the procedure provided in Sections 26.081 through 26.086 of this code.

(c) In those portions of the state which are not within a standard metropolitan statistical area, the commission shall observe this state policy by encouraging interested and affected persons to cooperate in developing and using regional and area-wide systems. The commission may not use the procedure specified in Sections 26.081 through 26.086 of this code in these areas to implement this policy. However, this does not affect or diminish any authority which the commission may otherwise have and exercise under other provisions of this chapter.

(d) The term "standard metropolitan statistical area," as used in this section, means an area consisting of a county or one or more contiguous counties which is officially designated as such by the United States Office of Management and Budget or its successor in this function.

**Credits**
Added by Acts 1977, 65th Leg., p. 2207, ch. 870, § 1, eff. Sept. 1, 1977. Amended by Acts 1985, 69th Leg., ch. 795, § 1.093, eff. Sept. 1, 1985.

Notes of Decisions (1)

V. T. C. A., Water Code § 26.081, TX WATER § 26.081
Current through legislation effective May 13, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

---

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Appendix Item 6

## Texas Water Code – Other Provisions

- Tex. Water Code §§ 5.122, 5.351
- Tex. Water Code §§ 26.027, 26.030

Vernon's Texas Statutes and Codes Annotated
  Water Code (Refs & Annos)
    Title 2. Water Administration (Refs & Annos)
      Subtitle A. Executive Agencies
        Chapter 5. Texas Commission on Environmental Quality (Refs & Annos)
          Subchapter D. General Powers and Duties of the Commission

V.T.C.A., Water Code § 5.122

§ 5.122. Delegation of Uncontested Matters to Executive Director

Currentness

(a) The commission by rule or order may delegate to the executive director the commission's authority to act on an application or other request to issue, renew, reopen, transfer, amend, extend, withdraw, revoke, terminate, or modify a permit, license, certificate, registration, or other authorization or approval if:

(1) required notice of the application or request for the authorization or approval has been given;

(2) the holder of or applicant for the authorization or approval agrees in writing to the action to be taken by the executive director; and

(3) the application or request:

(A) is uncontested and does not require an evidentiary hearing;

(B) has become uncontested before parties are named because each person who requested a contested case hearing within the time allowed by law has:

(i) withdrawn the request for a contested case hearing without condition;

(ii) withdrawn the request for a contested case hearing conditioned only on the withdrawal of all other hearing requests; or

(iii) agreed in writing to allow the executive director to make a final decision on the matter; or

(C) has become uncontested because all parties have agreed in writing to the action to be taken by the executive director.

(b) A person affected by an action the executive director takes on a matter delegated under this section may appeal the executive director's action to the commission unless the action is a decision:

(1) regarding a federal operating permit under Subchapter C, Chapter 382, Health and Safety Code [1] ; or

(2) specified as final and appealable by the commission rule that delegates the decision to the executive director.

(c) A person affected by a decision of the executive director on a matter delegated under this section that regards a federal operating permit under Subchapter C, Chapter 382, Health and Safety Code [1] , may:

(1) petition the administrator of the United States Environmental Protection Agency in accordance with rules adopted under Section 382.0563, Health and Safety Code; or

(2) file a petition for judicial review under Section 382.032, Health and Safety Code.

(d) The commission's authority under this section is cumulative of the commission's authority to delegate its powers, duties, or rights under any other law.

**Credits**
Added by Acts 1995, 74th Leg., ch. 860, § 1, eff. Aug. 28, 1995. Amended by Acts 1997, 75th Leg., ch. 302, § 1, eff. Sept. 1, 1997; Acts 2017, 85th Leg., ch. 1065 (H.B. 3177), § 1, eff. Sept. 1, 2017.

Notes of Decisions (1)

## Footnotes

1     V.T.C.A., Health & Safety Code § 382.051 et seq.

V. T. C. A., Water Code § 5.122, TX WATER § 5.122
Current through legislation effective May 13, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
    Water Code (Refs & Annos)
        Title 2. Water Administration (Refs & Annos)
            Subtitle A. Executive Agencies
                Chapter 5. Texas Commission on Environmental Quality (Refs & Annos)
                    Subchapter I. Judicial Review

V.T.C.A., Water Code § 5.351

§ 5.351. Judicial Review of Commission Acts

Currentness

(a) A person affected by a ruling, order, decision, or other act of the commission may file a petition to review, set aside, modify, or suspend the act of the commission.

(b) A person affected by a ruling, order, or decision of the commission must file a petition within 30 days after the effective date of the ruling, order, or decision. A person affected by an act other than a ruling, order, or decision must file a petition within 30 days after the date the commission performed the act.

(c) Notwithstanding Subsection (b) or another provision of law to the contrary, a person affected by a ruling, order, or decision on a matter delegated to the executive director under Section 5.122 or other law may, after exhausting any administrative remedies, file a petition to review, set aside, modify, or suspend the ruling, order, or decision not later than the 30th day after:

  (1) the effective date of the ruling, order, or decision; or

  (2) if the executive director's ruling, order, or decision is appealed to the commission as authorized by Section 5.122(b) or other law, the earlier of:

    (A) the date the commission denies the appeal; or

    (B) the date the appeal is overruled by operation of law in accordance with commission rules.

**Credits**
Added by Acts 1977, 65th Leg., p. 2207, ch. 870, § 1, eff. Sept. 1, 1977. Amended by Acts 1985, 69th Leg., ch. 795, § 1.001, eff. Sept. 1, 1985; Acts 2017, 85th Leg., ch. 1065 (H.B. 3177), § 2, eff. Sept. 1, 2017; Acts 2021, 87th Leg., ch. 174 (S.B. 211), § 4, eff. Sept. 1, 2021.

Notes of Decisions (28)

V. T. C. A., Water Code § 5.351, TX WATER § 5.351

Current through legislation effective May 13, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
   Water Code (Refs & Annos)
      Title 2. Water Administration (Refs & Annos)
         Subtitle D. Water Quality Control
            Chapter 26. Water Quality Control (Refs & Annos)
               Subchapter B. General Powers and Duties

V.T.C.A., Water Code § 26.027

§ 26.027. Commission May Issue Permits

Currentness

(a) The commission may issue permits and amendments to permits for the discharge of waste or pollutants into or adjacent to water in the state. No permit shall be issued authorizing the discharge of any radiological, chemical, or biological warfare agent or high-level radioactive waste. The commission may refuse to issue a permit when the commission finds that issuance of the permit would violate the provisions of any state or federal law or rule or regulation promulgated thereunder, or when the commission finds that issuance of the permit would interfere with the purpose of this chapter.

(b) A person desiring to obtain a permit or to amend a permit shall submit an application to the commission containing all information reasonably required by the commission. The commission shall, at minimum, require an applicant who is an individual to provide:

  (1) the individual's full legal name and date of birth;

  (2) the street address of the individual's place of residence;

  (3) the identifying number from the individual's driver's license or personal identification certificate issued by the state or country in which the individual resides;

  (4) the individual's sex; and

  (5) any assumed business or professional name of the individual filed under Chapter 71, Business & Commerce Code.

(c) A person may not commence construction of a treatment facility until the commission has issued a permit to authorize the discharge of waste from the facility, except with the approval of the commission.

(d) The commission may not require under this chapter any permit for the placing of dredged or fill materials into or adjacent to water in the state for the purpose of constructing, modifying, or maintaining facilities or structures, but this does not change or limit any authority the commission may have with respect to the control of water quality. The commission may adopt rules and regulations to govern and control the discharge of dredged or fill materials consistent with the purpose of this chapter.

**Credits**

Added by Acts 1977, 65th Leg., p. 2207, ch. 870, § 1, eff. Sept. 1, 1977. Amended by Acts 1985, 69th Leg., ch. 795, § 1.074, eff. Sept. 1, 1985; Acts 1993, 73rd Leg., ch. 152, § 2, eff. Sept. 1, 1993; Acts 2007, 80th Leg., ch. 885, § 2.40, eff. April 1, 2009.

Notes of Decisions (10)

V. T. C. A., Water Code § 26.027, TX WATER § 26.027
Current through legislation effective May 13, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

**End of Document**  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Water Code (Refs & Annos)
    Title 2. Water Administration (Refs & Annos)
      Subtitle D. Water Quality Control
        Chapter 26. Water Quality Control (Refs & Annos)
          Subchapter B. General Powers and Duties

V.T.C.A., Water Code § 26.030

§ 26.030. Permit; Effect on Recreational Water

Currentness

(a) In considering the issuance of a permit to discharge effluent into any body of water having an established recreational standard, the commission shall consider any unpleasant odor quality of the effluent and the possible adverse effect that it might have on the receiving body of water, and the commission may consider the odor as one of the elements of the water quality of the effluent.

(b) In considering the issuance of a permit to discharge effluent comprised primarily of sewage or municipal waste into any body of water that crosses or abuts any park, playground, or schoolyard within one mile of the point of discharge, the commission shall consider any unpleasant qualities of the effluent, including unpleasant odor, and any possible adverse effects that the discharge of the effluent might have on the recreational value of the park, playground, or schoolyard.

**Credits**
Added by Acts 1977, 65th Leg., p. 2207, ch. 870, § 1, eff. Sept. 1, 1977. Amended by Acts 1985, 69th Leg., ch. 424, § 1, eff. June 11, 1985.

V. T. C. A., Water Code § 26.030, TX WATER § 26.030
Current through legislation effective May 13, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Appendix Item 7

Texas Administrative Code Provisions

- 16 Tex. Admin. Code § 24.225
- 30 Tex. Admin. Code §§ 80.17, 307.4, 307.5, 309.11, 309.13, 319.9

Texas Administrative Code
 Title 16. Economic Regulation
  Part 2. Public Utility Commission of Texas
   Chapter 24. Substantive Rules Applicable to Water and Sewer Service Providers
    Subchapter H. Certificates of Convenience and Necessity

16 TAC § 24.225

§ 24.225. Certificate of Convenience and Necessity Required

Currentness

(a) Unless otherwise specified, a utility or a water supply or sewer service corporation may not in any way provide retail water or sewer utility service directly or indirectly to the public without first having obtained from the commission a certificate of convenience and necessity (CCN). Except as otherwise provided by this subchapter, a retail public utility may not provide, make available, or extend retail water or sewer utility service to any area to which retail water or sewer utility service is being lawfully provided by another retail public utility without first obtaining a CCN that includes the area in which the consuming facility is located.

(b) A district may not provide services within the certificated service area of a retail public utility or within the boundaries of another district without the retail public utility's or district's consent, unless the district has a CCN to provide retail water or sewer utility service to that area.

(c) Except as otherwise provided by this subchapter, a retail public utility may not provide retail water or sewer utility service within the boundaries of a district that provides the same type of retail water or sewer utility service without the district's consent, unless the retail public utility has a CCN to provide retail water or sewer utility service to that area.

(d) A person that is not a retail public utility, a utility, or a water supply or sewer service corporation that is operating under provisions in accordance with TWC §13.242(c) may not construct facilities to provide retail water or sewer utility service to more than one service connection that is not on the property owned by the person and that is within the certificated service area of a retail public utility without first obtaining written consent from the retail public utility.

(e) A supplier of wholesale water or sewer service may not require a purchaser to obtain a CCN if the purchaser is not otherwise required by this chapter to obtain a CCN.

**Credits**
**Source:** The provisions of this §24.225 adopted to be effective October 17, 2018, 43 TexReg 6826.

Current through 50 Tex.Reg. No. 802, dated February 7, 2025, as effective on or before February 14, 2025. Some sections may be more current. See credits for details.

16 TAC § 24.225, 16 TX ADC § 24.225

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Texas Administrative Code
Title 30. Environmental Quality
Part 1. Texas Commission on Environmental Quality
Chapter 80. Contested Case Hearings
Subchapter A. General Rules

30 TAC § 80.17

§ 80.17. Burden of Proof

Currentness

(a) The burden of proof is on the moving party by a preponderance of the evidence, except as provided in subsection (b) of this section.

(b) In an enforcement case, the executive director has the burden of proving by a preponderance of the evidence the occurrence of any violation and the appropriateness of any proposed technical ordering provisions. The respondent has the burden of proving by a preponderance of the evidence all elements of any affirmative defense asserted. Any party submitting facts relevant to the factors prescribed by the applicable statute to be considered by the commission in determining the amount of the penalty has the burden of proving those facts by a preponderance of the evidence.

(c) In contested cases regarding a permit application filed with the commission on or after September 1, 2015, and referred under Texas Water Code, §5.556 or §5.557:

(1) the filing of the administrative record as described in §80.118(c) of this title (relating to Administrative Record) establishes a prima facie demonstration that the executive director's draft permit meets all state and federal legal and technical requirements, and, if issued consistent with the executive director's draft permit, would protect human health and safety, the environment, and physical property;

(2) a party may rebut the presumption in paragraph (1) of this subsection by presenting evidence regarding the referred issues demonstrating that the draft permit violates a specifically applicable state or federal legal or technical requirement; and

(3) if a rebuttal case is presented by a party under paragraph (2) of this subsection, the applicant and executive director may present additional evidence to support the executive director's draft permit.

**Credits**
**Source:** The provisions of this §80.17 adopted to be effective June 6, 1996, 21 TexReg 4763; amended to be effective September 23, 1999, 24 TexReg 8276; amended to be effective November 15, 2001, 26 TexReg 9105; amended to be effective May 3, 2012, 37 TexReg 3147; amended to be effective December 31, 2015, 40 TexReg 9680; amended to be effective January 3, 2019, 43 TexReg 8611.

Current through 50 Tex.Reg. No. 802, dated February 7, 2025, as effective on or before February 14, 2025. Some sections may be more current. See credits for details.

30 TAC § 80.17, 30 TX ADC § 80.17

---

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Texas Administrative Code
Title 30. Environmental Quality
Part 1. Texas Commission on Environmental Quality
Chapter 307. Texas Surface Water Quality Standards

30 TAC § 307.4

§ 307.4. General Criteria

Currentness

(a) Application. The general criteria set forth in this section apply to surface water in the state and specifically apply to substances attributed to waste discharges or human activities. General criteria do not apply to those instances when surface water, as a result of natural phenomena, exhibit characteristics beyond the limits established by this section. General criteria are superseded by specific exemptions stated in this section or in § 307.8 of this title (relating to the Application of Standards), or by site-specific water quality standards for classified segments. Provisions of the general criteria remain in effect in mixing zones or below critical low-flow conditions unless specifically exempted in § 307.8 of this title.

(b) Aesthetic parameters.

(1) Concentrations of taste and odor producing substances must not interfere with the production of potable water by reasonable water treatment methods, impart unpalatable flavor to food fish including shellfish, result in offensive odors arising from the waters, or otherwise interfere with the reasonable use of the water in the state.

(2) Surface water must be essentially free of floating debris and suspended solids that are conducive to producing adverse responses in aquatic organisms or putrescible sludge deposits or sediment layers that adversely affect benthic biota or any lawful uses.

(3) Surface waters must be essentially free of settleable solids conducive to changes in flow characteristics of stream channels or the untimely filling of surface water in the state. This provision does not prohibit dredge and fill activities that are permitted in accordance with the Federal Clean Water Act.

(4) Surface waters must be maintained in an aesthetically attractive condition.

(5) Waste discharges must not cause substantial and persistent changes from ambient conditions of turbidity or color.

(6) No foaming or frothing of a persistent nature is permissible.

(7) Surface waters must be maintained so that oil, grease, or related residue do not produce a visible film or sheen of oil or globules of grease on the surface or coat the banks or bottoms of the watercourse; or cause toxicity to man, aquatic life, or terrestrial life in accordance with subsection (d) of this section.

(c) Radiological substances. Radioactive materials must not be discharged in excess of the amount regulated by Chapter 336 of this title (relating to Radioactive Substance Rules).

(d) Toxic substances. Surface waters must not be toxic to man from ingestion of water, consumption of aquatic organisms, or contact with the skin, or to terrestrial or aquatic life. Additional requirements and criteria for toxic substances are specified in § 307.6 of this title (relating to Toxic Materials). Criteria to protect aquatic life from acute toxicity apply to all surface waters in the state except as specified in § 307.8(a)(3) of this title. Criteria to protect aquatic life from chronic toxicity apply to surface waters with an aquatic life use of limited, intermediate, high, or exceptional as designated in § 307.10 of this title (relating to Appendices A-G) or as determined on a case-by-case basis in accordance with subsection (l) of this section. Toxic criteria to protect human health for consumption of fish apply to waters with a sustainable or incidental fishery, as described in § 307.6(d) of this title. Additional criteria apply to water in the state with a public drinking water supply use, as described in § 307.6(d) of this title. The general provisions of this subsection do not change specific provisions in § 307.8 of this title for applying toxic criteria.

(e) Nutrients. Nutrients from permitted discharges or other controllable sources must not cause excessive growth of aquatic vegetation that impairs an existing, designated, presumed, or attainable use. Site-specific nutrient criteria, nutrient permit limitations, or separate rules to control nutrients in individual watersheds are established where appropriate after notice and opportunity for public participation and proper hearing. Site-specific numeric criteria related to chlorophyll a are listed in Appendix F of § 307.10 of this title.

(f) Temperature. Consistent with § 307.1 of this title (relating to General Policy Statement) and in accordance with state water rights permits, temperature in industrial cooling impoundments, industrial cooling water areas, and all other surface water in the state must be maintained so as to not interfere with the reasonable use of such waters. Numerical temperature criteria have not been specifically established for industrial cooling impoundments, which in most areas of the state contribute to water conservation and water quality objectives. In addition, numerical criteria for temperature are not applicable in designated industrial cooling water areas, as defined in § 307.3 of this title (relating to Definitions and Abbreviations). The horizontal boundaries of an industrial cooling water area must be defined in the applicable wastewater permit. The following temperature criteria, expressed as a maximum temperature differential (rise over ambient) are established except for industrial cooling impoundments, temperature elevations due to discharges of treated domestic (sanitary) effluent, and temperature elevations within designated mixing zones or industrial cooling water areas. The maximum temperature differentials are:

(1) freshwater streams: 5 degrees Fahrenheit (degrees F);

(2) freshwater lakes and impoundments: 3 degrees F; and

(3) tidal river reaches, bay, and gulf waters: 4 degrees F in fall, winter, and spring, and 1.5 degrees F in summer (June, July, and August).

(4) Additional temperature criteria (expressed as maximum temperatures) for classified segments are specified in Appendix A of § 307.10 of this title. These criteria are not applicable within industrial cooling water areas.

(g) Salinity.

(1) Concentrations and the relative ratios of dissolved minerals such as chloride, sulfate, and total dissolved solids must be maintained such that existing, designated, presumed, and attainable uses are not impaired.

(2) Criteria for chloride, sulfate, and total dissolved solids for classified freshwater segments are specified in Appendix A of § 307.10 of this title.

(3) Salinity gradients in estuaries must be maintained to support attainable estuarine dependent aquatic life uses. Numerical salinity criteria for Texas estuaries have not been established because of the high natural variability of salinity in estuarine systems, and because long-term studies by state agencies to assess estuarine salinities are still ongoing. Absence of numerical criteria must not preclude evaluations and regulatory actions based on estuarine salinity, and careful consideration must be given to all activities that may detrimentally affect salinity gradients.

(h) Aquatic life uses and dissolved oxygen.

(1) Dissolved oxygen concentrations must be sufficient to support existing, designated, presumed, and attainable aquatic life uses. Aquatic-life use categories and corresponding dissolved oxygen criteria are described in § 307.7(b)(3) of this title (relating to Site-Specific Uses and Criteria).

(2) Aquatic life use categories and dissolved oxygen criteria for classified segments are specified in Appendix A of § 307.10 of this title. Aquatic life use categories and dissolved oxygen criteria for other specific water bodies are specified in Appendix D of § 307.10 of this title. Where justified by sufficient site-specific information, dissolved oxygen criteria that differ from § 307.7(b)(3) of this title may be adopted for a particular water body in § 307.10 of this title.

(3) Perennial streams, rivers, lakes, bays, estuaries, and other appropriate perennial waters that are not specifically listed in Appendix A or D of § 307.10 of this title are presumed to have a high aquatic life use and corresponding dissolved oxygen criteria. Applicable dissolved oxygen criteria are described in § 307.7(b)(3)(A) of this title. Higher uses are protected where they are attainable.

(4) When water is present in the streambed of intermittent streams, a 24-hour dissolved oxygen mean of at least 2.0 mg/L and 24-hour minimum dissolved oxygen concentration of 1.5 mg/L must be maintained. Intermittent streams that are not specifically listed in Appendix A or D of § 307.10 of this title are considered to have a minimal aquatic life use except as indicated below in this subsection. For intermittent streams with seasonal aquatic life uses, dissolved oxygen concentrations commensurate with the aquatic life uses must be maintained during the seasons when the aquatic life uses occur. Unclassified intermittent streams with perennial pools are presumed to have a limited aquatic life use and corresponding dissolved oxygen criteria. Higher uses are protected where they are attainable.

(i) Aquatic life uses and habitat. Vegetative and physical components of the aquatic environment must be maintained or mitigated to protect aquatic life uses. Procedures to protect habitat in permits for dredge and fill are specified in Federal Clean Water Act, § 404 and in Chapter 279 of this title (relating to Water Quality Certification).

(j) Aquatic recreation.

(1) Existing, designated, presumed, and attainable uses of aquatic recreation must be maintained, as determined by criteria that indicate the potential presence of pathogens. Categories of recreation and applicable criteria are established in § 307.7(b)(1) of this title.

(2) Recreational use categories and criteria for classified segments are specified in Appendix A of § 307.10 of this title. Site-specific recreational use categories and criteria for selected unclassified water bodies are specified in Appendix G of § 307.10 of this title. Where justified by sufficient site-specific information, recreational uses and criteria that differ from § 307.7(b)(1) of this title may be adopted for a particular water body in § 307.10 of this title. For water bodies not specifically listed in Appendix A or Appendix G of § 307.10 of this title, the following recreational uses are presumed to apply.

(A) Primary contact recreation 1. Primary contact recreation 1 is presumed for lakes, reservoirs, and tidal water bodies. Primary contact recreation 1 is presumed to apply to intermittent streams, intermittent streams with perennial pools, nontidal wetlands, and perennial freshwater streams and rivers, except where site-specific information indicates that recreational activities that involve a significant risk of ingestion have little to no likelihood of occurring, in accordance with subparagraph (C) of this paragraph.

(B) Primary contact recreation 2. No water body is presumed to have a use of primary contact recreation 2. This use is applicable when designated for an individual water body as listed in Appendix A or G in § 307.10 of this title. Primary contact recreation 2 applies to water bodies where water recreation activities that involve a significant risk of ingestion of water occur, but less frequently than for primary contact recreation 1 due to:

(i) physical characteristics of the water body; or

(ii) limited public access.

(C) Secondary contact recreation 1. Secondary contact recreation 1 applies to water bodies where water recreation can occur, but the nature of the recreation does not involve a significant risk of ingestion. Secondary contact recreation 1 applies to intermittent and perennial freshwaters where site-specific information demonstrates that primary contact recreation 1 or 2 have little to no likelihood of occurring. At a minimum, the following characteristics must be demonstrated for a presumed use of secondary contact recreation 1 to apply:

(i) during dry weather flows, the average depth at the thalweg (mid-channel) is less than 0.5 meters and there are not substantial pools with a depth of 1 meter or greater; and

(ii) there are no existing recreational activities that create a significant risk of ingestion or uses for primary contact recreation 1 or 2.

(D) Secondary contact recreation 2. Secondary contact recreation 2 applies to water bodies where water recreation activities do not involve a significant risk of water ingestion and where activities occur less frequently than for secondary contact recreation 1 due to physical characteristics of the water body or limited public access. No water

body is presumed to have a use of secondary contact recreation 2. This use is applicable when designated for an individual water body as listed in Appendix A or G in § 307.10 of this title.

(E) Noncontact recreation. Noncontact recreation applies to water bodies where recreation activities do not involve a significant risk of water ingestion and where primary and secondary contact recreation uses should not occur because of unsafe conditions. No water body is presumed to have a use of noncontact recreation. This use is applicable when designated for an individual water body as listed in Appendix A or G in § 307.10 of this title.

(3) Assigning recreational uses to an unclassified water body.

(A) Applying presumed uses. Recreational uses and associated numerical criteria are assigned to an unclassified water body in accordance with the presumed uses and guidelines established in paragraph (2) of this subsection. To assign uses other than primary contact recreation 1, a reasonable level of inquiry is conducted to determine if a different presumed use is appropriate for a particular water body. A reasonable level of inquiry includes review of available relevant information or completed site surveys.

(B) Assigning presumed uses. Presumed uses of primary contact recreation 1 and secondary contact recreation 1 can be assigned to an individual water body for regulatory action without individually designating the recreational use and criteria in Appendix G in § 307.10 of this title. Regulatory action may include issuing Texas Pollutant Discharge Elimination System permits, revising the list of impaired water bodies under Clean Water Act, § 303(d), or setting and implementing a total maximum daily load. The presumed secondary contact recreation 1 use is included in the public notice of a regulatory action that could affect recreational water quality, and the assigned recreational uses are subject to applicable public comment and approval by the United States Environmental Protection Agency (EPA). For tracking purposes, presumed recreational uses that have been determined to be less stringent than primary contact recreation 1 are noted in a publicly available list such as the EPA's Water Quality Standards Repository prior to a water quality standards revision. Presumed uses that have been determined for particular water bodies are listed in Appendix G in § 307.10 of this title when the water quality standards are revised.

(C) Assigning a use less stringent than presumed use. A recreational use that is less stringent than the applicable presumed use can only be assigned to an individual water body for a regulatory action after that use is approved by the EPA and designated in Appendix A or G in § 307.10 of this title. Support for designating a use less stringent than an applicable presumed use requires a use-attainability analysis (UAA). 40 Code of Federal Regulations § 131.1(g) lists six reasons for a change in use in a water body. At least one of these reasons must be included in the UAA.

(k) Antidegradation. Nothing in this section is intended to be construed or otherwise used to supersede the requirements of § 307.5 of this title (relating to Antidegradation).

(l) Assessment of unclassified waters for aquatic life uses. Waters that are not specifically listed in Appendices A or D of § 307.10 of this title are assigned the specific uses that are attainable or characteristic of those waters. Upon administrative or regulatory action by the commission that affects a particular unclassified water body, the characteristics of the affected water body must be reviewed by the commission to determine which aquatic life uses are appropriate. Additional uses so determined must be indicated in public notices for discharge applications. Uses that are not applicable throughout the year in a particular unclassified water body are assigned and protected for the seasons where such uses are attainable. Initial determinations of use are considered preliminary, and in no way preclude redeterminations of use in public hearings conducted under the provisions

of the Texas Water Code. For unclassified waters where the presumed minimum uses or criteria specified in this section are inappropriate, site-specific standards may be developed in accordance with § 307.2(d) of this title (relating to Description of Standards). Uses and criteria are assigned in accordance with this section and with § 307.7(b)(3) of this title. Procedures for assigning uses and criteria are described in the standards implementation procedures.

(m) pH. Consistent with § 307.1 of this title, pH levels in all surface water in the state must be maintained so as to not interfere with the reasonable use of such waters.

**Credits**
**Source:** The provisions of this §307.4 adopted to be effective July 10, 1991, 16 TexReg 3400; amended to be effective July 13, 1995, 20 TexReg 4701; amended to be effective April 30, 1997, 22 TexReg 3712; amended to be effective August 17, 2000, 25 TexReg 7722; amended to be effective July 22, 2010, 35 TexReg 6294; amended to be effective March 6, 2014, 39 TexReg 1450.

Current through 50 Tex.Reg. No. 802, dated February 7, 2025, as effective on or before February 14, 2025. Some sections may be more current. See credits for details.

30 TAC § 307.4, 30 TX ADC § 307.4

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Texas Administrative Code
    Title 30. Environmental Quality
        Part 1. Texas Commission on Environmental Quality
            Chapter 307. Texas Surface Water Quality Standards

30 TAC § 307.5

§ 307.5. Antidegradation

Currentness

(a) Application. The antidegradation policy and implementation procedures set forth in this section apply to actions regulated under state and federal authority that would increase pollution of the water in the state. Such actions include authorized wastewater discharges, total maximum daily loads (TMDLs), waste load evaluations, and any other miscellaneous actions, such as those related to man-induced nonpoint sources of pollution, that may impact the water in the state.

(b) Antidegradation policy. In accordance with the Texas Water Code, § 26.003, the following provisions establish the antidegradation policy of the commission.

(1) Tier 1. Existing uses and water quality sufficient to protect those existing uses must be maintained. Categories of existing uses are the same as for designated uses, as defined in § 307.7 of this title (relating to Site-Specific Uses and Criteria).

(2) Tier 2. No activities subject to regulatory action that would cause degradation of waters that exceed fishable/swimmable quality are allowed unless it can be shown to the commission's satisfaction that the lowering of water quality is necessary for important economic or social development. Degradation is defined as a lowering of water quality by more than a de minimis extent, but not to the extent that an existing use is impaired. Water quality sufficient to protect existing uses must be maintained. Fishable/swimmable waters are defined as waters that have quality sufficient to support propagation of indigenous fish, shellfish, terrestrial life, and recreation in and on the water.

(3) Tier 3. Outstanding national resource waters are defined as high quality waters within or adjacent to national parks and wildlife refuges, state parks, wild and scenic rivers designated by law, and other designated areas of exceptional recreational or ecological significance. The quality of outstanding national resource waters must be maintained and protected.

(4) Discharges that cause pollution that are authorized by the Texas Water Code, the Federal Clean Water Act, or other applicable laws must not lower water quality to the extent that the Texas Surface Water Quality Standards are not attained.

(5) Anyone discharging wastewater that would constitute a new source of pollution or an increased source of pollution from any industrial, public, or private project or development is required to provide a level of wastewater treatment consistent with the provisions of the Texas Water Code and the Clean Water Act (33 United States Code, §§ 1251 et seq.). As necessary, cost-effective and reasonable best management practices established through the Texas Water Quality Management Program are achieved for nonpoint sources of pollution.

(6) Application of antidegradation provisions does not preclude the commission from establishing modified thermal discharge limitations consistent with the Clean Water Act, § 316(a) (33 United States Code, § 1326).

(c) Antidegradation implementation procedures.

(1) Implementation for specific regulatory activities.

(A) For TPDES permits for wastewater, the process for the antidegradation review and public coordination is described in the standards implementation procedures.

(B) For federal permits relating to the discharge of fill or dredged material under Federal Clean Water Act, § 404, the antidegradation policy and public coordination is implemented through the evaluation of alternatives and mitigation under Federal Clean Water Act, § 404(b)(1). State review of alternatives, mitigation, and requirements to protect water quality may also be conducted for federal permits that are subject to state certification, as authorized by Federal Clean Water Act, § 401 and conducted in accordance with Chapter 279 of this title (relating to Water Quality Certification).

(C) Other state and federal permitted and regulated activities that increase pollution of water in the state are also subject to the provisions of the antidegradation policy as established in subsections (a) and (b) of this section.

(2) General provisions for implementing the antidegradation policy.

(A) Tier 1 reviews must ensure that water quality is sufficiently maintained so that existing uses are protected. All pollution that could cause an impairment of water quality is subject to Tier 1 reviews. If the existing uses and criteria of a potentially affected water body have not been previously determined, then the antidegradation review must include a preliminary determination of existing uses and criteria. Existing uses must be maintained and protected.

(B) Tier 2 reviews apply to all pollution that could cause degradation of water quality where water quality exceeds levels necessary to support propagation of fish, shellfish, terrestrial life, and recreation in and on the water (fishable/swimmable quality). Guidance for determining water bodies that exceed fishable/swimmable quality is contained in the standards implementation procedures. For dissolved oxygen, analyses of degradation under Tier 2 must utilize the same critical conditions as are used to protect instream criteria. For other parameters, appropriate conditions may vary. Conditions for determining degradation are commensurate with conditions for determining existing uses. The highest water quality sustained since November 28, 1975 (in accordance with EPA Standards Regulation 40 Code of Federal Regulations Part 131) defines baseline conditions for determinations of degradation.

(C) Tier 3 reviews apply to all pollution that could cause degradation of outstanding national resource waters. Outstanding national resource waters are those specifically designated in this chapter.

(D) When degradation of waters exceeding fishable/swimmable quality is anticipated, a statement that the antidegradation policy is pertinent to the permit action must be included in the public notice for the permit application or amendment. If no degradation is anticipated, the public notice must so state.

(E) Evidence can be introduced in public hearings, or through the public comment process, concerning the determination of existing uses and criteria; the assessment of degradation under Tier 1, Tier 2, and Tier 3; the social and economic justification for lowering water quality; requirements and conditions necessary to preclude degradation; and any other issues that bear upon the implementation of the antidegradation policy.

(F) Interested parties are given the opportunity to provide comments and additional information concerning the determination of existing uses, anticipated impacts of the discharge, baseline conditions, and the necessity of the discharge for important economic or social development if degradation of water quality is expected under Tier 2.

(G) The antidegradation policy and the general provisions for implementing the antidegradation policy apply to the determination of TMDLs and to waste load evaluations that allow an increase in loading. If the TMDL or waste load evaluation indicates that degradation of waters exceeding fishable/swimmable quality is expected, the public hearing notice must so state. Permits that are consistent with an approved TMDL or waste load evaluation under this antidegradation policy are not subjected to a separate antidegradation review for the specific parameters that are addressed by the TMDL or waste load evaluation.

**Credits**
**Source:** The provisions of this §307.5 adopted to be effective July 10, 1991, 16 TexReg 3400; amended to be effective July 13, 1995, 20 TexReg 4701; amended to be effective August 17, 2000, 25 TexReg 7722; amended to be effective July 22, 2010, 35 TexReg 6294.

Current through 50 Tex.Reg. No. 802, dated February 7, 2025, as effective on or before February 14, 2025. Some sections may be more current. See credits for details.

30 TAC § 307.5, 30 TX ADC § 307.5

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Texas Administrative Code
   Title 30. Environmental Quality
      Part 1. Texas Commission on Environmental Quality
         Chapter 309. Domestic Wastewater Effluent Limitation and Plant Siting
            Subchapter B. Location Standards

30 TAC § 309.11

§ 309.11. Definitions

Currentness

The following words and terms, when used in this subchapter, shall have the following meanings, unless the context clearly indicates otherwise.

(1) Active geologic processes--Any natural process which alters the surface and/or subsurface of the earth, including, but not limited to, erosion (including shoreline erosion along the coast), submergence, subsidence, faulting, karst formation, flooding in alluvial flood wash zones, meandering river bank cutting, and earthquakes.

(2) Aquifer--A geologic formation, group of formations, or part of a formation capable of yielding a significant amount of groundwater to wells or springs. Portions of formations, such as clay beds, which are not capable of yielding a significant amount of groundwater to wells or springs are not aquifers.

(3) Erosion--The group of natural processes, including weathering, deterioration, detachment, dissolution, abrasion, corrosion, wearing away, and transportation, by which earthen or rock material is removed from any part of the earth's surface.

(4) Existing facility--Any facility used for the storage, processing, or application of domestic wastewater and which has obtained approval of construction plans and specifications as of March 1, 1990.

(5) New facility--Any domestic wastewater treatment facility which is not an existing facility.

(6) Nuisance odor prevention--The reduction, treatment, and dispersal of potential odor conditions that interfere with another's use and enjoyment of property that are caused by or generated from a wastewater treatment plant unit, which conditions cannot be prevented by normal operation and maintenance procedures of the wastewater treatment unit.

(7) One hundred-year flood plain--Any land area which is subject to a 1.0% or greater chance of flooding in any given year from any source.

(8) Substantial change in the function or use--An increase in the pollutant load or modification in the existing purpose of the unit.

(9) Wastewater treatment plant unit--Any apparatus necessary for the purpose of providing treatment of wastewater (i.e., aeration basins, splitter boxes, bar screens, sludge drying beds, clarifiers, overland flow sites, treatment ponds or basins that contain wastewater, etc.). For purposes of compliance with the requirements of §309.13(e) of this title (relating to Unsuitable Site Characteristics), this definition does not include off-site bar screens, off-site lift stations, flow metering equipment, or post-aeration structures needed to meet permitted effluent minimum dissolved oxygen limitations.

(10) Wetlands--Those areas that are inundated or saturated by surface water or groundwater at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs, playa lakes, and similar areas.

**Credits**
**Source:** The provisions of this §309.11 adopted to be effective March 19, 1990, 15 TexReg 1160; amended to be effective June 5, 1998, 23 TexReg 5723; amended to be effective January 9, 2020, 45 TexReg 370.

Current through 50 Tex.Reg. No. 802, dated February 7, 2025, as effective on or before February 14, 2025. Some sections may be more current. See credits for details.

30 TAC § 309.11, 30 TX ADC § 309.11

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Texas Administrative Code
　Title 30. Environmental Quality
　　Part 1. Texas Commission on Environmental Quality
　　　Chapter 309. Domestic Wastewater Effluent Limitation and Plant Siting
　　　　Subchapter B. Location Standards

30 TAC § 309.13

§ 309.13. Unsuitable Site Characteristics

Currentness

(a) A wastewater treatment plant unit may not be located in the 100-year flood plain unless the plant unit is protected from inundation and damage that may occur during that flood event.

(b) A wastewater treatment plant unit may not be located in wetlands. (This prohibition is not applicable to constructed wetlands.)

(c) A wastewater treatment plant unit may not be located closer than 500 feet from a public water well as provided by §290.41(c)(1)(B) of this title (relating to Water Sources) nor 250 feet from a private water well. The following separation distances apply to any facility used for the storage, processing, or application of domestic wastewater. Exceptions to these requirements will be considered at the request of a permit applicant on a case-by-case basis, and alternative provisions will be established in a permit if the alternative condition provides adequate protection to potable water sources and supplies.

(1) A wastewater treatment plant unit, or land where irrigation using wastewater effluent occurs must be located a minimum horizontal distance of 150 feet from a private water well.

(2) A wastewater treatment plant unit, or land where irrigation using wastewater effluent occurs, must be located a minimum horizontal distance of 500 feet from an elevated or ground potable-water storage tank as provided by §290.43(b)(1) of this title (relating to Water Storage).

(3) A wastewater treatment plant unit, or land where irrigation using wastewater effluent occurs, must be located a minimum horizontal distance of 500 feet from a public water well site as provided by §290.41(c)(1)(C) of this title, spring, or other similar sources of public drinking water.

(4) A wet well or pump station at a wastewater treatment facility must be located a minimum horizontal distance of 300 feet from a public water well site, spring, or other similar sources of public drinking water as provided by §290.41(c)(1)(B) of this title.

(5) A wastewater treatment plant unit, or land where irrigation using wastewater effluent occurs, must be located a minimum horizontal distance of 500 feet from a surface water treatment plant as provided by §290.42(a)(2)(A) of this title (relating to Water Treatment).

(d) A wastewater treatment facility surface impoundment may not be located in areas overlying the recharge zones of major or minor aquifers, as defined by the Texas Water Development Board, unless the aquifer is separated from the base of the containment structure by a minimum of three feet of material with a hydraulic conductivity toward the aquifer not greater than $10^{-7}$ cm/sec or a thicker interval of more permeable material which provides equivalent or greater retardation of pollutant migration. A synthetic membrane liner may be substituted with a minimum of 40 mils thickness and an underground leak detection system with appropriate sampling points.

(e) One of the following alternatives must be met as a compliance requirement to abate and control a nuisance of odor prior to construction of a new wastewater treatment plant unit, or substantial change in the function or use of an existing wastewater treatment unit.

(1) Lagoons with zones of anaerobic activity (e.g., facultative lagoons, un-aerated equalization basins, etc.) may not be located closer than 500 feet to the nearest property line. All other wastewater treatment plant units may not be located closer than 150 feet to the nearest property line. Land used to treat primary effluent is considered a plant unit. Buffer zones for land used to dispose of treated effluent by irrigation shall be evaluated on a case-by-case basis. The permittee must hold legal title or have other sufficient property interest to a contiguous tract of land necessary to meet the distance requirements specified in this paragraph during the time effluent is disposed by irrigation.

(2) The applicant must submit a nuisance odor prevention request for approval by the executive director. A request for nuisance odor prevention must be in the form of an engineering report, prepared and sealed by a licensed Texas professional engineer in support of the request. At a minimum, the engineering report shall address existing climatological conditions such as wind velocity and atmospheric stability, surrounding land use which exists or which is anticipated in the future, wastewater characteristics in affected units pertaining to the area of the buffer zone, potential odor generating units, and proposed solutions to prevent nuisance conditions at the edge of the buffer zone and beyond. Proposed solutions shall be supported by actual test data or appropriate calculations. The request shall be submitted, prior to construction, either with a permit application and subject to review during the permitting process or submitted for executive director approval after the permitting process is completed.

(3) The permittee must submit sufficient evidence of legal restrictions prohibiting residential structures within the part of the buffer zone not owned by the applicant. Sufficient evidence of legal restriction may, among others, take the form of a suitable restrictive easement, right-of-way, covenant, deed restriction, deed recorded, or a private agreement provided as a certified copy of the original document. The request shall be submitted, prior to construction, either with a permit application and subject to review during the permitting process or submitted for executive director approval after the permitting process is completed.

(f) For a facility for which a permit application, other than a renewal application, is made after October 8, 1990, if the facility will not meet the buffer zone requirement by one of the alternatives described in subsection (e) of this section, the applicant shall include in the application for the discharge permit a request for a variance. A variance will be considered on a case-by-case basis and, if granted by the commission, shall be included as a condition in the permit. This variance may be granted by the commission, consistent with the policies set out in Texas Water Code, §26.003.

(g) Any approved alternative for achieving the requirements of this section must remain in effect as long as the wastewater treatment plant is permitted by the commission. To comply with this requirement, the permittee must carry out the nuisance

odor prevention plan at all times, shall ensure sufficient property ownership or interest and shall maintain easements prohibiting residential structures, as appropriate.

(h) For a permitted facility undergoing renewal of an existing permit with plans and specifications approved prior to March 1, 1990, for which no design change is requested, the facility will not be required to comply with the requirements of this section.

(i) Facilities for which plans and specifications have been approved prior to March 1, 1990, are not required to resubmit revised plans and specifications to meet changed requirements in this section in obtaining renewal of an existing permit.

**Credits**
**Source:** The provisions of this §309.13 adopted to be effective March 19, 1990, 15 TexReg 1160; amended to be effective October 8, 1990, 15 TexReg 5500; amended to be effective June 5, 1998, 23 TexReg 5723; amended to be effective January 9, 2020, 45 TexReg 370.

Current through 50 Tex.Reg. No. 802, dated February 7, 2025, as effective on or before February 14, 2025. Some sections may be more current. See credits for details.

30 TAC § 309.13, 30 TX ADC § 309.13

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

<div style="border">

Texas Administrative Code

  Title 30. Environmental Quality

    Part 1. Texas Commission on Environmental Quality

      Chapter 319. General Regulations Incorporated into Permits

      Subchapter A. Monitoring and Reporting System

</div>

30 TAC § 319.9

§ 319.9. Self-Monitoring Frequency

Currentness

(a) The following table sets forth the self-monitoring schedules applicable to treated domestic sewage effluent.

Figure: 30 TAC §319.9(a)

Figure: 30 TAC §319.9(a)

## Table 1

### MEASUREMENT FREQUENCY FOR TREATED DOMESTIC SEWAGE EFFLUENT
(Based on Permitted Daily Average Flow)

| Parameter | 0 to less than 0.50 MGD | 0.50 to less than 1.00 MGD | 1.00 to less than 5.00 MGD | 5.00 to less than 10.00 | 10.00 MGD or greater |
|---|---|---|---|---|---|
| Flow | One instantaneous measurement each working day but not less than five measurements per week. (b) (c) | The daily flow measured by a totalizing meter. | The daily flow measured by a totalizing meter. | The daily flow measured by a totalizing meter. | The daily flow measured by a totalizing meter. |
| Five-Day Biochemical Oxygen Demand | One each week | One each week | Two each week | One each weekday (a) | One each day of the week |
| Total Suspended Solids | One each week | One each week | Two each week | One each weekday (a) | One each day of the week |
| Chlorine Residual | One each working day but not less than five measurements per week (c) | One each day of the week | One each day of the week | One each day of the week | One each day of the week |
| pH | One each month | Two each month | One each week | One each weekday (a) | One each day of the week |
| Sample Collection | grab sample collected at peak loading periods    flow measurements shall be taken concurrently with such grab samples. (d) | pH and chlorine residual test are grab samples or *in situ*    all others are composite sample proportioned according to flow, made up of three portions collected no closer | The laboratory tests, except the pH and chlorine residual test which are performed on grab sample or *in situ*, shall be made on a composite sample proportioned according to flow, made up of six | The laboratory tests, except the pH and chlorine residual test which are performed on grab samples or *in situ*, shall be made on 24-hour composite samples proportioned according to flow | The laboratory tests, except the pH and the chlorine residual test which are performed on grab samples or *in situ*, shall be made on 24-hour composite samples proportioned according to flow |

| Parameter | 0 to less than 0.50 MGD | 0.50 to less than 1.00 MGD | 1.00 to less than 5.00 MGD | 5.00 to less than 10.00 | 10.00 MGD or greater |
|---|---|---|---|---|---|
| | | together than 2 hours and with the first sample collected no earlier than 10:00 a.m. | portions collected no closer together than 2 hours and with the first sample collected no earlier than 10:00 a.m. | collected no closer together than 2 hours in 12 individual portions. | collected no closer together than 2 hours in 12 individual portions. |

(a) Weekday is Monday through Friday.
(b) Where a totalizing meter is provided, the actual volume of water which has been processed each day should be determined and reported.
(c) Working Day is a day when the plant is visited for routine work.
(d) Peak loading period - that time during the calendar day when the maximum flow rate is experienced within the facility.

(b) The following table sets forth the bacteria self-monitoring schedules applicable to treated domestic sewage effluent that is discharged to water in the state.

Figure: 30 TAC §319.9(b)

Figure: 30 TAC §319.9(b)

Table 2
MEASUREMENT FREQUENCY FOR BACTERIA

| Permitted Daily Average Flow (mgd) | Chlorine Systems | Ultraviolet Systems | Natural Systems |
|---|---|---|---|
| >10 | 5/week | Daily | Daily |
| >5-10 | 3/week | Daily | 5/week |
| >1-5 | 1/week | Daily | 3/week |
| >0.5-1.0 | 2/month | Daily | 1/week |
| 0.1-0.5 | 1/month | 5/week | 2/month |
| <0.1 | 1/quarter | 5/week | 1/month |

(1) Sampling must be spaced across the time period at approximately equal intervals, with the exception of the five times per week sampling schedule. Five samples per week must be taken one on each of five days during a seven-day period.

(2) A permittee that has at least 12 months of uninterrupted compliance with its bacteria limit may notify the commission of its compliance and request a less frequent measurement schedule.

(A) If the commission finds that a less frequent measurement schedule is protective of human health and the environment, the permittee will be given a less frequent measurement schedule. Daily will drop to five/week, five/week to three/week, three/week to one/week, one/week to two/month, two/month to one/month, one/month to one/quarter, and one/quarter to one/six months.

(B) A violation of the bacteria limit by a facility that has been granted a less frequent measurement schedule will require the permittee to return to the standard frequency schedule.

(C) A permittee that has had a violation while on a less frequent measurement schedule may not apply for another reduction in measurement frequency for at least 24 months from the last violation.

(3) A chemical system other than chlorine will be required to comply with the ultraviolet frequency schedule.

(4) The executive director may establish a more frequent measurement schedule if necessary to protect human health or the environment.

(c) The following table sets forth the self-monitoring schedules applicable to nondomestic wastewater effluent.

Figure: 30 TAC §319.9(c)

Figure: 30 TAC §319.9(c)

## Table 3
### MEASUREMENT FREQUENCY FOR NONDOMESTIC WASTEWATER EFFLUENT
(Based on Permitted Daily Average Flow)

| Parameter | 0 to less than 0.05 MGD | 0.05 to less than 0.50 MGD | 0.50 to less than 2.00 MGD | 2.00 to less than 10.00 MGD | 10.00 MGD or greater |
|---|---|---|---|---|---|
| Flow | One instantaneous measurement per operating day except on sample days when 3 instantaneous measurements made concurrently with the collection of sample portions are required. | One instantaneous measurement per operating shift - on sample days concurrent with the collection of a sample portion. | One instantaneous measurement per operating shift - on sample days concurrent with the collection of a sample portion or the reading from a totalizing flow meter. | Six instantaneous measurements per day spaced at equal intervals during the operating period or the reading from a totalizing flow meter. | Instantaneous measurements made each operating hour or the reading from a totalizing flow meter. |
| pH (a) | 1 per day | 1 per day | 1 per day | 1 per day | 1 per day |
| Temperature (b) | 1 per day | 3 per day | 3 per day | 6 per day | 12 per day |
| BOD₅ | 1 per week | 2 per week | 2 per week | 3 per week | 1 per day |
| COD | 1 per week | 2 per week | 2 per week | 3 per week | 1 per day |
| TOC | 1 per week | 2 per week | 2 per week | 3 per week | 1 per day |
| Oil & Grease (c) | 1 per week | 2 per week | 2 per week | 3 per week | 1 per day |
| Ammonia Nitrogen | 1 per week | 2 per week | 2 per week | 3 per week | 1 per day |
| Arsenic | 1 per week | 2 per week | 2 per week | 3 per week | 1 per day |
| Barium | 1 per week | 2 per week | 2 per week | 3 per week | 1 per day |
| Boron | 1 per week | 2 per week | 2 per week | 3 per week | 1 per day |
| Cadmium | 1 per week | 2 per week | 2 per week | 3 per week | 1 per day |
| Chromium | 1 per week | 2 per week | 2 per week | 3 per week | 1 per day |
| Copper | 1 per week | 2 per week | 2 per week | 3 per week | 1 per day |
| Lead | 1 per week | 2 per week | 2 per week | 3 per week | 1 per day |
| Manganese | 1 per week | 2 per week | 2 per week | 3 per week | 1 per day |
| Mercury | 1 per week | 2 per week | 2 per week | 3 per week | 1 per day |
| Nickel | 1 per week | 2 per week | 2 per week | 3 per week | 1 per day |
| Selenium | 1 per week | 2 per week | 2 per week | 3 per week | 1 per day |
| Silver | 1 per week | 2 per week | 2 per week | 3 per week | 1 per day |
| Zinc | 1 per week | 2 per week | 2 per week | 3 per week | 1 per day |
| TSS | 1 per week | 2 per week | 2 per week | 3 per week | 1 per day |
| TDS | 1 per week | 2 per week | 2 per week | 3 per week | 1 per day |
| Chloride | 1 per week | 2 per week | 2 per week | 3 per week | 1 per day |
| Sulphate | 1 per week | 2 per week | 2 per week | 3 per week | 1 per day |
| Nitrate Nitrogen | 1 per week | 2 per week | 2 per week | 3 per week | 1 per day |
| Sulfide (c) | 1 per week | 2 per week | 2 per week | 3 per week | 1 per day |

| Phenol (c) | 1 per week | 2 per week | 2 per week | 3 per week | 1 per day |
|---|---|---|---|---|---|
| Collection of Samples | Samples shall be composite samples made up of three portions, sized proportional to flow, collected no closer together than one hour and over a span of time not exceeding 24 hours. | Samples shall be composite samples made up of three portions, sized proportional to flow, one portion being collected during each operating shift or otherwise suitably distributed throughout the operating day. | Samples shall be composite samples made up of three portions, sized proportional to flow, one portion being collected during each operating shift or otherwise suitably distributed throughout the operating day. | Samples shall be composite samples made up of six portions, sized proportional to flow, collected concurrently with the instantaneous flow measurements made during a 24-hour time span. | Samples shall be 24-hour composite samples collected in 12 or more individual portions, sized proportional to flow, equally spaced throughout the operating day. |

Where:

(a) The required laboratory tests shall be made on grab samples and analyzed immediately after collection or analyzed *in situ* at the permit sampling point.

(b) The temperature shall be measured *in situ* on the water at the permit sampling point.

(c) The required laboratory tests shall be made on grab samples.

**Credits**

**Source:** The provisions of this §319.9 adopted to be effective July 27, 1988, 13 TexReg 3514; amended to be effective August 15, 2002, 27 TexReg 7166; amended to be effective November 26, 2009, 34 TexReg 8332; amended to be effective November 12, 2020, 45 TexReg 8000.

Current through 50 Tex.Reg. No. 802, dated February 7, 2025, as effective on or before February 14, 2025. Some sections may be more current. See credits for details.

30 TAC § 319.9, 30 TX ADC § 319.9

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Appendix Item 8

Georgetown
Unified Development Code §§ 1.01, 13.05

## *SECTION 1.01. SHORT TITLE*

This Ordinance is hereby officially known and cited as the Unified Development Code of the City of Georgetown, Texas. References to "this Code," or "this UDC" shall be interpreted as references to this Unified Development Code. In the interpretation of provisions in this Code, certain terms and words are defined in Chapter 16 or, if not, resort to their customary usage and meaning. For the purposes of using this Code, words used or defined in one tense or form shall include other tenses and derivative forms, words in the singular number shall include the plural number and words in the plural number shall include the singular number. The word "shall" is mandatory. The word "may" is permissive. The word "City" means the City of Georgetown, Texas. In the case of any difference of meaning or implication between the text of this Code and any caption, number, illustration or table, the text shall control, unless otherwise specifically noted herein.

### Sec. 1.01.010. How to Use This Code.

A.  **If you need to subdivide or plat your land:**

    Whether you live inside or outside the city limits, you may not develop or disturb your land (see Section 16.02 for definition of "land disturbance") until you have properly subdivided or platted your parcel. The procedures that you will need to follow are described in Section 3.08.

B.  **If you want to build or establish a particular use on your property:**

    1.  **Step One:** You should first determine what kind of use you desire to establish. You can usually determine the use by referencing the use categories and specific uses found in Chapter 5. Refer to the definitions of the specific uses in Chapter 5 to help you determine the use that best describes what you want to establish.

    2.  **Step Two:** You should next determine the zoning district (and any overlay districts) that applies to your property. The official zoning map, available at the Planning and Development Office, depicts the zoning designation for every parcel of land in the City limits of Georgetown. If your property is not in the City limits, no zoning designations or requirements apply, but some development standards and requirements do apply. Read Section 3.01.020 to identify which applications or permits you must acquire before you build.

    3.  **Step Three:** For properties in the City limits, locate the use tables in Chapter 5. Find the row that lists the specific use you are interested in. Match this row to your zoning district designation (across the top of the table) to determine whether the use you want to establish is permitted in the district.

    4.  **Step Four:** If your use is permitted, you must get the appropriate applications approved (see Chapter 3) and comply with the applicable development standards of this Code before building the structure or establishing the use.

    These requirements are intended to help you and the City ensure that your project is legally established and that it matches the development vision that the City of Georgetown, as a community, desires.

C.  **If you own or lease property and want to know what rules apply:**

    Follow steps two through four above, to identify your zoning district and the permitted uses. You can find the specific details for the uses in your zoning district in Chapter 5 and the definitions found in Chapter 16. You can also find the various development standards that apply to your property in Chapters 6 through 12.

D.  **If you want to change your Zoning District:**

Georgetown, Texas, Unified Development Code
(Supp. No. 12)

Created: 2024-03-05 10:41:28 [EST]

Page 1 of 2

Only the City Council may rezone property, following public notice and hearings at meetings of the Planning and Zoning Commission and the City Council. See Section 3.03 for public notice requirements and 3.06 for Rezoning requirements.

## Sec. 1.01.020. Purpose and Intent.

This Unified Development Code is adopted for the purpose of promoting the public health, safety and general welfare of the present and future citizens of the City of Georgetown and promoting the safe orderly and healthful development of the City of Georgetown. The City of Georgetown's Comprehensive Plan is the fundamental guide to all decisions made under this Code. In order to implement the broad goals of the plan, this Code regulates land development in order to achieve objectives of the plan that include, but are not limited to, the following:

A.   Lessen congestion in the streets;

B.   Secure safety from fire, panic and other dangers;

C.   Promote health and general welfare;

D.   Provide adequate light and air;

E.   Prevent the overcrowding of land;

F.   Avoid concentration of population;

G.   Promote the beneficial and appropriate development of all land and the most desirable use of land in accordance with a well-considered plan;

H.   Protect the character and the established pattern of desirable development in each area;

I.   Prevent or minimize land use incompatibilities and conflicts among different land uses;

J.   Facilitate adequate provision of transportation, water, sewerage, parks and other public requirements;

K.   Facilitate erosion protection and water pollution management by reducing stormwater runoff;

L.   Maintain property values by stabilizing expectations and ensuring predictability in development; and

M.   Establish a process that effectively and fairly applies the regulations and standards of this Code and respects the rights of property owners and the interests of citizens.

## *SECTION 13.05. PUBLIC WASTEWATER STANDARDS*

All development, where desired or required, shall be served with an approved public wastewater system, including but not limited to, wastewater lines, manholes, force mains, and lift stations, consistent with the Comprehensive Plan. Properties in the ETJ that desire or require wastewater service from the City of Georgetown shall first submit a petition for voluntary annexation, in accordance with Section 3.25 of this Code. All improvements shall be designed and constructed according to the City's Construction Manual.

A.  Where an approved public wastewater collection main or outfall line is less than one-half mile from the property boundary, connection to the public wastewater system shall be required and a public wastewater collection system shall be installed throughout the development.

B.  Extension of wastewater utilities shall conform to the City's adopted Utility Extension and Improvement Policy, as amended.

C.  The developer shall be responsible for the cost of extension and connection to the existing wastewater collection system.

D.  The wastewater gravity main pipe size for wastewater improvements shall be a minimum diameter of eight inches.

E.  The design and construction of all wastewater systems shall comply with regulations covering extension of public sanitary wastewater systems adopted by the Texas Commission on Environmental Quality.

F.  All wastewater systems shall be designed and constructed to operate on a gravity flow basis. In extraordinary circumstances and with the approval of the Development Engineer, lots one acre and greater may design a low-pressure, vacuum, or gravity flow system to minimize the need for lift stations.

G.  Where an approved wastewater collection main or outfall line is more than one-half mile away from the property boundary, on-site septic system(s) may be utilized; however, if the City's Capital Improvement Plan has scheduled the extension of a wastewater collection main or outfall line to be completed to a location point within one-half mile away from the property boundary within five years from the date of the Preliminary Plat submittal, connection to the public wastewater system is required. In such instance, the subdivider shall be required to install a public wastewater collection system and shall bear the cost of connecting to such existing wastewater collection system. A subdivider may request an exception or alternative to this requirement, which shall be considered by the Development Engineer or their designee. An appeal of the decision made by the Development Engineer in this regard shall be heard by the City Council.

H.  Improvements required through the Water Services Master Plan shall be designed and installed in accordance with Section 13.08 of this Code.

(Ord. No. 2017-15, § 2, 2-28-2017)

Georgetown, Texas, Unified Development Code
(Supp. No. 12)

Created: 2024-03-05 10:41:55 [EST]

Page 1 of 1

# Appendix Item 9

TCEQ Regionalization Guidance Webpage


TEXAS COMMISSION ON ENVIRONMENTAL QUALITY
(https://www.tceq.texas.gov)

Home (https://www.tceq.texas.gov) / Permits, Registrations, and Reporting (https://www.tceq.texas.gov/permitting) /
Wastewater Treatment (https://www.tceq.texas.gov/permitting/wastewater) / TCEQ Regionalization Policy for Wastewater
Treatment

# TCEQ Regionalization Policy for Wastewater Treatment

**Information for applicants and the public about the requirements associated with regionalization and TCEQ's role in reviewing domestic wastewater permit applications.**

**On this page:**

- **What is wastewater regionalization?**
- **When does TCEQ assess for wastewater regionalization?**
- **How has TCEQ decided on wastewater regionalization in the past?**
- **What do I need to provide as an applicant, for TCEQ to assess the need and availability of regionalization during the wastewater permitting process?**
- **How can the public participate in the wastewater permitting process?**

## What is wastewater regionalization?

Regionalization is the administrative or physical combination of two or more community wastewater systems for improved planning operation or management.

Texas Water Code (TWC) Section 26.081 provides Texas' regionalization policy for wastewater treatment. It states that TCEQ is to implement a policy to "encourage and promote the development and use of regional and area-wide waste collection, treatment, and disposal systems to serve the waste disposal needs of the citizens of the state and to prevent pollution and maintain and enhance the quality of the water in the state".

In furtherance of that policy TWC Section 26.0282 authorizes TCEQ, when considering issuing a permit to discharge waste, to deny or alter the terms and conditions of a proposed permit based on need and the availability of existing or proposed area-wide or regional waste collection, treatment, and disposal systems.

 **Back to top**

## When does TCEQ assess for wastewater regionalization?

TCEQ will assess for the need and availability of regionalization for wastewater during the permitting process. The presence of a wastewater treatment facility or wastewater collection system within three miles of a proposed new wastewater treatment facility or the expansion of an existing facility is <u>not</u> an automatic basis to deny an application or to compel an applicant to connect to an existing facility.

TCEQ may approve new, renewal, and major amendment applications for discharges of wastewater in any of the following situations where:

- There is no wastewater treatment facility or collection system within three miles of the proposed facility.

**AIRW-EXH. 28**
AIRW000382

- The applicant requested service from wastewater treatment facilities within the 3 miles, and the request was denied.
- The applicant can successfully demonstrate that an exception to regionalization should be granted based on costs, affordable rates, and/or other relevant factors.
- The applicant has obtained a Certificate of Convenience and Necessity (CCN) for the service area of the proposed new facility or the proposed expansion of the existing facility.

🔺 **Back to top**

## How has TCEQ decided on wastewater regionalization in the past?

TCEQ has not denied any wastewater permit actions based solely on regionalization, and the agency supports new applicants and existing facilities productively working together to provide quality and cost-effective service. The following concerns related to regionalization were raised during previous wastewater permit actions and subsequent legal proceedings:

- lack of timely and cost-efficient wastewater services within the surrounding area
- lack of detailed cost analysis and comparison
- lack of thorough communication with existing facilities within a three-mile radius
- discharges within the Cibolo Creek Watershed per Title 30 , Texas Administrative Code (30 TAC), Section 351.65

TCEQ has previously included agreed language between the applicant and protestants in the "Other Requirements" section of the proposed permit that contains requirements about future coordination if the existing wastewater provider is able to provide service to proposed area.

🔺 **Back to top**

## What do I need to provide as an applicant, for TCEQ to assess the need and availability of regionalization during the wastewater permitting process?

TCEQ requires that you include justification of permit need in all wastewater permit applications for new facilities and all applications to amend an existing permit. Section 1.1 of the Domestic Technical Report for wastewater permit applications also requires the following information:

1. Determine whether or not there are any permitted domestic wastewater treatment facilities or collection systems within a three-mile radius of the proposed facility.
   - Tools to use:
     - **Wastewater Outfall Map Viewer** 🔗 **(https://tceq.maps.arcgis.com/apps/webappviewer/index.html? id=d47b9419f42c49dea592203aeda99da1)**
     - **PUC CCN Map Viewer** 🔗 **(https://www.puc.texas.gov/industry/water/utilities/map.aspx)**
2. Contact any existing permitted domestic wastewater treatment facilities within a three-mile radius to inquire if they currently have the capacity to accept or are willing to expand to accept the volume of wastewater proposed.
   - If an existing facility does have the capacity to accept the proposed wastewater, submit an analysis of expenditures required to connect to the existing facility or collection system versus the cost of constructing and operating the proposed new facility or expansion.
3. Provide copies of all correspondence with the owners and/or operators of any existing permitted domestic wastewater treatment facilities and collection systems within a three-mile radius of the proposed facility.

🔺 **Back to top**

**AIRW-EXH. 28**

AIRW000383

## How can the public participate in the wastewater permitting process?

- **Environmental Permitting: Participating in the Process (/agency/decisions/participation/permitting-participation)**
- **Permits for Municipal Wastewater Treatment Plants: Learning More (/agency/decisions/participation/permitting-participation/municipal-wastewater)**

▲ **Back to top**

**AIRW-EXH. 28**

AIRW000384

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Colton Halter on behalf of Sara Ferris
Bar No. 50511915
colton.halter@oag.texas.gov
Envelope ID: 101129721
Filing Code Description: Brief Requesting Oral Argument
Filing Description: Brief of Appellant TCEQ
Status as of 5/21/2025 6:28 PM CST

Associated Case Party: City of Georgetown

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Patricia Carls | 3813425 | tcarls@tcarlslaw.com | 5/21/2025 4:41:47 PM | SENT |
| Carlota Hopinks-Baul | 24094039 | chbaul@spencerfane.com | 5/21/2025 4:41:47 PM | SENT |
| Maris Chambers | | MChambers@spencerfane.com | 5/21/2025 4:41:47 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| William Thompson | 24088531 | will@lkcfirm.com | 5/21/2025 4:41:47 PM | SENT |
| Edmond McCarthy | 13367200 | ed@ermlawfirm.com | 5/21/2025 4:41:47 PM | SENT |
| William Faulk | 24075674 | cfaulk@spencerfane.com | 5/21/2025 4:41:47 PM | SENT |
| John Carlton | 3817600 | john@carltonlawaustin.com | 5/21/2025 4:41:47 PM | SENT |
| Helen Gilbert | 786263 | hgilbert@bartonbensonjones.com | 5/21/2025 4:41:47 PM | SENT |
| Colton Halter | | colton.halter@oag.texas.gov | 5/21/2025 4:41:47 PM | SENT |
| Todd Disher | | todd@lkcfirm.com | 5/21/2025 4:41:47 PM | SENT |
| Kelli Carlton | | kelli@carltonlawfirm.com | 5/21/2025 4:41:47 PM | SENT |
| Erin Selvera | | erin@carltonlawfirm.com | 5/21/2025 4:41:47 PM | SENT |
| Michael Parsons | 24079109 | michael@carltonlawaustin.com | 5/21/2025 4:41:47 PM | SENT |

Associated Case Party: Texas Commission on Environmental Quality

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Kellie E.Billings-Ray | | Kellie.Billings-Ray@oag.texas.gov | 5/21/2025 4:41:47 PM | SENT |
| Sara Ferris | | sara.ferris@oag.texas.gov | 5/21/2025 4:41:47 PM | SENT |

**Automated Certificate of eService**
This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Colton Halter on behalf of Sara Ferris
Bar No. 50511915
colton.halter@oag.texas.gov
Envelope ID: 101129721
Filing Code Description: Brief Requesting Oral Argument
Filing Description: Brief of Appellant TCEQ
Status as of 5/21/2025 6:28 PM CST

Associated Case Party: Texas Commission on Environmental Quality

| | | | | |
|---|---|---|---|---|
| Sara Ferris | | sara.ferris@oag.texas.gov | 5/21/2025 4:41:47 PM | SENT |
| Jennifer Jamison | | jennifer.jamison@tceq.texas.gov | 5/21/2025 4:41:47 PM | SENT |
| Bobby Salehi | | bobby.salehi@tceq.texas.gov | 5/21/2025 4:41:47 PM | SENT |
| Erin  K.Snody | | Erin.Snody@oag.texas.gov | 5/21/2025 4:41:47 PM | ERROR |

Associated Case Party: AIRW 2017-7, LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Andrew Davis | | andrew@lkcfirm.com | 5/21/2025 4:41:47 PM | SENT |

Associated Case Party: Jonah Water Special Utility District

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| John Carlton | | john@carltonlawfirm.com | 5/21/2025 4:41:47 PM | SENT |